## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| FULTON COUNTY COBB COUNTY, and DEKALB COUNTY, GEORGIA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.: |
| WELLS FARGO & CO., WELLS FARGO FINANCIAL, LLC, WELLS FARGO BANK, N.A., WELLS FARGO FINANCIAL GEORGIA, INC., and WELLS FARGO "John Doe" CORPS 1-375, | ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) ) | |

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................1

JURISDICTION & VENUE....................................................................12

PARTIES..................................................................................................13

    A.    Plaintiffs ................................................................................13

    B.    Defendants..............................................................................14

BACKGROUND FACTS.........................................................................19

    A.    The Federal Government Found Discrimination Was Pervasive in Subprime Mortgage Lending Beginning in 2003 and Continuing Through Early 2008 ........................................19

    B.    Congress Found that Predatory and Discriminatory Lending Caused the Foreclosure Crisis............................................25

    C.    The Predatory Non-Prime Mortgage Lending and Securitization Activities of Defendants and Other Industry Participants Led to the U.S. Financial Crisis......................................................34

    D.    The Foreclosure Crisis Has Disparately Impacted Minorities Nationwide ........................................................................39

DEFENDANTS' DISCRIMINATORY ACTIONS AND OTHER WRONGFUL CONDUCT.......................................................................43

    A.    Residential Mortgage-Backed Securities .............................43

    B.    Wells Fargo's Financial Motivations to Engage in Their Predatory and Discriminatory Conduct................................51

    C.    Wachovia's Financial Motivations to Engage in Its Predatory and Discriminatory Conduct ................................................63

D.    Defendants Knew, or Were Grossly Negligent or Reckless in Not Knowing, about the Predatory and Discriminatory Nature of Their Conduct ...................................................................................67

E.    Defendants Focused their Discriminatory Conduct on Ethnic Minorities for Non-Prime Mortgage Loans Because Defendants Considered Them the Easiest Targets ...................................................84

F.    Wells Fargo Directly Targeted Minorities for Non-Prime Mortgage Loan Originations and Incentivized that Conduct Through its Employee Compensation Scheme and Quotas ...............86

G.    Wachovia Targeted its Pick-A-Pay Loan Originations to FHA Protected Minority Borrowers ...........................................................100

H.    Defendants' Discretionary Pricing Policies Enabled and Incentivized Predatory Non-Prime Mortgage Lending on a Discriminatory Basis Through Their Wholesale Lending and Broker Channels ..................................................................................104

I.    Defendants Lowered or Circumvented Their Underwriting Standards, Enabling Predatory Non-Prime Mortgage Loans to Be Made on a Discriminatory Basis ......................................................112

J.    Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory and Discriminatory ..........................................................124

K.    Empirical Data Evidences Defendants' Targeting of, and the Discriminatory Impact on, Minority Borrowers in Plaintiffs' Communities ...................................................................................137

      1.    Defendants' Minority Lending & Funding Activity in Fulton County ...................................................................................141

      2.    Defendants' Minority Lending & Funding Activity in Cobb County ...................................................................................144

      3.    Defendants' Minority Lending & Funding Activity in DeKalb County ...................................................................................147

L.    Defendants' Discriminatory Foreclosure Activity ............................ 150

      1.  Fulton County .................................................................... 151

      2.  Cobb County ..................................................................... 160

      3.  DeKalb County .................................................................. 168

M.    Defendants' Discrimination is Evidenced by the Concentration of Their Lending & Funding Activities in Plaintiffs' Neighborhoods with the Highest Foreclosure Risk ("HFR") - Plaintiffs' Higher Minority Neighborhoods ..................................... 177

      1.  Defendants' Lending & Funding Activities in Fulton County's HFR Areas .................................................................... 179

      2.  Defendants' Lending & Funding Activities in Cobb County's HFR Areas .................................................................... 181

      3.  Defendants' Lending & Funding Activities in DeKalb County's HFR Areas .................................................................... 182

      4.  Defendants' Discriminatory Foreclosures in Plaintiffs Counties ......................................................................... 184

N.    The Full Extent of Defendants' Discriminatory Housing Practices Are Concealed Through Defendants' Underreporting of Minority Status in HMDA Data and Through MERS® .............. 191

DEFENDANTS' PREDATORY AND DISCRIMINATORY MORTGAGE LENDING, SERVICING, AND FORECLOSURE PRACTICES HAVE HARMED PLAINTIFFS ............................................................................. 196

A.    Tax-Base Related Damages ............................................................ 209

B.    Lost Municipal Income Related Damages ....................................... 217

C.    Foreclosure Processing-Related Damages ....................................... 219

D.    Non-Monetary Damages ................................................................ 222

WELLS FARGO IS LIABLE FOR THE ACTS OF WACHOVIA AS A
RESULT OF ITS MERGER WITH WACHOVIA ...............................................224

CAUSES OF ACTION ......................................................................................226

COUNT I: Violation of Fair Housing Act  42 U.S.C. §§ 3601-31  Defendants'
  Equity Stripping Scheme Based on Facially Neutral Loan Origination,
  Servicing & Foreclosure Policies and Practices Resulted in Disparate
  Impact in Minority Neighborhoods ..............................................226

COUNT II: Violation of Fair Housing Act   42 U.S.C. §§ 3601-31
  Defendants' Facially Neutral Mortgage Servicing and Foreclosure
  Practices Resulted in Disparate Impacts in Minority Neighborhoods ........230

COUNT III: Violation of Federal Fair Housing Act  42 U.S.C. §§ 3601-31
  Defendants' Discriminatory Equity Stripping Scheme Was Intentional
  and Constitutes Disparate Treatment...........................................235

DEMAND FOR JURY TRIAL ...........................................................................239

PRAYER FOR RELIEF .....................................................................................239

**INTRODUCTION**

1.      Plaintiffs Fulton County, Cobb County, and DeKalb County bring this action pursuant to the civil enforcement provision of the Fair Housing Act, 42 U.S.C. §§ 3601-31, 3613 ("FHA"), which protects communities (and the individuals residing in them) from discriminatory acts, policies, and/or practices that make housing unavailable or establish terms and conditions in real estate-related transactions, including real estate financing activities, that discriminate on the basis of race or ethnicity.

2.      The FHA has a broad remedial purpose and defines an "aggrieved person" as "any person" who "claims to have been injured" or "believes [they] will be injured by a discriminatory housing practice that is about to occur." To effectuate its broad remedial purpose, the FHA provides a broad range of remedies, including injunctive relief, actual damages, and punitive damages when a court finds that an aggrieved person has been injured by a discriminatory housing practice that has "occurred or is about to occur."

3.      Plaintiffs seek injunctive relief to remedy, and monetary damages for, Defendants' predatory and discriminatory residential mortgage lending and servicing activities that have resulted in — and will continue to cause — unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures,

and/or home vacancies in Plaintiffs' communities and neighborhoods, particularly those communities with high percentages of FHA protected minority residents. Indeed, Wells Fargo's Chief Executive Officer, Charles Scharf, effectively admitted in his testimony before Congress the accuracy of the conclusions in the Majority Staff Report entitled "The Real Wells Fargo: Board & Management Failures, Consumer Abuses, And Ineffective Regulatory Oversight Report Prepared by the Majority Staff of the Committee on Financial Services, U.S. House of Representatives" (March 2020) ("Report"), available at https://financialservices.house.gov/uploadedfiles/wells_fargo_staff_report_final_mm.pdf) that:

- "For at least the past fifteen years, one of America's largest financial institutions, Wells Fargo (i.e., Wells Fargo Bank, N.A. and Wells Fargo & Company, collectively), has failed to correct serious deficiencies in its infrastructure for managing risks to consumers and complying with the law. As a result, Wells Fargo's customers have been exposed to countless abuses, including racial discrimination, wrongful foreclosure, illegal vehicle repossession, and fraudulently opened accounts." (Report at 4);

- "[D]uring the 2008 financial crisis, unchecked predatory banking practices at Wells Fargo … and regulators' inability to rein in such practices, harmed millions of consumers and contributed to the near collapses of the global economy." (Report at 12 citing 2012 DOJ/WF settlement).

- "The following list of [DOJ] and financial regulators' findings provide a mere snapshot of the consumer abuses resulting from Wells Fargo's critically deficiency compliance and risk management infractures:

*Discrimination against minority home loan borrowers: From 2004 through 2009, Wells Fargo Bank 'engaged in a pattern or practice of discrimination' by 'systematically' charging African-American and Hispanic borrowers higher fees and rates than similarly qualified white borrowers." (Report at 12-13 citing 2012 DOJ/WF settlement).

- "The Federal Reserve noted the similarities between the root causes of the 2016 sales fraud scandal at Wells Fargo Bank, and other sales practices issues Reserve enforcement action against Wells Fargo Financial, a former non-bank subsidiary of WFC:  The root causes of the sales practice issue (poorly administered incentive compensation structures that produce high sales pressure and contribute to inappropriate employee behavior) are extremely similar to the root causes of issues that the [Federal Reserve] identified almost 10 years ago in Wells Fargo Financial, Inc., which led to the July 2011 consent order (i.e., poorly administered incentive compensation structures that led employees to steer customers into subprime loans and falsify income in order to support unaffordable loans)."  (Report at 27-28);

*See* March 10, 2020 testimony of Charles Scharf before House Financial Services Committee.[1] Moreover, there have been admissions and widespread media reports of recent statements by Wells Fargo executives, including CEO Scharf, acknowledging racial bias within Wells Fargo.[2]

---

[1] *See* https://financialservices.house.gov/uploadedfiles/chrg16hhrg42866.pdf.

[2] *See, e.g.*, https://enterprise.vnews.com/2020/10/15/we-need-to-do-more-seven-high-ranking-black-women-leave-wells-fargo/("Enterprise"); https://www.cbsnews.com/news/wells-fargo-ceo-black-talent-limited/ (Wells Fargo CEO Scharf apologizes for blaming lack of diversity on "limited pool of Black talent", "Scharf called his earlier statements, which he made in an email to workers in mid-June and then repeated on an employee Zoom call this summer, 'insensitive' and a reflection of his 'own unconscious bias.'"); https:// newsroom.wf.com/English/news-releases/news-release-details/2020/CEO-Charlie-Scharf-Reinforces-Commitment-

4.     The foreclosure crisis was the foreseeable and inevitable result of Defendants' (and other industry participants') "equity stripping" schemes that originated and/or funded higher cost first lien home mortgage loans (over 70% were for refinances, not purchases, and half of the refinances were "cash out" refinances) and second lien home equity mortgage loans and lines of credit.

5.     By its very nature, Defendants' equity stripping involves interrelated predatory and discriminatory loan making, loan servicing, and foreclosure activities that occur over the entire life of each mortgage loan, continuing until the loan is either paid off (or refinanced with a non-predatory loan) or until the borrower defaults and the underlying asset is foreclosed upon. Equity stripping:

    a.     begins at loan origination when Defendants impose higher interest rates, higher origination costs, and improper fees;

    b.     occurs with each monthly payment when Defendants service the loan because a borrower makes a higher payment due to an inflated interest rate;

    c.     occurs upon payment of a pre-payment penalty when a borrower attempts to refinance or pay off the loan;

    d.     continues following and during default because Defendants subject the borrower to additional improper fees and costs; and

---

to-Diversity-and-Inclusion/default.aspx  (Wells Fargo press release, dated Sept. 23, 2020); Enterprise (quoting Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion: "There definitely is a sense that bias lives vibrantly at Wells Fargo.  And I think it is around gender, gender identity, as well as race and ethnicity.").

e.     is complete upon foreclosure when Defendants take away the borrower's home, thereby removing any remaining equity and eliminating the borrower's ability to generate future equity through home value appreciation or loan principal pay down.

6.     Defendants' individual mortgage banking operational policies and practices facilitated equity stripping by offering mortgage loans despite the borrower's inability to repay such loans; granting employees, brokers, and managers the discretion both to steer minority borrowers into more costly loans and to set loan pricing above published rate sheets (in order to maximize yield spreads); specifically compensating employees and brokers to do so; and functionally enabling the approval of such loans by systematically lowering or waiving published underwriting standards and guidelines.

7.     Defendants began their discriminatory housing practice of equity stripping by directly targeting FHA protected minority mortgage borrowers in Plaintiffs' communities and neighborhoods, particularly African American and Latino borrowers, including African American women,[3] in order to maximize the income and assets Defendants could generate by originating or acquiring as many "high cost," higher cost, near prime, "subprime," ALT-A, and certain other

---

[3] The term "minority" as used hereafter includes racial/ethnic minorities and women.

conforming and non-conforming first and second lien home purchase and refinance mortgage loans (hereinafter, collectively described as "non-prime") as possible. Such non-prime mortgage loans included higher costs, predatory loan terms, and/or have been underwritten in a predatory or discriminatory manner.

8.     Defendants' discriminatory behavior maximized Defendants' revenue and income through loan origination and prepayment fees and higher interest rate yield spreads, securitization, and sales of mortgage loans into residential mortgage-backed securities, and the creation and retention of mortgage servicing rights assets to generate continuing and future income through Defendants' predatory and discriminatory mortgage servicing and foreclosure activities. Defendants intentionally engaged in this conduct notwithstanding their knowledge of its illegality and the financial risks it posed to all. Indeed, Defendants' equity stripping activities have targeted and continue to target minority homeowners discriminatorily, and are discriminatorily impacting such borrowers, primarily through Defendants' foreclosure activities that are themselves being conducted on a discriminatory basis.

9.     Defendants' targeted marketing practices, discretionary pricing policies, credit score override practices, underwriting policies, wholesale mortgage funding and mortgage securitization operations, compensation policies, and

mortgage servicing operations each individually, or in combination with each other, authorized, approved, or otherwise encouraged the origination and funding of first and second lien residential mortgage loans with different terms and conditions to borrowers who were similarly situated financially on the improper basis of race, color, ethnicity, sex, and age.

10.    Defendants' activities have established and/or perpetuate unfair terms and/or conditions in residential real estate-related finance transactions and have made housing unavailable to FHA protected minorities in Plaintiffs' communities. Such activities stripped and continue to strip borrower home equity, increasing the risk of default and foreclosure and ultimately resulting in vacancies and foreclosures on minority borrowers' homes.

11.    After identifying and targeting FHA protected minority borrowers using advanced data mining techniques and predictive analysis methodologies, Defendants' various mortgage origination, securitization, and servicing policies and practices allowed or encouraged: (a) unchecked or improper credit approval decisions for minority borrowers, resulting in borrowers being approved for and receiving refinance and home equity loans they could not afford and consequently being at risk of becoming delinquent and/or in default on those loans; (b) subjective surcharges on minority borrowers of additional points, fees, and other credit and

servicing costs over and above an otherwise objective risk-based financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans; (c) minority borrowers to be steered into higher cost loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and (d) undisclosed inflation of appraisal values of minority residences in order to support inflated loan amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

12.    As a result of Defendants' equity stripping schemes, Plaintiffs' communities, and neighborhoods with relatively higher concentrations of FHA protected African American and Latino/Hispanic minority homeowners have disproportionately and disparately received more higher cost mortgage loans and have been disproportionately and disparately impacted by the increased delinquencies, defaults, foreclosures, and home vacancies resulting from such loans. Indeed, both the relative percentage share of non-prime loans — and the resulting increased levels of loan delinquencies and defaults, loan foreclosures, and home vacancies — increase in direct relationship to increases in the percentage concentrations of FHA protected African American and Latino/Hispanic minorities in Plaintiffs' communities and neighborhoods. Moreover, Defendants' foreclosure practices in and of themselves are discriminatory, as is reflected in the

overwhelmingly disproportionate number of foreclosures on African American and Latino/Hispanic minority homes and higher concentrated neighborhoods.

13.   Defendants' lending practices were designed to capitalize on a relatively short-term opportunity to earn enormous fee income while home prices, and corresponding home equity levels, were at historic highs prior to the housing bubble burst. They also enabled Defendants to continue to generate fee income from servicing loans as well as from servicing and/or foreclosing on defaulted loans.

14.   Defendants' discriminatory mortgage servicing and foreclosure activities have directly caused tremendous monetary damage to Plaintiffs including, but not limited to:  (i) the loss of property taxes on those foreclosed properties resulting from Defendants' discriminatory housing practices, and the lost property taxes on properties surrounding those foreclosures; (ii) the cost to provide eviction, judicial and non-judicial foreclosure, and other related services for inspecting, monitoring, securing, cleaning, maintaining, and/or demolishing those vacant foreclosed or abandoned properties resulting from Defendants' discriminatory housing practices, which costs include the necessary reallocation and utilization of Plaintiffs' limited financial resources to provide such services, and (iii) the loss of municipal service income from those abandoned foreclosed and vacant properties resulting from Defendants' discriminatory housing practices.

15.    The Defendants' continuing actions of servicing each of the predatory and discriminatory mortgage loans they made perpetuates equity stripping. The act of foreclosure is the ultimate denial of housing and is the final activity in Defendants' discriminatory housing practice of equity stripping. Thus, Defendants' FHA violations continue to this very day and have not ended because Defendants continue to service and foreclose on the discriminatory loans for which they are responsible. The impact is exacerbated by the discriminatory manner of Defendants' foreclosure activity on minority borrowers' homes and Defendants' loss mitigation activities. Defendants' discriminatory foreclosure activity is not only the final activity in Defendants' equity stripping scheme, but also gives rise to a separate, stand-alone claim of discrimination under the FHA for every discriminatory foreclosure Defendants file.

16.    As Plaintiffs further allege below, Defendants have been sued by, and have settled with, a wide variety of other plaintiffs, including federal and municipal governmental entities and individuals, for similar predatory and discriminatory conduct as alleged herein. For instance, Wells Fargo was sued by, and settled with, the United States Department of Justice ("DOJ"), the City of Baltimore, the City of Memphis and Shelby County, Tennessee, for FHA violations similar to those at issue here. Indeed, the DOJ concluded Defendants discriminatorily steered tens of

thousands of ethnic minority borrowers across the country into higher cost and subprime mortgage loans that charged higher fees and interest rates than loans made to white borrowers who posed the same credit risk.

17.    Wells Fargo also has entered into a variety of consent orders and settlements with federal banking regulators, the DOJ, and various State Attorneys General regarding Defendants' predatory and unfair servicing and foreclosure practices but, to this day, Defendants' discriminatory conduct continues.

18.    Plaintiffs, which are the embodiment of all the communities, neighborhoods, and residents they collectively represent, seek to hold Defendants financially accountable under the FHA for that portion of Plaintiffs' injuries that Defendants' own actions *already have caused* to Plaintiffs' communities and neighborhoods, which is distinct from the harm caused to individual borrowers and the fines and settlements Defendants have paid in connection with quasi-criminal and civil regulatory actions.

19.    As contemplated by the FHA Plaintiffs also seek to hold Defendants financially accountable for that portion of Plaintiffs' injuries that Defendants' own actions *are about to cause* through additional mortgage delinquencies, defaults, home vacancies and/or foreclosures.

20.     Because of the deliberate, egregious, and widespread nature of Defendants' predatory and discriminatory mortgage lending and servicing practices and policies, along with their efforts to obfuscate their liability and their callous disregard for the impact of their actions on Plaintiffs' communities, neighborhoods, and residents, Plaintiffs to seek punitive and/or exemplary damages.

## JURISDICTION & VENUE

21.     This is an action for violations of the FHA 42 U.S.C. §§ 3601-31. This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

22.     Venue is proper under 28 U.S.C. § 1391 because each Defendant is a corporation subject to personal jurisdiction in this County. Defendants have transacted business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## PARTIES

**A.    Plaintiffs**

23.    Plaintiff Fulton County, Georgia, including its affiliated departments and authorities, is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution. Fulton County is Georgia's most populous county with more than 920,000 residents. Fulton County consists of various communities, neighborhoods, and cities such as Alpharetta, Chattahoochee Hills, College Park, East Point, Fairburn, Hapeville, Johns Creek, Milton, Mountain Park, Palmetto, Roswell, Sandy Springs, and Union City, several unincorporated areas, and a portion of the City of Atlanta. Fulton County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

24.    Plaintiff Cobb County, Georgia, including its affiliated departments and authorities, is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution. Cobb County consists of various communities, neighborhoods, and cities such as Acworth, Austell, Kennesaw, Marietta, Powder Springs, and Smyrna. Cobb County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

25.    Plaintiff DeKalb County, Georgia, including its affiliated departments and authorities, is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution. DeKalb County is Georgia's third largest

county with more than 700,000 residents. DeKalb County consists of various communities, neighborhoods, and cities such as Avondale Estates, Chamblee, Clarkston, Decatur, Doraville, Dunwoody, Lithonia, Pine Lake, Stone Mountain, and Tucker, several unincorporated areas, and a portion of the City of Atlanta. DeKalb County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

**B.      Defendants**

26.      Defendant Wells Fargo & Co. ("Wells Fargo") is a nationwide diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California. Wells Fargo provides banking, insurance, investment, mortgage, and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally. It is the parent company of Wells Fargo Bank, N.A. As a bank holding company, Wells Fargo is subject to the regulatory authority of the Board of Governors of the Federal Reserve System, among other federal regulators.

27.      Defendant Wells Fargo Financial, LLC ("Wells Fargo Financial") is a subsidiary of Wells Fargo and the successor to Wells Fargo Financial, Inc. Its principal place of business is in Des Moines, IA. Prior to September 2008, Wells Fargo Financial conducted home mortgage lending through nonbank subsidiaries located throughout the United States. As used herein, and unless otherwise indicated,

"Wells Fargo Financial" includes its subsidiaries that transacted business in Georgia, Inc. By September 2008, Wells Fargo had transferred the lending operations of Wells Fargo Financial to Defendant Wells Fargo Bank, N.A. as part of a corporate reorganization.

28.     Defendant Wells Fargo Financial Georgia, Inc. ("Wells Fargo Fin'l GA), was a foreign for-profit corporation that was registered to do business in Georgia, formed in September 1982 and withdrew its Certificate of Authority on March 2, 2018. During the time Wells Fargo Fin'l GA was authorized to do business in Georgia, its principal office address was 800 Walnut Street, Des Moines, Iowa, and its physical address was 40 Technology Parkway South, #300, Norcross, Georgia. According to its Application for Withdrawal of Certificate of Authority, any service of process may be served on Wells Fargo & Co. – Legal Department/MAC code: N9305-173, 90 South 7th Street, Minneapolis, MN 55402. Wells Fargo Fin'l GA transacted business in Georgia and originated and purchased loans in Plaintiffs' communities during the relevant time period.

29.     Defendant Wells Fargo Bank, N.A. ("Wells Fargo Bank") is organized as a national banking association under the laws of the United States. Its headquarters are in Sioux Falls, South Dakota. As a federally insured banking entity, Wells Fargo Bank is subject to the regulatory authority of the Office of the Comptroller of the Currency, among other federal regulators, and, as of July 21,

2011 became subject to the regulatory authority of the Consumer Financial Protection Bureau ("CFPB"). Wells Fargo Bank is one of the nation's largest residential mortgage originators and servicers. It offers residential mortgage loans to consumers through its Wells Fargo Home Mortgage division, which at one time operated as a separately owned subsidiary of Wells Fargo, but which was merged into Wells Fargo Bank in 2004. Wells Fargo Bank maintains multiple offices in the State of Georgia and within Cobb, DeKalb, and Fulton Counties and their municipalities for the purposes of soliciting applications for and making residential mortgages loans, among other banking activities. It has transacted business in this district.

30.     On December 31, 2008, in a stock purchase transaction, Wells Fargo acquired Wachovia Corporation, then the country's fourth largest diversified financial services and bank holding companies, based in Charlotte, North Carolina. As a bank holding company, Wachovia Corporation was subject to the regulatory authority of the Federal Reserve, among other federal regulators. In connection with its acquisition of Wachovia Corporation, Wells Fargo "acquired all of Wachovia Corporation and all its business and obligations, including its preferred equity and indebtedness, and all its banking deposits."[4] Wells Fargo's acquisition included Wachovia Mortgage and all the assets of Wachovia Bank, N.A., a national banking

---

[4] https://www.sec.gov/Archives/edgar/data/36995/000119312508205973/dex99a.htm.

association, which totaled $635 billion at December 31, 2008. As a federally insured banking entity, Wachovia Bank was subject to the regulatory authority of the Office of the Comptroller of the Currency.

31.   Prior to being purchased by Wells Fargo, Wachovia itself expanded through a merger with First Union Corp., and its related entities and subsidiaries, in 2001, and in 2006, Wachovia purchased troubled subprime lender Golden West Financial, which owned World Savings Bank, FSB, then the second largest savings and loan in the United States. In addition, Wachovia owned American Mortgage Network and its related entities. Wachovia Corporation, Wachovia Bank, and their subsidiaries, including World Savings Bank and American Mortgage Network, are hereinafter referred to collectively as "Wachovia" or the "Wachovia entities."

32.   Defendant Wells Fargo, as the corporate parent of Wells Fargo Bank and its subsidiaries, as well as the corporate parent of its other subsidiaries involved in the wrongful activities alleged herein, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of interrelated, interdependent, centralized, and/or coordinated functions, practices, and policies involved in their entire mortgage banking operations, particularly retail and wholesale higher cost, subprime, ALT-A, or other non-conforming loan origination, funding, purchase, securitization, and servicing activities. For this reason, Defendants Wells Fargo, Wells Fargo Financial, Wells

Fargo Fin'l GA, Wells Fargo Bank, and any of their subsidiaries or acquisitions involved in the matters alleged herein, are collectively referred to hereinafter as "Wells Fargo."

33.    Wells Fargo is legally responsible for, either directly or as a successor in interest to, Wachovia as a result of Wells Fargo's all stock purchase-acquisition of Wachovia in December 2008. Upon its acquisition, Wachovia became part of Wells Fargo's common enterprise involving the unlawful acts and practices alleged below. Wachovia's operations were eventually merged into Wells Fargo's operations.

34.    Wells Fargo and Wachovia have engaged in "residential real estate-related transactions" within the meaning of the FHA, 42 U.S.C. § 3605(b). Accordingly, at all relevant times, Wells Fargo, including Wachovia, has been subject to federal laws governing fair lending, including the FHA, and the fair housing regulations of the Department of Housing and Urban Development ("HUD"), 24 C.F.R. §§ 100.1-100.600.

35.    The term "Defendants," as generally used throughout this Complaint, refers to Wells Fargo, Wachovia, and their respectively acquired or controlled subsidiaries and affiliates.

36.    Defendants Wells Fargo Corps. 1-375 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein. Defendants

established and/or maintained at least 378 subsidiary and affiliate correspondent lenders throughout the United States as reflected in publicly available data reported pursuant to the Home Mortgage Disclosure Act. Such parties are named in "John Doe" capacity pending discovery in this case.

## BACKGROUND FACTS

**A.  The Federal Government Found Discrimination Was Pervasive in Subprime Mortgage Lending Beginning in 2003 and Continuing Through Early 2008**

37.   In 1975, Congress passed the Home Mortgage Disclosure Act ("HMDA"), implemented under the Federal Reserve Board's Regulation C, requiring all mortgage lenders, including the Defendants here, to compile by census tract and report to the Federal Reserve certain mortgage loan origination and purchase information, which includes borrower race, ethnicity, and gender. One of the primary purposes of HMDA reporting is to enable federal regulators to identify discriminatory lending patterns, such as those that violate the Fair Housing Act. HMDA data is the only readily available information, absent review of Defendants' actual loan level mortgage lending data, from which to demonstrate (using statistical data) Defendants' discriminatory housing practices.

38.   Concerned with potential discrimination in loan pricing and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, in 2004, the Federal

Reserve began requiring lenders to identify loans originated as "high cost" or "rate spread" loans. These are loans where the annual percentage rate cost of borrowing, including up-front points and fees, exceeds certain threshold percentage points levels above reported yields for U.S Treasury securities of comparable maturities. Mortgage lending industry groups successfully thwarted efforts by consumer groups to require lenders to include borrower credit score and other objective credit risk information in their HMDA reporting. Nonetheless, in connection with Defendants' internal and external operations, including for analytical and risk evaluation purposes, the sale and securitization of such mortgage loans, and loan servicing operations, Defendants and other industry participants collect and maintain borrower credit score and other objective credit risk information for each mortgage loan.

39.    Based on its own review of all HMDA data, the Federal Reserve Board confirmed that, on a national basis, African American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers during the period of excessive mortgage lending and refinance activity at issue here. For example, the Federal Reserve's analysis of 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely . . . to have received higher-priced loans than non-Hispanic whites [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort, and Glenn B. Canner, *Higher-Priced Home Lending and the 2005 HMDA Data*, Federal Reserve Bulletin

(revised Sept. 18, 2006), at A124, A159. The Federal Deposit Insurance Corporation ("FDIC") echoed such findings. Martin J. Gruenberg, then-FDIC Vice Chairman and subsequently FDIC Chairman, observed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders." Martin J. Gruenberg, *Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S.* (Oct. 18, 2006).

40.    Even after accounting for the differences in borrowers' incomes, credit scores, property location, and loan amounts in the 2004 HMDA data, a Federal Reserve report found that, on average, African American borrowers were 3.1 times more likely and Latino borrowers were 1.9 times more likely to receive higher rate loans than Caucasian borrowers. *See* Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit (June 13, 2006) at 2. Reporting on the Center for Responsible Lending's study of the HMDA data (the Center is a non-profit research organization), Ernst testified:

> Our findings were striking. We found that race and ethnicity — two factors that should play no role in pricing — are significant predictors of whether a subprime loan falls into the higher-rate portion of the market. Race and ethnicity remained significant predictors even after we accounted for the major factors that lenders list on rate sheets to determine loan pricing.
>
> In other words, even after controlling for legitimate loan risk factors, including borrowers' credit score, loan-to-value ratio, and ability to

document income, race, and ethnicity matter. African American and Latino borrowers continue to face a much greater likelihood of receiving the most expensive subprime loans — even with the same loan type and the same qualifications as their white counterparts. Across a variety of different loan types, African American and Latino borrowers were commonly 30% more likely to receive a higher-rate loan than white borrowers.

*Id* at 3.

41.     Similarly, HMDA data for 2005 evidences that, "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159. Similar average discriminatory patterns exist on loan refinancing for the same period when African Americans were 28.3 percent more likely than similarly situated Caucasians to receive higher priced loans. *See Id.* at A124, A159. Indeed, a study commissioned by the Wall Street Journal found that in 2005 and 2006, 55% and 61% respectively of borrowers who received subprime mortgages could have qualified for traditional mortgages at the lower rates offered to prime borrowers. Rick Brooks and Ruth Simon, *Subprime Debacle Traps Even Very Creditworthy*, Wall Street Journal, Dec. 3, 2007.

42.     The U.S. Department of Housing and Urban Development ("HUD") found that in neighborhoods where at least 80% of the population is African American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender and even higher-income borrowers living in

predominantly African American neighborhoods were twice as likely as lower-income Caucasian borrowers to have subprime loans. *See* U.S. Department of Housing and Urban Development, Office of Policy Development and Research, *All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions* (2002).

43.    In 2006, the Center for Responsible Lending uncovered "large and statistically significant differences between the rates of mortgage loans offered to African Americans and Caucasians, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated Caucasian counterparts, African Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans." Gruenstein, Bocian, Ernst and Li, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (May 31, 2006).

44.    Similarly, in December 2006, the Consumer Federation of America ("CFA") revealed the results of its extensive study of gender disparity in subprime lending, their conclusions evident from the title of their report. *See* Allen J. Fishbein & Patrick Woodall, *Women are Prime Targets for Subprime Lending: Women are Disproportionately Represented in High-Cost Mortgage Market* (December 2006) (hereinafter, "*Women are Prime Targets*").[5] As the CFA found:

---

[5] Publicly available at http://www.consumerfed.org/pdfs/WomenPrimeTargetsStudy120606.pdf.

Women are more likely to receive subprime mortgages than men. These gender disparities exist across mortgage product lines. Women with the highest incomes have the highest disparities relative to men with similar incomes than women at lower income levels. The gap is especially pronounced for women of color. African American and Latino women have the highest rates of subprime lending. Moreover, African American, and Latino women with the highest incomes have much higher rates of subprime lending than white men with similar incomes. The Consumer Federation of America (CFA) study found these patterns of subprime gender disparity exist for home purchase, refinance, and home improvement lending.

Thus, the CFA concluded, among other things, that "[t]he prevalence of subprime loans among women borrowers diminishes their ability to fully utilize homeownership as a pathway to build wealth."

*Id.* at 3.

45.    The CFA's key findings, which Plaintiffs specifically incorporate and allege herein, include:

- Women are more likely to receive subprime and higher-cost mortgages: About a third (32.0 percent) of women borrowers receive subprime mortgage loans of all types compared to about a quarter (24.2 percent) of male borrowers — making women 32 percent more likely to receive subprime mortgages than men. More than one in ten (10.9 percent) women received high-cost subprime mortgages compared to about one in thirteen (7.7 percent) men — making women 41 percent more likely to receive higher-cost subprime loans with interest rates more than 5 percentage points higher than comparable Treasury notes.

- Women are significantly over-represented in the pool of subprime mortgages. Although women make up 30.0 percent of borrowers for mortgages of all types, they make up 38.8 percent of subprime borrowers — a 29.1 percent over-representation. This over-representation of women in the subprime mortgage pool exists for all types of mortgages but is especially true of refinance and home improvement loans which are more likely to be subprime and predatory mortgages.

- Women are more likely to receive subprime mortgages of all types regardless of income, and disparity between men and women increases as incomes rise. For purchase mortgages, women earning double the median income are 46.4 percent more likely to receive subprime mortgages than men with similar incomes. In contrast, women earning below the area median income are 3.3 percent more likely to receive subprime mortgages. Women earning between the median and twice the median income are 28.1 percent more likely to receive subprime purchase mortgages than men.

- Women of color are the most likely to receive subprime loans and white men are the least likely to receive subprime loans at every income level and the gap grows with income. African American women earning below the area median income are nearly two and a half times more likely to receive a subprime purchase mortgage than white men and Latino women earning below the area median are nearly twice as likely to receive subprime purchase mortgages as white men. The gap is much higher at incomes above twice the area median income. Upper income African American women are nearly five times more likely to receive subprime purchase mortgages than upper income white men and upper income Latino women are nearly four times more likely to receive subprime loans than upper income white men.

- Women are more likely to receive subprime mortgages than men of the same race and women of color are much more likely to receive subprime mortgages than white men. For purchase mortgages, African American women were 5.7 percent more likely than African American men to receive subprime mortgages; Latino women were 12.7 percent more likely than Latino men to receive subprime mortgages; and white women were 25.8 percent more likely to receive subprime purchase mortgages than white men. African American women were 256.1 percent more likely to receive subprime purchase mortgages than white men and Latino women were 177.4 percent more likely to receive subprime mortgages than white men.

## B.   Congress Found that Predatory and Discriminatory Lending Caused the Foreclosure Crisis

46.    According to Congressional findings, the foreclosure crisis throughout

the United States, and within Plaintiffs' neighborhoods and communities leading up

25

to the current period, resulted from the predatory lending activities of the mortgage industry, particularly the predatory and discriminatory lending activities of Defendants (and others) that Plaintiffs allege herein. Department of Housing and Urban Development, *Report to Congress on the Root Causes of the Foreclosure Crisis* (January 2010) (hereinafter, the "*Root Causes Report*").

47.    As explained in the *Root Causes Report*, housing prices escalated after 2003, and "lenders began offering new mortgage products intended to stretch borrowers' ability to afford ever more expensive homes as a means of keeping loan origination volumes high." *Root Causes Report, Executive Summary* at ix.

48.    The foreclosure crisis was "driven by the very design of the loans at issue. The loan products at the heart of the crisis were structured in a way that made widespread failure virtually inevitable." E. Harnick, *The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?,* 31 Western New England L. Rev. 625, 628 (2009).

49.    Nationwide, between 2001 and 2006:

- Adjustable rate mortgages as a share of total subprime loans originated increased from about 73 percent to more than 91 percent;

- The share of loans originated for borrowers unable to verify information about employment, income, or other credit-related information ("low-documentation" or "no-documentation" loans) jumped from more than 28 percent to more than 50 percent; and

- The share of ARM originations on which borrowers paid interest only, with nothing going to repay principal, increased from zero to more than 22 percent.

*See Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, Report & Recommendations by Majority Staff of Joint Economic Committee (October 25, 2007).

50.    The Government Accountability Office ("GAO") has reported that "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans." Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, *HOME MORTGAGES Recent Performance of Non-prime Loans Highlights the Potential for Additional Foreclosures*, GAO-09-922T, at 5 (July 28, 2009):

> Of the active subprime loans originated from 2000 through 2007, 92 percent of those that were seriously delinquent as of March 31, 2009, were from those four cohorts [year-groups]. Furthermore, loans from those cohorts made up 71 percent of the subprime mortgages that had completed the foreclosure process. This pattern was even more pronounced in the Alt-A market. Among active Alt-A loans, almost all (98 percent) of the loans that were seriously delinquent as of March 31, 2009, were from the 2004 through 2007 cohorts. Likewise, 93 percent of the loans that had completed the foreclosure process as of that date were from those cohorts.
>
> Cumulative foreclosure rates show that the percentage of mortgages completing the foreclosure process increased for each successive loan cohort . . . . Within 2 years of loan origination, 2 percent of the subprime loans originated in 2004 had completed the foreclosure process, compared with 3 percent of the 2005 cohort, 6 percent of the 2006 cohort, and 8 percent of the 2007 cohort. Within 3 years of loan origination, 5 percent of

the 2004 cohort had completed the foreclosure process, compared with 8 percent and 16 percent of the 2005 and 2006 cohorts, respectively. The trend was similar for Alt-A loans, although Alt-A loans foreclosed at a slower rate than subprime loans. For example, within 3 years of origination, 1 percent of Alt-A loans originated in 2004 had completed the foreclosure process, compared with 2 percent of the loans originated in 2005, and 8 percent of the loans originated in 2006.

51.     The Office of the Comptroller of the Currency ("OCC") reported that as of June 30, 2011, 28.1% of subprime and higher cost loans nationwide were seriously delinquent or in foreclosure as compared to only 5.5% of prime loans. Thus, these loans were more than five times more likely to be seriously delinquent or in foreclosure than prime loans. The OCC subsequently reported in June 2013 that while only 2.5% of prime mortgages were considered seriously delinquent, 8.9% and 15.4% of ALT-A and subprime mortgages loans, respectively, were considered seriously delinquent, reflecting a continuing, massive disparity in such delinquency rates.

52.     Defendants were among the largest originators and/or purchasers, funders, and securitizers of ARM loans and other predatory non-prime and higher cost mortgage loan products in the United States.

53.     "The leading cause of the problem was the characteristics of the market and mortgage products sold, rather than the characteristics of the borrowers who received those products." Joint Congressional Economic Committee, Statement of

Keith S. Ernst, Center for Responsible Lending, *Current Trends in Foreclosure and What More Can be Done to Prevent Them* (July 28, 2009) ("*Ernst Testimony*").[6]

54.     As noted in a study of mortgage loan originations between 2004 and 2008 issued by the Center for Responsible Lending, "[l]oan characteristics and foreclosures are strongly linked . . . . Loans originated by brokers, hybrid adjustable-rate mortgages ("ARMs," such as 2/28s), option ARMs, loans with prepayment penalties, and loans with high interest rates (a proxy for subprime mortgages) all have much higher rates of completed foreclosures and are more likely to be seriously delinquent." D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (November 2011) (hereinafter the "*Lost Ground Report*"). Congress has determined that "the incidence of early payment defaults among these loans suggests that much of their poor performance may be related to lax underwriting that allowed borrowers to take on monthly payments that were unaffordable even before interest rate resets occurred." *Root Causes Report* at 9.

55.     Congress found that the foreclosure crisis was "unusual in that general economic weakness did not play a significant role in producing delinquencies and foreclosures in most market areas — at least not initially." *Root Causes Report* at

---

[6] https://www.jec.senate.gov/reports/111th%20Congress/Current%20Trends%20in%20Foreclosures%20a nd%20What%20More%20Can%20Be%20Done%20to%20Prevent%20Them%20(1856).pdf, at 121.

29. Instead, as further alleged below, it was the predatory lending practices of Defendants and other industry participants — combined with the related credit risk, deteriorating performance, and lack of transparency in the mortgage loan assets pooled in mortgage-backed securities — that de-stabilized U.S. and global credit markets and, in turn, brought down the economy and increased unemployment. This in turn led to more mortgage loan delinquencies, defaults, foreclosures, and vacancies, all as a result of Defendants' predatory and discriminatory lending practices to begin with.

56.    Simply put, mortgage loans made to minorities pursuant to the CRA and the affordable housing goals of Fannie Mae and Freddie Mac were not a cause of the foreclosure crisis. As explained in the *Lost Ground Report*:

> Our study provides further support for the key role played by loan products in driving foreclosures. Specific populations that received higher-risk products — regardless of income and credit status — were more likely to lose their homes. While some blame the subprime disaster on policies designed to expand access to mortgage credit, such as the Community Reinvestment Act (CRA) and the affordable housing goals of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), the facts undercut these claims. Rather, dangerous products, aggressive marketing, and poor loan underwriting were major drivers of foreclosures in the subprime market.

57.    Concentrations of the type of higher cost and subprime loans at issue in this litigation that were disproportionately made in minority communities by Defendants (among other industry participants) have been found to be the cause of the foreclosure crisis with the highest correlation to foreclosures among the other

two major contributing factors such as the drop in real estate prices and economic collapse, *see* Jacob S. Rugh and Douglas S. Massey, *Racial Segregation and the America Foreclosure Crisis*, 75(5) Amer. Sociol. Rev. 629 (2010),[7] both of which Plaintiffs allege below were caused in the first instance by Defendants' and other industry participants' discriminatory and predatory equity stripping practices (including loan making, securitization, servicing, and foreclosure activity).

58.    Indeed, economists at the University of Michigan and elsewhere have found that the high rates of early delinquency and default, which led to the housing market crash, were caused by a deterioration in Defendants' and other lenders' credit characteristics.

59.    Although previously known to, or reasonably foreseen by, Defendants, the default risk inherent in the non-prime mortgage loan products originated and/or funded by Defendants (and other industry participants) began to materialize in the first half of 2006 when delinquency rates on such mortgage loan products began increasing rapidly, particularly for borrowers of adjustable rate products (the overwhelming majority of mortgage loan products at issue herein that were originated during the relevant time period) who began facing "payment shock" due to higher monthly payments as the interest rates adjusted pursuant to the loan terms.

---

[7] Available at http://www.asanet.org/images/journals/docs/pdf/asr/Oct10ASRFeature.pdf.

At this point in time, U.S. unemployment rates were low and home values were near their highest levels.

60.    The foreclosure crisis was known (or at least foreseeable) to Defendants due to the increased risk of default inherent in the non-prime mortgage loan products they originated, funded, securitized, and/or serviced. *See Ernst Testimony*. These products included the "high cost," higher cost, subprime, and other non-prime loan products that Defendants discriminatorily sold to minority borrowers that are at issue here. Indeed, Defendants further increased the likelihood of delinquencies, defaults, vacancies, and eventual foreclosures by steering borrowers to "low-doc" or "no-doc" loans (no verification of employment, income, or other credit-related information) and "interest only" ARM products, which accounted for more than 50% and 22%, respectively, of all subprime ARM originations by 2006.

61.    Defendant Wachovia also created and marketed to minorities a particularly toxic product known as the Pick-A-Pay loan, that provided a variety of payment options at the borrower's choice, including a negatively amortizing minimum monthly payment option that caused the outstanding loan balance, and therefore accrued interest, to ***increase*** over time, stripping out borrower equity at an even faster rate than other subprime loan products.

62.    The intentional predatory equity-stripping lending activities at issue — targeting minority borrowers and/or steering them into higher cost loans, approving

minority borrowers for loans that they were not otherwise qualified to obtain, inflating the loan costs and amounts to minority borrowers, and the application of willfully lax underwriting standards — in and of themselves dramatically increased the likelihood of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies because those factors undermined the ability of borrowers to repay their loan in the first place, creating a self-destructive lending cycle concentrated in Plaintiffs' minority communities.

63.    Defendants and other industry participants knew full well of the likely outcome of their predatory lending activity, particularly because of the terms of their loan products combined with lax underwriting. During the 2004-2006 period when more than eight million ARMs were originated, the subprime mortgage industry (including Defendants) knew that the "[t]ypical subprime borrower had a housing-payment-to-gross-income ratio of 40 percent" and upon initial reset of the ARM, 39% of borrowers would face a payment increase of between 25 and 50 percent, 10% of borrowers would face a payment increase of 51 to 99 percent, and15% of borrowers would face a payment increase of 100 percent or more. *See Root Causes Report* at 29. Defendants also knew that, upon the initial interest rate adjustment in the ARM products, many typical borrowers would face payment shock and be unable to make their mortgage payments.

C.  **The Predatory Non-Prime Mortgage Lending and Securitization Activities of Defendants and Other Industry Participants Led to the U.S. Financial Crisis**

64.  Beginning in the early 2000s, Defendants and other industry participants followed a business model that involved pooling, packaging, securitizing, and selling loans after they were originated — either directly, through a broker, or by a correspondent lender — or purchased from other third-party subprime originators to create mortgage-backed securities ("RMBS").

65.  The securitization transactions typically required the establishment of a special purpose vehicle ("SPV") or Variable Interest Entity ("VIE") such as a trust. When mortgage loans are made by Defendants, their brokers, or correspondent lenders, the loans become negotiable instruments, and when assigned to a trust (or another SPV or VIE), the trust becomes a holder in due course under the Uniform Commercial Code. As described in detail below, although the loans were sold and securitized, Defendants frequently retained all the lucrative servicing rights as additional revenue streams. Sometimes a tracking number from the Mortgage Electronic Registration Systems ("MERS®") was assigned to the loan.

66.  As delinquencies on the non-prime loans that had been securitized escalated, RMBS investors began demanding that non-performing subprime and higher cost mortgage loans be repurchased by the financial institutions, like Defendants, that had pooled, securitized, and sold them. Between the first and third

quarters of 2006, demands for loan repurchases tripled within the industry, including demands that Defendants repurchase the non-performing loans they securitized. Rapidly increasing loan delinquency rates, repurchase demands, and the associated risk at financial institutions, including Defendants, set the financial crisis in motion.

67.    By February 2007, industry-wide increases in subprime defaults had become widely known, and the cost of insuring pools of mortgages — particularly home equity loans — began increasing. Through the second quarter of 2007, delinquency rates were exploding beyond anything the mortgage lending industry had ever experienced, causing the demand for securitizations and related structured finance products to dry up. Simultaneously, unfavorable news of large losses, margin calls, and downgrades at financial institutions related to subprime and higher cost lending became pervasive.

68.    By the summer of 2007, banking regulators and investors understood that the risk in RMBS and other structured finance products relating to the subprime and higher cost loan products issued by Defendants (and other industry participants) was far greater than the market had previously been led to believe. This directly led to three distinct illiquidity waves.

69.    The first illiquidity wave began on August 9, 2007 when LIBOR rates spiked as liquidity plummeted and the default risk of financial institutions rose because of concerns over large financial institutions' exposure to counterparty credit

risk and their own lending risk as a result of both their securitizations and the high-risk mortgage loans underlying them.

70.    Throughout this period, mortgage delinquency rates continued to increase rapidly as funding for mortgage lending activity dried up and shut down, driving home prices lower. As home prices fell, much of the remaining equity borrowers had was eliminated because loan amounts exceeded actual home values. These elements — which Defendants created with their predatory and discriminatory activities in the first place — continued to create a downward spiral in home prices and a more rapid increase in loan delinquencies.

71.    In January and February 2008, large financial institutions reported numerous asset write-downs relating to their subprime losses during 2007. Throughout the spring and summer of 2008, the mounting losses at financial institutions led to a full-blown liquidity crisis in which financial institutions would not lend funds to each other for fear of the unknown levels of loss exposure with any counterparties.

72.    In the fall of 2008, the U.S. and global credit markets froze — leading to a much greater financial crisis — when regulators, investors, and other market participants realized the full extent of the credit losses, counterparty risk, and default risk on the subprime and higher-cost mortgage loans underlying RMBS and other securitized debt instruments was unknown and such an unknown level of risk had

infected a wide swath of other investment market segments as well as U.S and global financial institutions.

73.     It was not until June 2008 that unemployment levels in the U.S. first began to rise as foreclosure rates began to explode. In other words, an increase in unemployment rates did not cause the foreclosure crisis. Instead, increasing unemployment occurred as a result of the financial and economic crisis, which the predatory and discriminatory lending and securitization activities of Defendants (and other industry participants) caused. That economic crisis, and the increase in unemployment, further exacerbated the foreclosure crisis that had resulted from the predatory and higher cost terms of the mortgage loan products themselves and the willfully shoddy way they were underwritten.

74.     The Senate Permanent Subcommittee on Investigations ("SPSI") found that financial institutions like Defendants "were not the victims of the financial crisis." *Wall Street And The Financial Crisis: Anatomy of a Financial Collapse*, Majority and Minority Staff Report (April 13, 2011) at 4. Instead, the "billions of dollars in high risk, poor quality home loans" that they originated, sold, and securitized and their "unacceptable lending and securitization practices" were "the fuel that ignited the financial crisis." *Id.*

75.     According to a report from the Financial Crisis Inquiry Commission ("FCIC"), "[s]ecuritization and subprime originations grew hand in hand" as "[t]he

non-prime mortgage securitization process created a pipeline through which risky mortgages were conveyed and sold throughout the financial system. This pipeline was essential to the origination of the burgeoning numbers of high-risk mortgages." Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) ("FCIC Report") at 70, 125.[8] The FCIC concluded that "firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. . . . These problems appear to have been significant." FCIC Report, at 187.

76.     In sum, Defendants' predatory subprime mortgage lending (as well as the predatory lending of other industry participants), along with their attempt to conceal and shift the risk of their activities, ultimately caused the financial crisis, economic downturn, and increased unemployment rates, all further exacerbating the foreclosure crisis resulting from the original predatory lending activities and thereby exacerbating the injuries to Plaintiffs. Defendants cannot rely on general claims of economic downturn or borrower job losses as intervening causes of the defaults and foreclosures occurring in Plaintiffs' communities on predatory and discriminatory mortgage loans for which Defendants are responsible.

---

[8] Available at http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

**D.    The Foreclosure Crisis Has Disparately Impacted Minorities Nationwide**

77.    As the direct result of the terms of the mortgage loan products Defendants and other industry participants disproportionately sold to them, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) paid materially higher monthly mortgage payments, on higher loan balances, than similarly-situated Caucasian borrowers and face higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies on loans for which Defendants are responsible. For example, minority borrowers (both racial/ethnic and women) steered into or receiving higher cost loans may pay hundreds of dollars more each month in mortgage payments than a similarly situated borrower who has obtained a conforming loan at market interest rates. As a result, minority borrowers also face higher foreclosure rates. *See Lost Ground Report.*

78.    Numerous publicly available studies by reputable industry watchdog groups have found that the foreclosure crisis has hit African American and Hispanic neighborhoods and homeowners across the country disproportionately harder than nonminority homeowners and that this is the result of predatory and discriminatory lending activity.

79.    The percentage of delinquent loans, loans in the foreclosure process, and loans already foreclosed on, increases in direct relationship to increased concentrations of minorities in neighborhoods within Plaintiffs' communities. For

example, according to the *Lost Ground Report*, although 51.3% of loan originations within the Atlanta, Georgia metropolitan statistical area ("MSA") between 2004 and 2008 were to Nonminority borrowers (25% were made to African Americans and 4.7% to Latinos), Nonminority borrowers faced only about 6.5% of the total number of completed foreclosures and 6.5% of the total number of seriously delinquent loans (i.e., *future* foreclosures at the time).

80.    Other conclusions and findings of the *Lost Ground Report*, which Plaintiffs specifically incorporate and allege herein include:

- "African American and Latino borrowers are almost twice as likely to have been impacted by the crisis. Approximately one quarter of all Latino and African American borrowers have lost their home to foreclosure or are seriously delinquent, compared to just under 12 percent for white borrowers."

- "Racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example, approximately 10 percent of higher-income African American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates."

- "Loan type and race and ethnicity are strongly linked. African Americans and Latinos were much more likely to receive high interest rate (subprime) loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For

example, among borrowers with a FICO score of over 660 (indicating good credit), African Americans and Latinos received a high interest rate loan more than three times as often as white borrowers."

- "Impacts vary by neighborhood. Low- and moderate-income neighborhoods and neighborhoods with high concentrations of minority residents have been hit especially hard by the foreclosure crisis. Nearly 25 percent of loans in low-income neighborhoods and 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities."

- "Foreclosures have ramifications that extend beyond the families who lose their homes. Communities with high concentrations of foreclosures lose tax revenue and incur the financial and non-financial costs of abandoned properties and neighborhood blight."

- "[L]ow-income neighborhoods in other cities . . . have completed foreclosure rates of over 20 percent. Such high levels of concentrated foreclosures will place a significant burden on these neighborhoods and also the wider communities, which, without substantial interventions, will almost certainly suffer reduced revenues for vital city services, higher rates of crime, and myriad other adverse effects."

81.     Similarly, other studies have found that women have been adversely impacted by the foreclosure crisis as they have received a disproportionate number of subprime loans as compared to men:

*Single women, particularly women of color, represent one of the largest groups of homeowners affected by mortgage strain*. Single women experience higher rates of subprime lending than their male peers, even when controlling for risk factors such as credit, income, and neighborhood location. Despite having higher credit scores, single female homeowners are overrepresented among subprime mortgage holders by 29.1 percent, and African American women in particular are 256 percent more likely to have a subprime mortgage than a white man with the same financial profile. *The overrepresentation of single women in the subprime lending pool cannot be explained by assets, property location, or market conditions. Rather, they were targeted.*

41

Amy Castro Baker, *Eroding the Wealth of Women: Gender and the Subprime Foreclosure Crisis*, 88 Social Service Rev. 1, at 59-91 (Chicago Univ. Press, March 2014), (internal citations removed, emphasis added).[9]

82.    The reasons for, and impact of, this discrimination against women are further explained as follows:

> Several dynamics drove the likeliness that women, particularly women of color, would end up in the subprime pool. First, the overtly racist redlining practices during era I [1930s-1970s] contributed to the development of highly segregated neighborhoods that were entirely locked out of home ownership and upward mobility. This accumulated disadvantage severely inhibited the accrual of assets among people of color, whose households are predominately headed by women. Second, the ***deregulation of markets and the associated development of securitization flipped the profit motivator for brokers, who could shift the risk of a subprime mortgage onto the borrower and into the secondary mortgage market. Since originators no longer held the mortgages and instead acted as middlemen between investors and borrowers, they could legally extract wealth and equity out of borrowers with little to no consequence***. . . . Simultaneously, many middle- and low-income Americans, particularly women, have been relying on debt to finance everyday consumption as incomes have not kept pace with the costs of living. . . . In short, the lending disparities of the past situated women and people of color at risk for dangerous products in the present. Subprime loans were once lauded as a new vehicle for upward mobility among women, people of color, and previously redlined neighborhoods. Instead, they ***extracted wealth from vulnerable populations into the secondary mortgage market, benefiting investors at the expense of borrowers and effectively stifling progress toward gender equity***.

*Id*. at 82-83 (emphasis added).

---

[9] Available at http://amycastrobaker.files.wordpress.com/ 2014/01/675391-3.pdf.

## DEFENDANTS' DISCRIMINATORY ACTIONS AND OTHER WRONGFUL CONDUCT

### A.   Residential Mortgage-Backed Securities

83.   As described above, the mortgage lending practices of Defendants and other industry participants that are at issue here are unlike the lending activities of traditional mortgage lenders, such as savings and loan institutions or community banks. Traditional mortgage lenders typically earn income from the difference between the cost of borrowing the money they lend, and the interest paid by the mortgagor (borrower) over the life of the mortgage loan. Because they hold the mortgage loans they originate until the loans are repaid over time, traditional mortgage lenders are concerned with proper loan underwriting, supported asset values, and borrower ability to repay the loan over the life of the loan.

84.   In contrast, Defendants' non-prime residential mortgage loan business model involved the development and origination or funding of riskier and costlier mortgage loan products that were designed to generate much more income than traditional loans and enable Defendants to re-allocate and reuse their capital repeatedly, while passing the risk of loss on the loans to others by pooling, securitizing, and selling them to investors.

85.   The securitization process described above enables the assignee of the loan (e.g., the trust and trustee) to hold the note and enforce it without being subject to many of the defenses the borrower would have had against the original lender,

effectively cleansing the note of direct predatory lending claims, and obfuscating the ownership of the loan. At the same time, the risk of loss on the underlying mortgage loans passes to the trust — and ultimately onto its private or public investors who purchase the RMBS the trust issues.

86.    Because mortgage borrowers effectively lose their rights with the holder in due course to raise the initial act of the loan originator's predatory or discriminatory lending as a defense to foreclosure, Defendants and other industry participants were able to lend with deliberate indifference as to legality or propriety of the underlying loan origination and in fact were incentivized to engage in such misconduct through the securitization process.

87.    Moreover, unlike traditional mortgage lenders, Defendants' business model extracts as much value as possible from the equity in the residential real estate asset underlying the mortgage loan over the life of the loan. To generate the maximum income possible, Defendants' non-prime mortgage lending and funding operations were primarily concerned with making as many purchase money, refinance, and home equity loans as possible, at the highest interest rates possible, with the most upfront origination fees possible, and at the maximum loan values possible. On many loans, Defendants also incorporated loan prepayment and early repayment penalties — at an average of $5,300 per loan according to the Center for

Responsible Lending — making it prohibitively costly for borrowers to refinance their loans with another lender.

88. Through the ongoing vertically-integrated corporate policies, practices, processes, and/or procedures further alleged below, Defendants have engaged and are engaging in a continuing nationwide discriminatory housing practice of equity stripping involving a variety of interrelated business operations that: (i) originate, purchase, or otherwise acquire first lien and second lien "high cost," higher cost, subprime, non-prime, ALT-A, and other non-conforming or conforming residential home mortgage loans (collectively referred to as "non-prime" loans) to FHA protected borrowers on less favorable terms than those offered to similarly situated non-minority borrowers; (ii) pool, securitize, sell, and retain certain interests in the loans through residential mortgage backed securities; and (iii) service the loans until they default, including foreclosure activity on defaulted loans.

89. While the terms of the non-prime mortgage loan products Defendants directly originated or funded at issue here made those loans predatory in and of themselves, Defendants' (and their correspondent lenders') mortgage pricing, compensation, and underwriting practices, policies, and procedures, encouraged employees and brokers to make such loans routinely in a discriminatory and a predatory manner on the basis of the value of the underlying asset, not the borrower's ability to repay the loan over its life, while also making such loans at maximum loan

to value ratios, minimum income to debt ratios, unverified or undocumented income levels, and/or by qualifying adjustable rate loan borrowers based on their ability to make payments based only on the initial teaser interest rates.

90.     It was Defendants' business practices to allow their mortgage loan originators and mortgage brokers to place minority applicants into higher cost non-prime loans even when those applicants qualified for a prime loan according to Defendants' own underwriting guidelines. To do so, Defendants intentionally placed African American, Latino, and female borrowers into "high cost," higher cost and non-prime mortgage loans to a greater extent than non-minority borrowers with similar credit qualifications. As a result, such minority borrowers disproportionately paid, on average, tens of thousands of dollars more for a loan, and were disproportionately subject to possible pre-payment penalties, increased risk or credit problems, default, and foreclosure at higher rates.

91.     Inherently necessary to the fulfillment of Defendants' predatory and discriminatory equity stripping schemes, Wells Fargo (and Wachovia previously) serviced and continues to service the predatory and discriminatory loans for which it is responsible (including the Wachovia loans) and has done so in a predatory and discriminatory manner.

92.     Loan servicers, like Defendants, receive a percentage of each mortgage payment a borrower makes as compensation for handling the various administrative

aspects of the mortgage loan payment process including, but not limited to, collecting mortgage payments, crediting those payments to the borrowers' loan balance, assessing late charges, establishing escrow accounts for the payment of taxes and insurance, making such payments when due, collecting and making the payments to private mortgage insurance and tax collectors, and making distributions of principal and interest to the SPVs, VIEs, or other investors who have purchased interests in such loans through securitizations and/or RMBS.

93.     Although the servicing fees paid on an individual loan are relatively small — typically 0.25% (on prime loans) and 0.5% (on subprime loans) of the outstanding principal balance of each mortgage loan each month — when added across the millions of mortgage loans a servicer typically services, the fee revenue is enormous. Mortgage servicers like Defendants also typically earn interest income on the float of borrower mortgage payments to be remitted, as well as late payment fees and other fees.

94.     Mortgage loan servicers such as Defendants are responsible for managing loss mitigation when a borrower becomes delinquent (e.g., collection and work out activities) or defaults on a loan Defendants hold on their books (e.g., evictions, foreclosures, and management of vacant or foreclosed properties, including property maintenance and repairs). As part of their servicing activities, and because Defendants retained the servicing rights (the "MSRs") — on the mortgage

loans underlying their loan originations and purchases, Defendants are actively involved in the entire mortgage servicing and foreclosure process and have a continuing source of revenue and income that is very substantial.

95.    Mortgage loan servicers such as Defendants are responsible for managing loss mitigation when a borrower becomes delinquent (e.g., collection and work out activities) or defaults on a loan Defendants hold on their books (e.g., evictions, foreclosures, and management of vacant or foreclosed properties, including property maintenance and repairs). As part of their servicing activities, and because Defendants retained the servicing rights (the "MSRs") — on the mortgage loans underlying their loan originations and purchases, Defendants are actively involved in the entire mortgage servicing and foreclosure process and have a continuing source of revenue and income that is very substantial.

96.    For home mortgage loans in which Defendants have a financial interest in addition to the servicing rights (e.g., they hold the underlying first lien loan or a secondary loan), Defendants have an incentive not to foreclose when home prices are low to avoid a write down of the asset. In such circumstances, the borrower may be in default and simply vacate the property, leaving it uncared for, unprotected, and vulnerable to vandalism and/or criminal activity, all of which increase the harm to Plaintiffs. Indeed, when home prices are low, Defendants and other industry participants have become increasingly willing to walk away from foreclosure —

refusing to take ownership and possession — where the costs associated with the foreclosure and repair of the property outweigh the financial recovery Defendants can obtain from the foreclosure. All of this has led to a "shadow inventory" of vacant homes that have not yet been foreclosed on which have increased Plaintiffs' damages.

97.    Conversely, when home prices rise, Defendants have an incentive to initiate forecloses on defaulted loans, including loans in their shadow inventory, to acquire the asset for a price less than or equal to the loan value and, preferably for Defendants, less that its potential resale value. In this way, Defendants have utilized their financial leverage and "staying power" to complete their equity stripping, removing any opportunity for the borrower to gain back lost equity resulting from Defendants' predatory and discriminatory lending practices.

98.    For loans they service but do not hold on their books, loan servicers such as Defendants are either indifferent to borrower delinquencies, defaults, home vacancies, or foreclosures, or actually have a financial incentive to cause borrower delinquencies, defaults, home vacancies, or foreclosures because the sooner the foreclosures occur, the more net income Defendants receive. This is because servicers, like Defendants, are reimbursed for their servicing fees before any money passes to investors in securitizations because of a foreclosure.

99.   Importantly, loan servicers also are paid significant ancillary fees to provide loss mitigation services such as foreclosures (as well as late fees on overdue mortgage payments) and, because they typically do not bear the risk of loss on the underlying asset when they have sold it into a securitization, they have a further incentive to maximize their servicing fees, including through the foreclosure process itself, where Defendants have actually added upcharges to borrowers.

100.   Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue here and will continue to do so until the last predatory and discriminatory mortgage loan Defendants originate, purchase, or otherwise acquire, and/or service, has been repaid and closed or has been foreclosed upon. Indeed, Defendants' predatory and discriminatory loans at issue will continue to become delinquent and be defaulted on for at least several more years, leading to further property vacancies and foreclosures. Thus, Defendants' discriminatory housing practices in violation of the FHA continue to this day.

101.   In originating, funding, or purchasing, securitizing, and servicing predatory "high cost," higher cost, or non-prime mortgage loans, particularly those made on a discriminatory basis, Defendants placed their own financial interests above the best interests of their borrowers.

102.   For these reasons, Wells Fargo and Wachovia are directly responsible for the loans they originated directly, as well as for the many loans they funded or

purchased that were originated through their networks of affiliate and correspondent lenders, including PNC Mortgage LLC, a joint venture Wells Fargo formed with PNC Bank and PNC Mortgage LLC (collectively "PNC") in mid-2005.

## B. Wells Fargo's Financial Motivations to Engage in Their Predatory and Discriminatory Conduct

103. Defendants' continuing discriminatory and predatory practices generate financial gains from their equity stripping scheme throughout the life of each mortgage loan, and the continuing discriminatory and predatory practices Defendants employed and continue to employ further these gains through each step of their mortgage banking processes, when, *e.g.*:

- originating high cost, higher cost, near-prime, subprime, ALT-A, and other non-conforming mortgage loans on a discriminatory basis and in a predatory manner or with predatory terms (that are more profitable than prime loans, thereby increasing assets, revenue, and income);

- funding, purchasing, or acquiring such discriminatory and predatory loans through their wholesale lending and affiliated broker and correspondent lender network (increasing assets, revenue, and income);

- pooling and securitizing such originated and acquired loans for sale as RMBS (also increasing assets, revenue, and fee income, but more importantly transferring the credit risk of such loans onto third party RMBS purchasers); and

- creating through originations, retaining from securitizations, and/or purchasing lucrative MSRs on such loans (generating substantial assets); and

- servicing such loans pursuant to its MSRs (generating tremendous revenue and fee income), including initiating, and completing forecloses on such loans that have defaulted (generating more income through late charges and ancillary fees, and ultimately stripping any existing equity,

as well as the borrower's future equity from home price appreciation, in the foreclosure process).

104.   Indeed, as Wells Fargo explained in Note 21 to its 2002 Annual Report to its stockholders, relevant portions of which are publicly filed with the SEC as an exhibit to Wells Fargo's 2002 Form 10-K (such reports hereinafter referred to as "Annual Reports"), "We ***routinely originate, securitize and sell into the secondary market mortgage loans*** . . . . As a result, the Company ***typically retains the servicing rights*** and may retain other beneficial interests from the sales. These securitizations are usually ***structured without recourse*** to the Company and without restrictions on these retained interests. The retained interests ***do not contain significant credit risks***." (Emphasis added.) Wells Fargo repeated similar statements in subsequent Annual Reports.

105.   Over the relevant period, Wells Fargo has originated, funded, or purchased virtually every type of non-prime mortgage loan product available in the residential mortgage lending market, including "high cost," higher cost, near-prime, subprime, ALT-A, and other non-conforming residential home mortgage loans. Such mortgage loan products have: (1) loan application requirements, underwriting requirements or repayment terms less restrictive than traditional "prime" loans (e.g., interest-only loan terms, reduced documentation requirements, or balloon payments); (2) terms not permitted in prime loans (e.g., prepayment penalties or forced placed insurance); and/or (3) higher costs, fees, and interests' rates than prime

loans. As a result of these additional terms, costs, and risks, such loan products were expected to, did, and continue to generate greater profits for Wells Fargo than prime loans.

106.   The "Interagency Guidance on Subprime Lending," jointly issued on March 1, 1999 ("*Interagency Guidance*") by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision (Defendants' federal banking regulators) succinctly states the business rationale for lenders such as Defendants to engage in subprime and higher cost lending activities:

> Due to their higher risk, subprime loans command higher interest rates and loan fees than those offered to standard risk borrowers. These loans can be profitable, provided the price charged by the lender is sufficient to cover higher loan loss rates and overhead costs related to underwriting, servicing, and collecting the loans. Moreover, the ability to securitize and sell subprime portfolios at a profit while retaining the servicing rights has made subprime lending attractive to a larger number of institutions, further increasing the number of subprime lenders and loans.

107.   To capitalize on the opportunity presented by non-prime lending, by at least 1998, Wells Fargo and its predecessors embarked on a campaign to merge with and acquire other banking institutions to pursue the more profitable non-prime residential mortgage lending market. Following its merger that year with Norwest Corporation (which itself already had significant subprime lending and servicing operations, including through Norwest's prior acquisition of Directors Acceptance Corporation), the combined entity ranked first in the nation in residential mortgage

loan originations and loan servicing operations. Wells Fargo then endeavored to become a dominant player in the subprime lending industry through two separate channels: Wells Fargo Home Mortgage (f/k/a Directors Acceptance Corporation) and Wells Fargo Financial (f/k/a Norwest Financial, Inc.). The rebranded Wells Fargo Financial primarily offered higher cost and subprime home refinance mortgages, used for various purposes including debt consolidation, home improvement, and cash needs. The Wells Fargo Home Mortgage division sold higher cost and subprime mortgages through its retail storefronts and sought growth and non-prime market penetration through an affiliated network of mortgage brokers and correspondent lenders that included at least 140 joint ventures with smaller regional and national banks, realty companies, and builders, enabling PNC customers to apply for Wells Fargo mortgages through mortgage consultants based in PNC branches, PNC Advisors' offices, and PNC's call center.

108.   According to a former area manager for Wells Fargo Home Mortgage identified in a complaint in Illinois state court, the subprime division of Wells Fargo Home Mortgage was expected to make sufficient profit to cover the fixed costs of the rest of the bank. Indeed, managers informed employees in this division multiple times that this was the goal. To achieve this goal, the company set a quota for the number of subprime mortgages every area had to close. The company kept

scorecards for managers that included the number of subprime mortgages coming out of their area.

109.  As a result of this growth strategy, between its two subprime lending channels — Wells Fargo Home Mortgage and Wells Fargo Financial — Wells Fargo rapidly grew to become the eighth largest "high cost" and "subprime" mortgage lender in the nation by 2003, with its subprime lending totaling $16.5 billion in subprime originations that year. In 2006, Wells Fargo originated approximately $74.2 billion in subprime loans, more than any other lender in the nation.

110.  Wells Fargo's non-prime lending operations dramatically grew the amount of origination fees and income it received by maximizing the volume of mortgage loans originated, funded, or purchased, maximizing the face amount of such loans, maximizing the interest rates and other fees charged on such loans, and maximizing the price that purchasers of RMBS were willing to pay for such securitized loans because they generated higher coupon interest rates. As reflected in the chart below, over the relevant period Wells Fargo has earned tremendous income from the net gains on its originations and sales of mortgage loans and from its closing fees and costs earned on such mortgage loans:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Income  (rounded) $billions | $1.4 | $2.1 | $3.0 | $.5 | $1.1 | $1.1 | $1.3 |

| Year-end | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Income (rounded) $billions | $1.2 | $6.2 | $6.4 | $4.6 | $10.3 | $6.9 | $3.0 |

| Year-end | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Income (rounded) $billions | $4.1 | $4.3 | $2.9 | $1.6 | $2.2 |

111.   In addition to the income from fees generated by originating non-prime loans or providing wholesale funding to others to originate them, Wells Fargo's securitization activities have generated substantial revenue and fee income through the pooling of originated and acquired mortgage loans and the sale of residential mortgage-backed securities that were securitized with the pools of such loans. This practice enabled Wells Fargo to re-employ its capital continually to originate or acquire more loans (and therefore generate more fee income).

112.  Most importantly, however, Wells Fargo retained the lucrative residential MSR assets on the loans it originated, purchased, and securitized, while simultaneously transferring the risk of credit losses on the underlying loans to the purchasers of the RMBS created from the securitizations.

113.   Wells Fargo has disclosed in its financial statements publicly filed with the Securities & Exchange Commission ("SEC") that "[w]e have a sizeable portfolio of MSRs. A mortgage servicing right (MSR) is the right to service a mortgage loan — collect principal, interest, escrow amounts, etc. — for a fee. We acquire MSRs when we keep the servicing rights after we sell or securitize the loans we have

originated or when we purchase the servicing rights to mortgage loans originated by other lenders." Form 10-Q for the third quarter of 2006 ended September 30, 2006, at 30.[10]

114.   Wells Fargo's mortgage loan servicing operations generated and continue to generate substantial assets and massive amounts of revenue and income. As disclosed in Wells Fargo's Annual Reports over the time period shown in the chart below, although the fair value of Wells Fargo's MSRs are subject to a variety of assumptions (e.g., estimated loan prepayment speeds, loan life, and discount interest rate), the growth in the fair value of its MSRs generally corresponds to Wells Fargo's predatory and discriminatory non-prime residential mortgage lending activity and the resulting financial fallout from that activity (including changing pre-payment speed and loan life estimates):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $7.4 | $6.7 | $8.8 | $9.5 | $13.7 | $12.5 | $16.8 |

| Year-end | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $14.7 | $16.0 | $14.5 | $12.6 | $11.5 | $15.6 | $12.7 |

| Year-end | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $12.4 | $13.0 | $13.6 | $14.6 | $11.5 |

---

[10]   Publicly available at: http://www.sec.gov/Archives/edgar/data/72971/ 000095014906000510/ f24614e10vq.htm#123.

115.   This growth in the fair value of Wells Fargo's MSRs corresponds to the increase in Wells Fargo's annual acquisitions of MSRs from its securitizations of residential mortgage loans over the same period (not including the approximately $513 million of additional fair value of MSRs Wells Fargo obtained from Wachovia in 2008):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $1.0 | $1.5 | $2.1 | $1.4 | $2.7 | $4.1 | $3.7 |

| Year-end | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $3.5 | $6.2 | $4.1 | $4.0 | $5.2 | $3.5 | $1.2 |

| Year-end | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $1.6 | $2.2 | $2.3 | $2.0 | $1.9 |

116.   Similarly, the peak growth in the value of Wells Fargo's MSRs also corresponds to the increase in MSRs Wells Fargo obtained through its origination and purchases of residential mortgage loans over the same time period (also reflecting the general drop off of such activity during the financial crisis to levels not within Wells Fargo's financial reporting materiality threshold) as follows:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $1.9 | $2.4 | $3.5 | $1.8 | $2.7 | $3.9 | $.8 |

| Year-end | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Fair Value (rounded) $billions | $.2 | $0 | $0 | $0 |

117.   Wells Fargo's Annual Reports also reflect the tremendous growth in the size of its managed residential mortgage loan servicing portfolio, peaking in 2008 at over **$2.2 trillion** following the peak in the predatory and discriminatory lending at issue here:

| Year-end | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $trillions | $.6 | $.7 | $.8 | $1.0 | $1.4 | $1.6 | $2.2 |

| Year-end | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $trillions | $1.8 | $1.8 | $1.9 | $1.9 | $1.8 | $1.8 | $1.6 |

| Year-end | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Fair Value (rounded) $trillions | $1.8 | $1.8 | $1.9 | $1.9 |

118.   As the chart below reflects, the growth in Wells Fargo's MSR assets and its managed residential mortgage loan servicing portfolio is consistent with the tremendous annual income Wells Fargo has received, and continues to receive, from its mortgage servicing operations:

| Year end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|
| Income (rounded) $billions | $0.7 | $1.0 | $1.8 | $2.1 | $2.5 | $3.5 | $4.0 |

| Year end | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Income (rounded) $billions | $3.9 | $3.9 | $4.6 | $4.1 | $4.0 | $3.9 | $4.1 |

| Year end | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|

| Income (rounded) $billions | $3.9 | $3.4 | $3.4 | $3.6 | $3.3 |
|---|---|---|---|---|---|

119.    By 2004, Wells Fargo's income from its mortgage servicing operations (shown in the chart immediately above) began rapidly eclipsing the income Wells Fargo received from the gain on sales of its mortgage originations and closing fees (as shown in the first such chart above). This situation lasted well past 2009 when the federal government began purchasing huge numbers of RMBS from Wells Fargo and other subprime lenders as part of the financial industry bailout and related economic assistance.

120.    The enormous income Wells Fargo has received and continues to receive from its mortgage servicing operations and RMBS sales reflects both the importance of those operations to Wells Fargo's finances and the continuing nature of its equity stripping scheme that is at issue here.

121.    The financial information in the above charts also reflects that, although Wells Fargo's non-prime lending activity peaked at the height of the subprime mortgage lending boom and greatly subsided thereafter, Wells Fargo's predatory and discriminatory equity stripping scheme continues. Thus, while Wells Fargo's focus on "subprime" loan originations and purchases subsided by the end of 2008, Wells Fargo's predatory and discriminatory lending practices have continued through its other non-prime lending, and its mortgage banking and securitization activities,

including its sales of RMBS and its mortgage servicing, loan default, and mortgage foreclosure related activities.

122.   Finally, the financial information in the above charts reflects that Wells Fargo's efforts to maximize revenue and profits from its non-prime mortgage lending, securitization, and particularly its mortgage servicing operations were successful and are ongoing. Indeed, over the four years between 2010 and 2013, Wells Fargo earned a total of over ***$2.6 billion in late charges and ancillary fees*** charged to borrowers of mortgage loans for which Wells Fargo holds the MSRs.

123.   Wells Fargo's quarterly Form 10-Q public filing, for the second quarter of 2014 ending June 30, 2014, disclosed that it had a total residential mortgage servicing portfolio of approximately ***$1.8 trillion in loans***, $341 billion of which were owned by Wells Fargo and $1.45 trillion of which were owned by other entities for which Wells Fargo provides servicing.[11] As Wells Fargo further disclosed in the 10-Q, as of June 30, 2014, Wells Fargo's mortgage servicing activities ***generated quarterly net servicing fee income for Wells Fargo in the amount of approximately $1.13 billion***, reflecting annualized net servicing income of approximately ***$4.4 billion***.

---

[11]   Publicly available at: http://www.sec.gov/Archives/edgar/data/72971/000007297114000518/0000072971-14-000518-index.htm.

124.   Reflecting the corresponding increases in Wells Fargo's revenues, income, and assets over the entire period at issue, the price of Wells Fargo's common stock rose tremendously over the same period, more than doubling from its year-end 1999 adjusted closing price of $13.87 per share to $39.80 per share as of September 19, 2008. As of January 1, 2020, immediately preceding the COVID-19 pandemic, Wells Fargo's common stock closed at $46.94.

125.   Wells Fargo highly rewarded its top executives for the Company's growth during the run-up in its subprime lending activities and the associated asset growth, revenue, and income it generated. Executive compensation at Wells Fargo began to take off just as the company's non-prime lending operations ramped up. In 2001, John Stumpf, then Group Executive Vice President of Community Banking, received total annual compensation of about $1.4 million. Just one year later, Stumpf's annual compensation nearly tripled to over $3.6 million. In 2005, Stumpf was promoted to President and Chief Operating Officer and collected total annual compensation of nearly $5.4 million. Tracking the rapid increase in Wells Fargo's revenue, income and asset growth related to its predatory and discriminatory non-prime mortgage lending, securitization, and loan servicing operations at issue here, Stumpf's annual compensation skyrocketed to peak at almost $13.8 million in 2008. The financial benefit Wells Fargo's Chairman, Richard M. Kovacevich, derived in part from Wells Fargo's predatory and discriminatory lending activities was even

greater than Stumpf's. In 2001, Kovacevich earned approximately $4.9 million in total compensation. Over just one year, that nearly doubled, reaching approximately $9.1 million in 2002. By 2007, Kovacevich's annual compensation package from Wells Fargo exploded to just under $30 million, nearly six times his 2001 compensation. Similarly, Mark C. Oman, Wells Fargo's Senior Executive Vice President in charge of Home and Consumer Finance also benefited substantially as he watched his total compensation more than double from $2.8 million in 2001 to over $6.4 million by 2007.

## C.    Wachovia's Financial Motivations to Engage in Its Predatory and Discriminatory Conduct

126.   Like Wells Fargo, and prior to its acquisition by Wells Fargo, Wachovia and its predecessors also originated "high cost," higher cost, subprime, ALT-A, and other conforming and non-conforming non-prime residential home mortgage loans through both retail and wholesale lending channels and engaged in related securitization and loan servicing activities. As Wachovia disclosed in Note 5 to its 2005 Annual Statement, attached as exhibit 13 to its 2005 Form 10-K filed with the SEC," [t]he Company originates, securitizes, sells and services primarily commercial and consumer real estate loans, student loans and auto loans. . . . In connection with certain transactions where the Company securitizes and sells originated or purchased loans with servicing retained, servicing assets or liabilities

are recorded based on the relative fair value of the servicing rights on the date the loans are sold. The Company also purchases certain servicing assets."

127.    In 2006, Wachovia acquired Golden West, its subsidiary World Savings Bank, and its portfolio of predatory payment option mortgage loans known as "Pick-a-Payment" loans. Pick-a-Payment loans were non-conforming, higher cost, subprime loans, essentially a "stated income" and "stated asset" mortgage loan product, which included interest-only payment options and negatively amortizing, minimum-payment-only, payment options. After acquiring Golden West and World Savings Bank, Wachovia continued to originate, indeed push, the Pick-a-Payment loan product on less savvy borrowers. The product became the focus of Wachovia's mortgage lending operations to such a degree that, by year-end 2007, it accounted for approximately *53% of Wachovia's entire residential mortgage loan portfolio*, with an approximate value of *$120 billion*.

128.    The growth in Wachovia's managed residential mortgage loan portfolio (i.e., its consumer real estate secured loan portfolio, as disclosed in Financial Table 7 of Wachovia's Annual Reports), is reflected in the chart below:

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair    Value (rounded) $billions | $72.5 | $79.5 | $80.1 | $97.0 | $110.3 | $240.2 | $250.5 | * |

*Consolidated with Wells Fargo

129.   The chart below reflects Wachovia's income from securitizing its residential mortgage originations (i.e., its proceeds from new securitizations of consumer real estate, as Wells Fargo disclosed in Note 5 or Note 6 to Wachovia's Annual Reports):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $billions | $2.4 | $2.7 | $3 | $3 | $4.3 | $0 | $3.5 | * |

*Consolidated with Wells Fargo

130.   The chart below reflects Wachovia's service fee income from its residential mortgage originations (i.e., its service fees received from consumer real estate, as Wells Fargo disclosed in Note 5 or Note 6 to Wachovia's Annual Reports):

| Year-end | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Fair Value (rounded) $millions | $5 | $1 | $9 | $6 | $8 | $0 | $10 | * |

*Consolidated with Wells Fargo

131.   Like Wells Fargo, Wachovia generated substantial assets and income from its mortgage origination, securitization, and loan servicing operations, particularly those created from the Pick-A-Payment loan product and Wachovia's associated MSR assets. Thus, Wachovia's efforts to maximize revenue and profits from its non-prime mortgage lending, securitization, and mortgage servicing operations also were very successful, as reflected in the tremendous corresponding increase in the price of Wachovia's common stock over the same period.

132.   Also, like Wells Fargo, Wachovia highly rewarded its top executives for its growth. Executive compensation at Wachovia began to take off just as the company's subprime and higher cost lending operations ramped up. For example, Wachovia President, CEO and Chairman G. Kennedy Thompson saw his total compensation increase from just under $4.9 million in 2001 to over $16.3 million in 2002, a nearly three-fold increase. By 2006, at the peak of the subprime lending activity, Mr. Thompson's annual compensation package peaked at over $23.8 million.

133.   By the time Wells Fargo acquired Wachovia in December 2008, Wachovia's Pick-A-Payment mortgage origination activity had largely subsided, but its related and other predatory and discriminatory mortgage lending practices had not. Indeed, Wachovia continued to service its sizeable $437 billion residential MSR portfolio (fair value at year end 2007) that included many of the Pick-A-Payment loans it or World Savings Bank had originated, and Wells Fargo has since sold RMBS securitized with such loans.

134.   As a result of the merger of Wells Fargo and Wachovia, Defendant Wells Fargo is now responsible for servicing the active residential mortgage loans that both Wells Fargo and Wachovia retained servicing rights to. In addition to maintaining servicing rights on many of the first lien mortgages Defendants

originated or purchased, Defendants also serviced all second lien (e.g., home equity) loans they originated and/or purchased.

### D. Defendants Knew, or Were Grossly Negligent or Reckless in Not Knowing, about the Predatory and Discriminatory Nature of Their Conduct

135.   At all times relevant, the highest levels of the Wells Fargo and Wachovia Defendants' executive management and their boards of directors were required to know through Defendants' own risk monitoring and control efforts, and either knew or were reckless in not knowing, about the nature of the risk, the relative amounts of risk, the ability to control the risk, and the potential exposure to the risk of their non-prime mortgage lending activities. In addition, executive management and directors were required to know about Defendants' compliance (or lack thereof) with federal fair lending laws and the Fair Housing Act.

136.   The *Interagency Guidance,* which each Defendant knew, or was grossly negligent or reckless in not knowing, clearly warns against the predatory lending practices Defendants committed here:

> Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations. Higher fees and interest rates combined with compensation incentives can foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness.

137.   Because of the inherent risk to the safety and soundness of regulated banking institutions, the *Interagency Guidance* further explains that:

> Institutions that engage in subprime lending in any significant way should
> have board-approved policies and procedures, as well as internal controls
> that identify, measure, monitor, and control these additional risks. . . . If the
> risks associated with this activity are not properly controlled, the agencies
> consider subprime lending a high-risk activity that is unsafe and unsound.

138. Thus, at all times relevant, federal banking regulators required Defendants to have "board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control" the risks associated with their subprime and higher cost lending activities, including compliance with fair lending laws and the FHA. Defendants' holding companies, and their operating subsidiaries, were similarly required to maintain appropriate policies and procedures to ensure that they identified, measured, and controlled such risks.

139. Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that an appropriate risk management program required them to "take special care to avoid violating fair lending and consumer protection laws and regulations" because "higher fees and interest rates combined with compensation incentives [could] foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."

140. Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that their U.S. banking regulators, primarily concerned with bank safety and soundness issues, considered the avoidance of

predatory and discriminatory lending practices (particularly including violations of the FHA) to be an "essential component of a well-structured risk management program for subprime lenders," such as Defendants here, given the operating, compliance and legal risks involved. Indeed, at that time U.S. banking regulators were focused on the risks of abusive lending practices such as equity stripping, incorporating pricing terms that far exceeded the true risk of the loan, loan flipping, and one-way referral practices within a multi-subsidiary organization.

141.   Because Defendants core customers for their non-prime loan products (including Wachovia's Pick-A-Payment loans) are disproportionately the types of customers protected by the FHA — ethnic minority borrowers typically living in urban areas who have less access to traditional credit, limited credit histories, lower incomes, and homes with lower values but greater untapped equity, and single female borrowers with lower incomes and higher personal debt to income ratios — Defendants had every reason to ensure that their mortgage lending, funding, purchasing, securitization, and servicing practices did not violate the FHA.

142.   By virtue of the loan level information they are legally required to collect, maintain in their Loan Application Registry ("LAR"), and report to the federal government pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. § 2801-10, *implemented by* 12 C.F.R. § 1003.1, all Defendants knew, or were grossly negligent or reckless in not knowing, that the mortgage loan products they

originated or funded, securitized and serviced, contained predatory terms, were underwritten in a predatory manner, and were targeted to and/or disproportionately impacted FHA protected minority borrowers. Such data includes loan pricing data, location of property (by Metropolitan Statistical Area ("MSA"), state, county, and census tract), borrower race and ethnicity, gender, borrower income, borrower credit score, borrower debt to income ratio, loan to value ratio, and various loan terms and features (including interest rates, adjustment periods, index rates, and penalties). In addition, Defendants also are required to collect and maintain other specific and necessary lending and loan underwriting data in their LAR including, but not limited to, borrower name, the specific street-level property addresses, and the type of documentation of borrower income provided (e.g., Full Documentation, Low Documentation or No Documentation).

143.   Defendants collected (and have maintained and reported to their federal regulators on Form FR HMDA-LAR) certain of this and other mortgage loan level information covering all of the mortgage loans Defendants have made during the relevant period at issue here.

144.   As explained in 12 C.F.R. § 1003.1, *the* purpose of reporting the HMDA information Defendants are required to collect and maintain is "to provide the public with loan data that can be used," among other things "[t]o assist in

identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes."

145.   In addition to the HMDA required data, each Defendant creates, electronically maintains, and utilizes other additional information on each mortgage loan applied for and/or which Defendants purchased, sold, securitized into mortgage-backed securities, maintained, and/or serviced at any time, all in connection with Defendants' loan application, loan pricing, loan underwriting, and loan servicing activities. This data includes loan payment history, among other things, and is maintained in electronic form in Defendants' system of records, particularly including Defendants' LAR and mortgage servicing platforms.

146.   All of the foregoing loan level and loan servicing data that Defendants (and all other banking institutions) collect and maintain in electronic form is critical to Defendants' day-to-day business operations in recording, tracking, and monitoring each of the mortgage loans they make, fund, purchase, and/or service, the disposition of those loans, and Defendants' monitoring, evaluation, and financial analysis of Defendants' entire mortgage lending and servicing operations including through their respective:

- legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities; and

- analytical decisions, and analytical decision-making tools, applications, models, and data regarding, among other things

- o mortgage loan marketing (originations and wholesale);
- o credit risk scoring and risk scoring overrides;
- o override monitoring;
- o mortgage loan pricing;
- o mortgage loan underwriting;
- o mortgage loan performance, prepayment, delinquency, and loss severity rates;
- o asset valuation;
- o compliance with covenants in securitization transactions; and
- o related management compensation decisions.

147. Each Defendant created, maintained, and utilized such data in connection with its analytical decision-making tools, applications, and models regarding mortgage loan marketing (originations and wholesale), credit risk scoring, credit risk scoring overrides, override monitoring, mortgage loan pricing, mortgage loan underwriting, and related management compensation decisions.

148. Each Defendant created, maintained, and utilized such data in connection with its mortgage servicing operations.

149. Each Defendant created, maintained, and utilized such data in connection with its analytical decision-making tools, applications, and models regarding mortgage loan performance, prepayment rates, delinquency rates, loss severity rates, asset valuation, compliance with covenants in securitization transactions, and related management compensation decisions.

150. Each Defendant created, maintained, and utilized such data in connection with its legally required Management Information Systems, risk

management and control functions, internal control and compliance functions, and related board level reporting activities.

151.   For the non-prime mortgage loans Wells Fargo funded, purchased, or otherwise acquired from its affiliated brokers and correspondent lenders through its institutional and wholesale business lines, the Pick-A-Payment loans Wachovia originated directly or through its brokers, and any other mortgage loans Defendants purchased, sold, securitized, or for which Defendants acquired MSRs, Defendants were provided and have maintained all such loan level and loan servicing data in electronic form. Like the data Defendants created and maintained through their own mortgage origination activities, the data from wholesale lenders included information about the underlying mortgage loans that had been originated, including loan terms, underwriting characteristics, and borrower race, ethnicity, and gender information.

152.   Thus, Defendants knew, or were grossly negligent or reckless in not knowing, of the predatory and discriminatory nature of the non-prime mortgage loans Defendants were purchasing, securitizing, and generating MSRs from. This is particularly true where such loans followed Defendants' own pricing and underwriting policies and standards. Indeed, each of the Defendants created, distributed to, and incentivized their employees and correspondent lenders to follow each of the predatory and discriminatory mortgage pricing, underwriting, and loan

servicing policies and practices as further alleged herein. As such, Defendants knew, or were grossly negligent or reckless in not knowing, the predatory and discriminatory contents of those policies and practices, the predatory and discriminatory manner in which they were implemented, and the discriminatory effect they had on FHA protected minority borrowers in Plaintiffs' communities.

153.   As a result of their federally required risk management and control functions, internal control and compliance functions, corporate policies, and all the data they collected, maintained, utilized, and reported to federal regulators, each of the Defendants knew, or was grossly negligent or reckless in not knowing, that the mortgage loan products they originated, funded, purchased, and/or serviced contained predatory terms, were underwritten in a predatory manner and were targeted to and/or disproportionately made to FHA protected minority borrowers.

154.   Notwithstanding Defendants' knowledge regarding the predatory and discriminatory nature of their mortgage loan products and lending practices, the illegality of those practices, the risk to the safety and soundness of their federally insured banking operations, and the regulatory guidance warning against such activity, Defendants nevertheless engaged in their discriminatory equity stripping schemes (through the interrelated predatory and discriminatory mortgage lending, securitization and loan servicing activities alleged herein) for the singular purpose

of financial gain, placing their financial interests above the best interests of their

borrowers through, among other things, and as further alleged herein:

- targeting marketing of mortgage loans on unfavorable terms to vulnerable borrowers who were unsophisticated or without access to traditional credit sources;

- steering credit-worthy minority borrowers to more costly loans;

- incorporating into mortgage loans to minority borrowers' unreasonable terms, excessive fees, pre-payment penalties, and/or yield spread premiums to the loan broker (i.e., kickbacks) that are not related to borrower creditworthiness or other objective lending criteria;

- including prepayment penalties in minority borrower mortgage loans that inhibit the borrower's ability to refinance;

- basing loan values on inflated or fraudulent appraisals of minority borrowers' properties;

- repeated refinancing of loans to minority borrowers that does not benefit the borrower and often jeopardizes the property (loan flipping);

- lending to minority borrowers based on the value of the real estate asset collateralizing the loan, not the borrowers' ability to repay ("equity-stripping"); and

- inclusion of other loan terms and conditions in loans to minority borrowers that make it difficult or impossible for a borrower to reduce their indebtedness (such as credit, life, or other forced insurance policies).

155. Indeed, following lengthy parallel investigations of Wells Fargo's

mortgage lending practices by the OCC and the Department of Justice ("DOJ")

commencing in 2009, DOJ sued Wells Fargo in July 2012 for violations of the FHA,

among other federal statutes, for Wells Fargo's nationwide discriminatory and

predatory lending activities. According to the complaint, DOJ's investigation involved reviewing Wells Fargo's internal documents and non-public loan-level data on more than 2.7 million mortgage loans that Wells Fargo originated between 2004 and 2009. *See United States of America v. Wells Fargo Bank, NA*, No. 1:12-cv-01150-JDB (D.D.C. 2012) (hereinafter "DOJ Complaint"). A July 12, 2012 press release issued by the DOJ contemporaneously with the filing of the DOJ Complaint announced the parties had settled the lawsuit for "$184.3 million in compensation for wholesale borrowers who were steered into subprime mortgages or who paid higher fees and rates than white borrowers because of their race or national origin. Wells Fargo will also provide $50 million in direct down payment assistance to borrowers in communities around the country where the [DOJ] identified large numbers of discrimination victims and which were hard hit by the housing crisis."

156. As the DOJ alleged in its Complaint (emphasis added), which allegations Plaintiffs specifically make herein, senior Wells Fargo executives knew of improper discriminatory steering practices that were occurring within its non-prime mortgage origination operations but did nothing about it:

> From at least 2004 through mid-2008, Wells Fargo frequently originated short-term hybrid adjustable-rate mortgages (ARMs). These subprime loan products typically featured a relatively low nominal interest rate, sometimes called a "teaser" rate, for the first two or three years of the loan, after which the rate adjusted to a higher rate every six or twelve months. The most common types of short-term hybrid ARMS were "2/28" loans, with interest rates resetting after two years. Borrowers with 2/28 ARM loans often faced payment shock when the rate adjusted sharply upward.

Wells Fargo was *aware that many of these borrowers with 2/28 ARM loans qualified for more standard loans, such as 30-year fixed rate loans or less risky ARMs with more favorable rates that did not carry pre-payment penalties*.

Wells Fargo had information about each borrower's race and national origin.

Wells Fargo also knew or had reason to know based on its own internal monitoring and reporting that its policies of giving unguided discretion to its loan originators was resulting in discrimination. For example, Wells Fargo knew that its lending policies and practices encouraged the improper placement of qualified applicants into subprime rather than prime loan products and that its A-Paper Filter, an internal system designed to ensure that all prime-eligible borrowers were referred to the Bank's prime division, was ineffective and subject to easy manipulation.

Wells Fargo's internal documents reveal that senior officials were aware of the numerous tactics that subprime originators employed to keep loans in the subprime division, and that a significant percentage of borrowers were receiving subprime loans when they could have qualified for prime loans.

Wells Fargo did not act to adequately compensate borrowers who were victims of discrimination nor did it take effective action to change its policies or practices to eliminate the discrimination.

It was Wells Fargo's business practice to allow its HMCs [loan officers] and mortgage brokers to place an applicant in a subprime loan even when the applicant qualified for a prime loan according to Wells Fargo's underwriting guidelines.

Wells Fargo also gave its HMC's and mortgage brokers originating Wells Fargo loans discretion to request and grant exceptions to underwriting guidelines.

These policies and practices resulted in the placement of African American and Hispanic borrowers into subprime loans, when similarly situated white borrowers were placed into prime loans, both on a nationwide basis and in dozens of geographic markets across the country where Wells Fargo originated a large volume of loans.

Wells Fargo's product placement monitoring efforts, while inadequate to remedy discriminatory practices against African American and Hispanic borrowers through 2008, were sufficient to **put it on notice of widespread product placement disparities based on race and national origin**.

Even when Wells Fargo had reason to know there were disparities based on race and national origin, however, Wells Fargo did not act to determine the full scope of these product placement disparities, nor did it take prompt and effective action to eliminate those disparities.

[A]t all times relevant to this action, Wells Fargo had in place a system, called the "A-Paper Filter" or the "Enhanced Care Filter," whose stated purpose was ensuring that all prime-eligible borrowers were referred to the Bank's prime division.

**The A-Paper Filter was highly susceptible to manipulation** because individual subprime loan originators were responsible for entering a borrower's information into the Filter.

[I]nternal Wells Fargo documents indicate that **senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data** they entered into the A-Paper Filter in order to keep prime-eligible borrowers within the subprime division. Since at least 2005, **senior Wells Fargo officers were aware that this manipulation was in fact occurring on a systematic basis** but failed to take appropriate corrective action.

In mortgage lending commission structures, loan officers typically receive commissions in terms of "basis points' with one basis point being equivalent to 0.01% of the loan amount.

[A] subprime HMC lost between 25 and 130 basis points for referring a prime-eligible borrower to the prime division rather than originating the loan as subprime. **This policy and practice created a financial incentive for HMCs to originate loans as subprime rather than prime**, even when the applicant could have qualified for a prime loan.

Wells Fargo's cap on the amount of total compensation that a mortgage broker could receive on an individual loan also varied, in part, based on whether the loan was a subprime product or a prime product. From 2004 through 2007, total broker compensation for prime loans was capped at 4.5% of the loan amount. However, total broker compensation for subprime

loans was capped at 5% of the total loan amount, giving brokers a financial incentive to originate a subprime loan where possible. The higher cap means, for example, that a broker originating a $300,000 loan could make $1,500 more by originating the loan as subprime rather than prime.

Wells Fargo's compensation structure provided a strong incentive for HMCs and wholesale mortgage brokers to originate a loan as subprime, even if the borrower could qualify for a more favorable prime loan. This compensation structure, combined with the substantial discretion that subprime loan originators had to qualify prime-eligible borrowers for subprime loans, resulted in discrimination on the basis of race and national origin against African American and Hispanic borrowers.

Subprime loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible, thereby ensuring that the loan would remain in the subprime division. The incorrect information included but was not limited-to: (1) stating a reduced income in order to make a borrower's debt to income ("DTI") appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.

Subprime loan originators could also simply state that a borrower was unable to provide income documentation when a borrower had provided, or would have been able to provide, such documentation; reduced documentation loans were not required to go through the A-Paper Filter process at all.

***Subprime loan originators were not prohibited from encouraging prime-eligible borrowers to take steps that would disqualify them from receiving prime loans***, including, but not limited to: (1) encouraging borrowers to forego providing income and/or asset documentation; and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio ("LTV").

Internal Wells Fargo documents indicate that Wells Fargo ***senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.***

157.  Not only did senior Wells Fargo management know of the discriminatory steering practices occurring in its subprime operations and incentivize company loan officers and brokers to engage in such practices, but they also took the incredible step of eliminating the very electronic processes that made it easier for management to monitor such activity in the first place, effectively *concealing* this activity at the height of the subprime lending bubble. As alleged in the DOJ's Complaint (emphasis added), and as Plaintiffs specifically allege here:

> Until late 2004, the A-Paper Filter was a manual, handwritten checklist that underwriters were required to apply to every loan originally underwritten in the subprime division. Wells Fargo switched to an automated computerized filter for approximately 15 months, ***and then returned to the manual checklist format in January 2006***.

158.  Wells Fargo did not limit its improper, and illegal, loan origination activities to its non-prime loan products, but even extended them into its HUD-approved Fair Housing Administration mortgage loans that it originated pursuant to the HUD Direct Endorsement Lending program. Under HUD's mortgage insurance programs, if a borrower defaults on their loan and the mortgage holder forecloses on the property, HUD pays the mortgage holder the balance of the loan and assumes ownership and possession of the property, covering the expenses in managing, marketing, and reselling the foreclosed-upon property. This encourages lenders to make mortgage loans to creditworthy borrowers, who might not otherwise satisfy conventional underwriting criteria, and makes such mortgage loans valuable in the

secondary markets for securitizations and RMBS sales because they are secured by the full faith and credit of the United States.

159.   In October 2012, the United States sued Wells Fargo Bank for civil fraud in *United States v Wells Fargo Bank, N.A*., No. 12-Cv-7527 (hereinafter, the "HUD Complaint"), seeking recovery for its losses on the "materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance." Among other things, the HUD Complaint alleged, which allegations Plaintiffs also specifically make herein, that:

> Wells Fargo, the largest HUD-approved Federal Housing Administration ("FHA") residential mortgage lender, engaged in a regular practice of reckless origination and underwriting of its retail FHA loans over the course of more than four years, from May 2001 through October 2005, all the while knowing that it would not be responsible when the materially deficient loans went into default. Rather, as explained below, under FHA's Direct Endorsement program, HUD insured the loans that Wells Fargo was originating. During this four-and-a-half-year period, Wells Fargo certified to HUD that over 100,000 retail FHA loans met HUD's requirements for proper origination and underwriting, and therefore were eligible for FHA insurance, when the bank knew that a very substantial percentage of those loans - nearly half of the loans in certain months - had not been properly underwritten, contained unacceptable risk, and were ineligible for FHA insurance.

> Moreover, the extremely poor quality of Wells Fargo's loans was a function of management's nearly singular focus on increasing the volume of FHA originations (and the bank's profits), rather than on the quality of the loans being originated. Management's actions included hiring temporary staff to churn out and approve an ever-increasing quantity of FHA loans, failing to provide its inexperienced staff with proper training, paying improper bonuses to its underwriters to incentivize them to approve as many FHA loans as possible, and applying pressure on loan officers and underwriters to originate and approve more and more FHA loans as quickly as possible.

As a consequence of Wells Fargo's misconduct, FHA was required to pay hundreds of millions of dollars in insurance claims on defaulted loans that the bank had falsely certified met HUD's requirements, and thousands of Americans lost their homes through mortgage foreclosures across the country. Accordingly, the Government seeks recovery for its loss on these materially deficient mortgage loans that Wells Fargo recklessly underwrote and falsely certified were eligible for FHA insurance.

To compound matters, from January 2002 through December 2010, Wells Fargo purposely violated HUD reporting requirements and kept its materially deficient loans a secret. Wells Fargo was well aware that HUD regulations required it to perform monthly reviews of its FHA loan portfolio and to self-report to HUD any loan that was affected by fraud or other serious violations. This requirement permits HUD to investigate the bad loans and request reimbursement or indemnification, as appropriate. But, although the bank generally performed the monthly loan reviews and internally identified over 6,000 materially deficient loans during this period, including over 3,000 loans that had gone into default within the first six months after origination (known as "Early Payment Defaults" or "EPDs"), it chose not to comply with its self-reporting obligation to HUD.

160. Perhaps worse, the HUD Complaint alleged, which allegations Plaintiffs also specifically make herein, that Wells Fargo's management actively concealed its knowledge of early payment defaults (a red flag of poor underwriting) on the insured loans Wells Fargo had originated from the government:

Prior to October 2005, Wells Fargo, the largest originator of FHA loans in America, did not self-report a single bad loan to HUD. Instead, the bank concealed its bad loans and shoddy underwriting to protect its enormous profits from the FHA program. And when HUD inquired about Wells Fargo's self-reporting practices in 2005, the bank attempted to cover up its misdeeds by falsely suggesting to HUD that the bank had in fact been reporting bad loans. Thereafter, the bank's self-reporting was woefully and purposefully inadequate, all in an effort to avoid indemnification claims from HUD and pushback from wholesale brokers whose materially deficient loans would be reported to HUD. All told, from January 1, 2002 through December 31, 2010, Wells Fargo internally identified 6,558 loans

that it was required to self-report, including 3,142 Early Payment Defaults, but self-reported only 238 loans. As a consequence of Wells Fargo's intentional failure to self-report these ineligible loans to HUD, FHA was required to pay hundreds of millions of dollars in insurance claims when the loans defaulted, with additional losses expected in the future.

161.   In connection with its purchase of Wachovia, Wells Fargo conducted substantial due diligence regarding, and acquired, Wachovia's residential mortgage loan portfolio and related MSR assets. Wells Fargo had access (and eventually possessed) all of Wachovia's loan level information and reviewed, or should have reviewed, such information precisely to determine the risk exposure in Wachovia's mortgage portfolio and MSR assets to both financial and legal/regulatory risks. As such, Wells Fargo knew, or was grossly negligent or reckless in not knowing, of the empirical evidence (which Plaintiffs allege below) of the discriminatory and predatory nature of the Pick-A-Payment loans and the discriminatory way in which both Wachovia Mortgage and World Savings Bank originated such loans.

162.   As purchaser of Wachovia, and as a result of the merger of Wachovia into Wells Fargo, Wells Fargo is responsible for all predatory and discriminatory conduct in which Wachovia engaged. Moreover, Wells Fargo is responsible for the many more loans originated through their affiliate and correspondent lender networks, including the loans PNC originated after mid-2005.

1. In light of Defendants' knowledge and actions alleged herein, their conduct reflects either a reckless indifference or willful disregard for

the consequences of their discriminatory housing practices, or actual intent to cause the harm that Plaintiffs, their communities, neighborhoods, and residents have suffered. As such, Plaintiffs are entitled to punitive or special damages.

## E. Defendants Focused their Discriminatory Conduct on Ethnic Minorities for Non-Prime Mortgage Loans Because Defendants Considered Them the Easiest Targets

163. FHA protected ethnic minority mortgage loan borrowers were susceptible to the intentional targeted marketing efforts of the Defendants, as well as predatory subprime and high-cost mortgage lenders in each of the Defendants' correspondent and wholesale lending channels. This was because, as generally known to Defendants, such FHA protected minority borrowers traditionally: (a) lacked access to low-cost credit; (b) lacked strong relationships with traditional depository institutions; and/or (c) lacked adequate comparative financial information, access to such information and/or financial sophistication, such that they could not adequately evaluate the terms, conditions, and risks of the mortgage loan agreements they were entering into.

164. Because historical housing patterns and segregation had created communities and neighborhoods of ethnic minority population concentrations — borrowers who were typically living in urban areas, who have less access to traditional credit, limited credit histories, lower incomes, lower credit scores and

homes with lower values but, relatively untapped home equity — those communities and neighborhoods provided an efficient means for Defendants to target potential borrowers seeking to refinance their home loans, consolidate consumer loans, or obtain credit for consumer spending by utilizing their existing home equity.

165.   Given the traditional lack of competitive mortgage lending availability, the increased demand for such financing, and the concentration of that demand and untapped home equity, Wells Fargo and Wachovia directly targeted ethnic minorities with more profitable non-prime mortgage loan products because these borrowers provided the quickest and easiest path — i.e., the path of least resistance — for Defendants to originate as many loans as possible as rapidly as possible to borrowers most likely to accept the less favorable terms of Defendants' mortgage loan products. Thus, in the early 2000s, Defendants increased their marketing and lending penetration into higher ethnic minority concentrated communities across the United States, including in Plaintiffs' communities, where home values were relatively lower, home prices had not appreciated as rapidly as in other market segments (such as California), and minority borrower homes had available untapped equity.

166.   Defendants' predatory and discriminatory subprime and higher cost mortgage lending and servicing is not the result of random or non-discriminatory factors. Rather, it is the direct and intended result of Defendants' respective business

models, their intent to maximize corporate profits pursuant to those business models, and the corporate policies and practices they each put in place in order to effectuate those business models and maximize profits under them.

## F.   Wells Fargo Directly Targeted Minorities for Non-Prime Mortgage Loan Originations and Incentivized that Conduct Through its Employee Compensation Scheme and Quotas

167.   As reflected in the empirical data alleged further below, Wells Fargo targeted minority borrowers for its predatory non-prime mortgage loan products and such borrowers were disparately impacted by such products. This was the result of Wells Fargo's intentional discriminatory targeting policies and practices and its discriminatory loan pricing and underwriting policies and practices also further alleged below.

168.   SC, a former Regional Diverse Segments Manager ("RDSM") employed by Wells Fargo from 1999 through 2012, confirmed that during the time period relevant to this action Wells Fargo maintained a business unit — the "Diverse Segments" unit — "that was specifically tasked" with increasing the number of purchase money mortgage loans Wells Fargo made to two customer groups: (1) ethnic minorities, including African American, Latino, and Asian borrowers, regardless of their income and (2) low to moderate income borrowers (more typically than not ethnic minority borrowers). According to SC, to qualify as low to moderate

income, the prospective borrower had to have income at 80 percent or below of area median income.

169.   As described by SC, the role of RDSMs was to support the loan originator/lenders at Wells Fargo by building relationships with people or organizations that would refer loans to Wells Fargo. Thus, RDSMs were "relationship managers and partnership developers."

170.   SC stated that all the RDSMs reported to their local regional sales managers but also had dotted line reporting up to the Wells Fargo National Diverse Segments Manager, enabling Wells Fargo to orchestrate its targeting of minority mortgage borrowers. Indeed, Wells Fargo had RDSMs all over the country, including in Chicago, Atlanta, Maryland, Arizona, California, and New York.

171.   To reach minority borrowers, RDSMs had several Wells Fargo tools and resources available to them. Indeed, the RSDMs could access a plethora of information on their desktops, including lists of the top five companies that made the most mortgage loans in several categories, including low- and moderate-income borrowers, African American borrowers, and Latino borrowers.

172.   The Diverse Segments unit maintained a central Diverse Segments office within Wells Fargo's Silver Spring, Maryland, offices, which produced information for the RDSMs nationally about the minority communities they were to target for potential borrowers. For example, SC received from the Wells Fargo

Diverse Segments corporate headquarters maps, with color coded census tracts by ethnicity, which showed specific neighborhoods with high concentrations of African American or Latino borrowers. SC confirmed that all the RDSMs received similar maps, color coded by ethnicity, for their geographic areas of their responsibility.

173.   SC explained that the RDSMs, including SC, "used the maps in a number of different ways." For example, the maps allowed RDSMs to "see penetration in their markets" as to how many borrowers in the color-coded areas had mortgage loans with Wells Fargo. Then, the RDSMs were able to decide how best to increase the penetration of Wells Fargo's loans within the ethnic minority communities on which they focused. According to SC, this included whether Wells Fargo needed to recruit account executives in these markets, advertise in those markets, partner with realtors in those markets, partner with community organizations, or use some combination of each of these options.

174.   Another Wells Fargo RDSM tool SC identified was a database that detailed which local real estate brokers had the largest number of sales in particular ethnic neighborhoods and among targeted minority populations. The RDSMs could use that data to forge "strategic relationships" with realtors who could then recommend or refer minority borrowers to apply for mortgage loans from Wells Fargo. In addition, SC stated that the Wells Fargo Area Manager lender who SC worked with had a database that showed the equity in the homes within targeted

neighborhoods and used that data to specifically target and market refinance offers to the targeted potential borrowers. Area Managers and account executives were compensated for both refinances and purchase originations. SC did not use this database because RDSMs only targeted customers for purchase money loans, not refinances.

175.   The database of realtors was particularly useful to the Wells Fargo lender account executives who originated the loans because they could identify and try to partner with "the biggest producers" to gain access to those realtors' clients. Wells Fargo provided tools account executives could use to build partnerships with realtors or their clients. The tools included marketing materials, "drip campaign" materials, and trinkets such as calendars or mugs. RDSMs did less promotional based marketing and instead offered "lunch and learns" with realtors and realtor associations and had more direct contacts with realtors, such as taking them to lunch.

176.   RDSMs took a similar approach of direct contact and educational programs with community groups and faith-based groups. RDSMs established relationships with non-profit organizations, faith-based organizations, builders, and other community-based organizations that could provide another source of minority borrower referrals to Wells Fargo.

177.   To accomplish this, RDSMs encouraged the non-profits they sought as referral sources, including faith-based organizations, to apply for grants from the

Wells Fargo Foundation. Referring entities eligible for such grants included non-profits that promoted homebuyer education, worked with third-party groups to provide such education, or that invited RDSMs and Wells Fargo to provide such information. During the relevant period, Wells Fargo published on its website a list of its charitable foundation "managers" who, in many instances, are also RDSMs or hold other positions at Wells Fargo with responsibility for minority lending. After being approved by the Foundation to receive any grants, it was up to the discretion of the RDSM whether to provide a grant, and in what amount, to any particular recipient. To that end, each RDSM was given an annual budget of charitable foundation funds, which amount Wells Fargo varied (from $65,000 to over $300,000) based on how highly Wells Fargo valued the particular region.

178.   As SC testified, Wells Fargo provided grants to churches or other non-profit or community organizations with the implicit understanding that the church or organization would refer their members to Wells Fargo to apply for mortgage loans from Wells Fargo. These churches included predominantly African American or predominantly Latino congregations and were approached specifically to reach African American or Latino prospective mortgage borrowers.

179.   RDSMs also provided training presentations and support to local chapters of an association of primarily African American real estate professionals, the National Association of Real Estate Brokers. Similarly, RDSMs forged

relationships with local chapters of the National Association of Hispanic Real Estate Professionals.

180.   In addition to the foregoing, SC explained that, to achieve their targeting goals, RDSMs also were tasked with recruiting mortgage account executives (i.e., loan originators) for Wells Fargo "based on their community contacts." For potential recruits, their community contacts, and the ability to get minority borrowers within those communities to apply for loans with Wells Fargo was important. While SC often recruited employees based on a combination of their mortgage experience and community contacts, she stated that Wells Fargo hired account executives with no previous experience in the mortgage business and based the hiring decision on the prospective employee's connections within a particular ethnic community that Wells Fargo was targeting.

181.   SC also stated that Wells Fargo recruited people who had relationships in minority communities such that the recruits could supply purchase loans from minority borrowers. SC confirmed that some of these recruits were hired, even though they had no mortgage experience, because their community relationships indicated they could be successful bringing in loans to help meet minority lending goals.

182.   To maximize originations of mortgage loans to minority borrowers, Wells Fargo imposed on RDSMs specific goals regarding the number of mortgage

loans to minorities. Wells Fargo financially incentivized RDSMs to meet those goals. Thus, while RDSMs were paid a salary, they were also paid an "override bonus" based entirely on the number of mortgage loans made to low- to moderate-income borrowers and ethnic minorities. RDSMs also received bonuses based on how many mortgage loans newly recruited account executives made to low- to moderate-income borrowers or ethnic minority borrowers in the first year of those new employees' work with Wells Fargo. In addition to these positive incentives, Wells Fargo also utilized a negative incentive approach. According to SC, Wells Fargo published each RDSM's performance within the Diverse Segments group, based on their achieving loan targets to low- to moderate-income borrowers and minority borrowers, on "one scorecard for the whole country. Everybody saw everybody's numbers."

183.   Indeed, a July 20, 2011, *Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent*, Docket Nos. 11-094-B-HC1, *et al.* ("FRB Consent Order")[12] that the Federal Reserve Board brought against Wells Fargo and Wells Fargo Financial, confirmed that "[u]nder Financials' sales performance standards and incentive compensation programs, Financial sales personnel, called 'team members,' were expected to sell (a) a minimum dollar

---

[12] Available at http://www.federalreserve.gov/newsevents/press/enforcement/enf20110720a1.pdf.

amount of loans to avoid performance improvement plans that could result in loss of their positions with Financial, and (b) a minimum dollar amount of loans to receive incentive compensation payments above their base salary."

184.   While some of the loans Wells Fargo originated through its Diverse Segments division may have qualified as Community Reinvestment Act ("CRA") loans,[13] most of the loans did not. Regardless, in many cases, even if they did qualify, minority borrowers were steered to higher cost, non-prime, or less favorable alternatives, including conforming FHA and Freddie Mac mortgage loans that Wells Fargo could securitize and sell. Because CRA loans are low cost, the loan must be carefully underwritten and kept on a lender's books to qualify as a CRA loan. CRA loans are far less profitable to lenders, they tie up the lender's capital because they cannot be sold or securitized. Although subject to regulatory supervision, regulators do not force lenders to make such loans. Thus, Wells Fargo had a strong financial interest not to make CRA loans and made very few of them.

---

[13] To help overcome the historical reluctance of traditional lenders to make loans in minority communities (whether because of prejudice or lack of profit incentive) – i.e., "redlining" – the CRA, 12 U.S.C. § 2901, was enacted by Congress in 1977 to incentivize federally regulated banks and savings and loan institutions to make residential mortgage loans, consumer loans and commercial loans into predominantly minority communities. Because CRA loans are low cost and properly underwritten to avoid, and prevent financial loss to the borrower and the lender due to default, *CRA loans typically have much lower default rates than subprime or higher cost loans and certainly loans that are predatory*. Thus, according to then-Comptroller of the Currency in 2008, John C. Dugan, CRA loans were "not the culprit behind the subprime mortgage lending abuses, or the broader credit quality issues in the marketplace." Indeed, an extensive study of the CRA conducted for the Federal Reserve showed that CRA did not exacerbate the foreclosure crisis in any meaningful way.

185.   Other confidential witnesses who were former employees of Wells Fargo who were cited in a complaint filed against Wells Fargo in the United States District Court for the Southern District of Florida have confirmed that Wells Fargo pushed more expensive FHA and Freddie Mac loans on low- to mid- income borrowers instead of explaining the benefit of a CRA loan to a qualifying borrower.

186.   Those confidential witnesses also detailed, among other things, how Wells Fargo targeted its predatory and discriminatory lending practices toward predominantly African American and Latino neighborhoods. This included Wells Fargo's: (1) community based ethnic minority outreach programs that directly targeted ethnic minority borrowers for non-prime loans at community organizations and church gatherings; (2) sending only employees of color to make presentations to predominantly African American or black churches; (3) hosting presentations such as a "wealth building" seminars designed to promote non-prime products in 2005; and (4) refusing to allow a specific former employee to appear before a predominantly African American audience because she was "too white."

187.   Perhaps even more shocking, Wells Fargo utilized a computer function that permitted its employees to customize Wells Fargo marketing materials to target African Americans directly by choosing "African American" in a pull-down menu of "language options," according to a complaint filed in a separate action brought by the Illinois Attorney General against Wells Fargo in Illinois state court.

188.   According to the deposition testimony of a former Mortgage Consultant Wells Fargo employed from October 2003 through December 2006 ("ABL"), Wells Fargo trained its employees to "scrub" (i.e., review) internal Wells Fargo mortgage data. "Scrubbing" required ABL to look for "anyone with a LTV [Loan to Value Ratio] that had enough equity that they could pull cash out." "Scrubbing" is how ABL was trained to find potential borrowers for Wells Fargo's non-prime mortgage loans, including for cash-out refinance loans. ABL also testified that when she was first hired, she was sent to Arizona to attend a training for mortgage consultants that worked nationwide.

189.   ABL stated that, "in sub-prime, we needed to find people to refi." Thus, most of the sub-prime mortgages that ABL wrote were for refinancing existing mortgage loans. To that end, ABL was trained to search for Wells Fargo Adjustable Rate Mortgages (ARMs) that were set to expire. ABL also opined that Wells Fargo's subprime loans were "set up to fail" because they included loans for customers with approximately a 580 credit score, with stated income who were seeking 100% financing.

190.   At the time they originated many of the loan products at issue, funded others to make them, and/or purchased such loans to pool and resell, Defendants all knew or were reckless in not knowing that borrower "payment shock" — a large increase in borrowers' monthly mortgage payments — would result from the

scheduled increases to the interest rate and, in the case of Pay Option ARMS, were further magnified by negative amortization.

191.  Wells Fargo pressed upon FHA protected borrowers a revolving line of credit secured by their homes, in many cases systematically tacking on home-secured credit cards with high interest rates as junior mortgages that were never requested by the borrowers. These loans harm borrowers in a number of ways: (1) the higher interest rates on the credit lines generate high interest payments; (2) the home-secured debts inflate borrowers' loan to value ratios, making it more difficult for them to refinance out of their high-cost loans; and (3) borrowers are often not aware that these loans are secured by their homes.

192.  According to a former employee of Wells Fargo who provided a confidential witness statement in a separate California action, Wells Fargo loan officers would encourage customers to roll up unsecured debt into adjustable rate mortgages, intentionally misleading the customers about the potential negative effects of turning unsecured debt into a debt secured by the equity in their homes. The loan officers would tell the borrowers, for example, "they'd save on their monthly payment, and that was good, because they'd need extra money to buy some furniture and pay moving expenses, et cetera."

193.  As the FRB Consent Order confirmed, "in some cases, contrary to Financials' written policies and procedures, sales personnel marketed these loans to

customers by representing that the debt-consolidation home mortgage refinancing loans would improve or repair a consumer's credit."

194.   Although Wells Fargo's stated policy was that its credit managers found a "tangible benefit" to refinancing a consumer's mortgage, that policy was not seriously implemented or enforced, and Wells Fargo's definition of a "tangible benefit" was so broad as to be meaningless. According to the Center for Responsible Lending, by Wells Fargo's standards, a tangible benefit would exist so long as the refinanced loan reduced a customer's current monthly debt payments by any amount. For example, based on this permissive definition, Wells Fargo credit managers could charge over $17,000 in fees to refinance $10,000 in 29% interest credit card debt, and still provide a "tangible benefit" to the borrower. Thus, under Wells Fargo's definition, a tangible benefit would include increasing a consumer's mortgage balance to pay off unsecured debts, even though the long-term cost of financing such debt over the life of the mortgage could exceed the cost to the borrower of just repaying the unsecured debt down more directly. Wells Fargo also included in its definition of a "tangible benefit," a loan refinance in which the borrower was moved from an adjustable rate mortgage to a fixed rate mortgage, regardless of whether the fixed rate mortgage was less advantageous for the borrower.

195.   Wells Fargo also incentivized the making of non-prime loans through its internal referral systems in its retail operations. In these retail operations, Wells

Fargo drew a clear line between the products prime loan officers originated and subprime loan officers within Wells Fargo Home Mortgage's subprime division could originate. Wells Fargo did, however, permit loan officers on either side of the business to refer borrowers to loan officers on the other side. This meant that prime loan officers could refer borrowers to subprime loan officers and vice versa. As Plaintiffs describe below, however, Wells Fargo Home Mortgage's policies created stronger incentives to refer borrowers from prime to subprime.

196.   Wells Fargo Home Mortgage's compensation policy for referrals from prime to subprime loan officers provided significant financial incentives to its prime employees to steer borrowers into subprime mortgages, even if the borrowers could have qualified for prime mortgages. This referral compensation policy initially split the commissions for a subprime mortgage resulting from a referral by a prime loan officer to a subprime loan officer 60/40, meaning the subprime loan officer received 60% of the compensation, and the prime loan officer received 40%. Later Wells Fargo altered this policy to provide the prime loan officer a flat rate of 50 basis points for mortgages referred to subprime loan officers that resulted in the closing and funding of a subprime mortgage. Under both policies, prime loan officers could do little work and still receive significant compensation for referring a borrower to a subprime loan officer as opposed to spending the time and energy needed to originate a typically more document-intensive prime mortgage for the borrower. Employees

at Wells Fargo Home Mortgage predictably took advantage of this compensation policy by steering prime borrowers into subprime mortgages. There was never a reciprocal benefit to refer borrowers to prime loan products.

197.   Wells Fargo also compensated subprime loan officers significantly more per loan — a maximum of 325 basis points — than prime loan officers, who received a maximum of just 65 basis points. Subprime loan officers received 25 basis points for referring a loan to a prime loan officer, while prime loan officers received twice that amount — 50 basis points — for referring a loan to a subprime loan officer.

198.   These referral policies provided virtually no incentive for subprime loan officers to refer mortgages to prime loan officers or for prime loan officers to accept the referrals. In fact, according to a former employee cited in a separate Illinois state court action, it was difficult to get a prime loan officer to accept a referral from a subprime loan officer because the prime loan officer would have to give away too much of his or her commission to the referring subprime loan officer.

199.   The Wells Fargo Home Mortgage quota system was another consideration for subprime loan officers in determining whether to refer a mortgage to prime loan officers. The requirement that subprime loan officers close a certain number of loans per month created a strong disincentive to refer loans to prime loan officers.

200. Wells Fargo Home Mortgage also structured compensation for subprime loan officers so that there was great incentive to close as many subprime loans as possible, with the inevitable result of severely curtailing referrals to prime mortgage loan officers. Wells Fargo tiered compensation for these employees so that if the loan officers closed enough mortgages in a month to move to the next tier, the loan officers would receive greater compensation per additional loan.

201. These practices and policies in combination with Wells Fargo's underwriting and loan servicing policies and practices, as Plaintiffs allege below, resulted in the discriminatory conduct alleged herein.

## G. Wachovia Targeted its Pick-A-Pay Loan Originations to FHA Protected Minority Borrowers

202. The empirical data alleged below reflect that Wachovia targeted minority borrowers for its predatory Pick-A-Payment loan product and that the failure of the loan product itself disparately impacted minority borrowers.

203. Wachovia's heavy sales focus on its Pick-a-Payment product, discriminatory loan pricing and underwriting policies and practices, and compensation scheme — also further alleged below — all contributed to the discriminatory manner it was targeted to and disparately minority borrowers. According to a former Mortgage Consultant, KF, employed by Golden West Financial and Wachovia until Wachovia was acquired by Wells Fargo in December 2008, Wachovia pushed its employees in "meeting after meeting" to sell "Pick-A-

Payment" loans: "[I]t was ringing in our ears every day there." KF stated that Wachovia held state-wide mortgage consultant conference calls to increase the product originations: "It was the biggest thing flying. They really pushed us to sell it first. We were forced to push the product." KF further testified that the borrowers it was pushed upon "were not sophisticated enough to understand that loan. It did not work for the people in my area. Yet we were constantly required to . . . push that loan."

204.   KF stated that her compensation, as well as other mortgage consultants' compensation, was tied to sales of the Pick-A-Payment product. KF said Defendants imposed quotas for the number of Pick-A-Payment loans she needed to originate, and she would "get paid a whole lot more" for originating them. Thus, KF estimated that at least 30% of all mortgages she closed in the 2007-2008 timeframe for Wachovia were Pick-A-Payment loans. KF, however, "hated selling it. We were forced to sell it to people that didn't understand it — they didn't grasp what it meant." KF explained that the product was mostly a refinancing tool, as opposed to a mortgage product for home purchases and that because it had four payment options — three of which created negative amortization, they "made the loan bigger."

205.   While KF did not market the Pick-A-Payment loan product herself, most of her customers were referred to her by Financial Consultants in the Wells Fargo branches that had been trained by Wells Fargo to send potential Pick-A-

Payment borrowers to her. In addition, KF and other Wachovia mortgage consultants were trained on selling the product in meetings "a couple of times a month — learning how to pick out the right customers."

206.   KF and other mortgage consultants were trained to sell the product specifically to customers "with a lot of debt. It was basically for people that were struggling, for people that couldn't make ends meet. It was packaged as a way for people to use the equity in their homes to wipe out their debt — they could use their homes for it. Most minorities did not have money necessarily for the home purchase, but they had some equity in their home." Thus, "most" of KF's customers were African Americans who made up a significant part of Wachovia's core customer base for Pick-A-Payment loans.

207.   KF believed that the Pick-A-Payment product was the reason for so many subsequent foreclosures by Wachovia in her geographic area. KF also testified that she did not believe that Pick-A-Payment loans were in the borrowers' best interests in that region.

208.   RB, a Mortgage Consultant employed by Wachovia from June 2006 and thereafter by Wells Fargo until April 2012, testified that, at its state-wide mortgage consultant meetings, Wachovia "kept preaching" to make Pick-A-Payment loans. In fact, RB was told at the meeting that "if they order steak, you sell them chicken." As explained at the meeting, mortgage consultants needed to offer

the Pick-A-Payment loan to borrowers because if it was offered "they may buy it." It was like a "menu, and you're telling them, You think you want this, and you're the waitress. You're going to tell them about your specials today."

209.  RB testified that Pick-A-Pay loans "had its place for a certain client," a "savvier client" with a "lot of liquid assets and knew what they were doing." Pick-A-Pay loans were high risk and possibly predatory for first time or less savvy borrowers because the loan officer could determine whether to offer the borrower the fixed rate conversion option at the time the loan was originated. If the loan officer decided not to include the conversion option, then the borrower was never given the option. The "loan officer was in control" of whether to offer the conversion option. According to RB, if the conversion option was offered and the borrower chose the conversion option, then the loan officer's commission may have been less than if the loan officer simply chose not to offer the conversion option.

210.  These practices and policies in and of themselves, and further in combination with the Wachovia's underwriting and loan servicing policies and practices as alleged below, resulted in the discriminatory conduct alleged herein.

211.  In sum, Wells Fargo's and Wachovia's compensation schemes, quotas, and various pressure tactics were used to incentivize their loan officers, managers, brokers, and correspondent lenders to make as many non-prime loans as possible. And to make those loans as profitable as possible, Defendants encouraged

discretionary pricing policies and shoddy underwriting practices as Plaintiffs further allege below, resulting in the discriminatory conduct at issue in this complaint.

**H.     Defendants' Discretionary Pricing Policies Enabled and Incentivized Predatory Non-Prime Mortgage Lending on a Discriminatory Basis Through Their Wholesale Lending and Broker Channels**

212.   Defendants' discretionary pricing policies expressly authorized and encouraged discretionary non-prime mortgage loan origination and finance charges, including higher interest rates, increased fees at closing, additional or add-on fees, and/or other discretionary charges, all to maximize the profit on each non-prime mortgage loan. These discretionary charges are collected at the time the loans are originated and continue to be collected during the life of the loans through Defendants' loan servicing activities.

213.   Once a mortgage loan applicant provided their credit and financial information to Defendants through a mortgage consultant, loan officer, mortgage broker, or correspondent lender, Defendants performed an initial objective credit analysis. At this point, Defendants evaluated various traditional, objective, risk-related credit variables relating to the prospective borrower, including the borrower's debt-to-income ("DTI") ratio, the borrower's home's loan-to-value ("LTV") ratio,[14] the borrower's credit bureau history, FICO scores, and other credit

---

[14] Loan to value ratio is one of the most important factors in assessing default risk. It is the amount of the loan divided by the value of the home as of the date of the loan origination. The higher the

information such as bankruptcies, automobile repossessions, prior foreclosures, and payment histories, among other things. From these objective factors Defendants derived a risk-based financing rate for each borrower applicant, which is referred to in the mortgage industry as the "par rate" or the "base rate." Defendants then communicated the par or base rate back to the loan officer, branch manager, broker, or correspondent lender seeking to originate the mortgage loan.

214. Via "rate sheets" and other written communications made in conjunction with the par rates, however, Defendants regularly communicated, simultaneously encouraged, and automatically authorized their mortgage consultants, loan officers, branch managers, brokers, and correspondent lenders to mark up the par rate and impose additional discretionary or subjective charges, yield spread premiums, and other fees and costs on non-prime mortgage loans offered to FHA protected minority borrowers that were not based on any particular or appropriate credit risk factor — i.e., "overages."

215. Defendants' internal rate sheets for its mortgage consultants, loan officers, and branch managers informed them of Defendants' retail interest rates (i.e., that already included Defendants' own profit margins) and charges or

---

ratio, the less equity borrowers will have, the more likely borrowers will be to default during times of financial hardship.

adjustments for any risk factor or type of loan product other than a prime, conforming 30-year fixed rate mortgage loan, where the borrower's DTI is less than 45%, has a FICO score above 720, and the value of the home and amount of the loan create an LTV at or below 80%.

216. Defendants' external rate sheets for its brokers and correspondent lenders informed them of Defendants' different wholesale interest rates and charges for any risk factor or loan type and the associated profit margins for the broker or correspondent lender, including any additional yield spread premium that they could earn by charging the borrower interest rates higher than the Defendants' wholesale rates to the broker or tacking on additional origination fees and costs.

217. Wells Fargo communicated its non-prime mortgage loan product prices to its brokers through rate sheets available to brokers on a weekly daily basis via email or the "Brokers First." According to Wells Fargo's Wholesale Pricing Policy, Wells Fargo's Capital Markets Group initiated price changes as a result of rate movements. In addition, the Wholesale Pricing Group initiated price changes to adjust profit expectations or alter competitive position.

218. Wells Fargo and Wachovia benefitted financially from the loans they or their brokers made at interest rates above the par rates set by its rate sheets, and they benefitted even more if loans were made at rates above wholesale rates, which created yield spread premiums. For those loans Defendants sold or securitized,

higher interest rates meant sales at prices higher than otherwise would have been obtained. For loans they retained, higher interest rates meant more interest income over time and, therefore, generating greater MSR asset valuations.

219.   Defendants compensated brokers through origination fees and other direct costs charged to the borrower, which Wells Fargo directed its closing agents to pay to brokers out of borrowers' funds at the loan closing. Defendants also compensated brokers via yield spread premiums, or overages, by increasing the amount of the interest rate on a borrower's loan above the wholesale and par rates Defendants charged.

220.   From approximately 1999 to 2003 Wells Fargo did not cap the amount of fees or the rate its brokers could charge on a non-prime mortgage loan. While this policy was in place, there was no impediment to brokers charging as much over the rates quoted as they wanted. During the remainder of the subprime lending boom, Wells Fargo imposed a cap on total broker compensation of brokers of 4.5% (450 basis points) of the loan amount on prime loans but allowed a higher cap of 5% (500 basis points) on non-prime loans, further incentivizing brokers to make non-prime loans.

221.   Defendants were fully informed of all broker fees charged with respect to each individual residential loan application presented to them. Indeed, Defendants required brokers to disclose to the borrower all compensation and all other fees the

broker expected to receive in connection with the mortgage loan on the Good Faith Estimate, the HUD-1, and other disclosures as applicable. And the total fees brokers charged raised the annual percentage rate on a loan above the par and wholesale rates that Defendants provided to such brokers.

222.   Other than these caps, Wells Fargo did not establish any objective criteria, or provide guidelines, instructions, or procedures for brokers and correspondent lenders in its wholesale channels to follow in setting the amount of direct fees they should charge or in determining to charge an interest rate for a loan above that set by its rate sheet, which in turn determined the amount of YSP that Wells Fargo would pay the broker.

223.   While Wells Fargo authorized brokers to inform prospective borrowers of the terms and conditions under which a Wells Fargo residential loan product was available, Wells Fargo did not require the mortgage brokers to inform the prospective borrower of all available loan products for which the borrower qualified, of the lowest interest rates and fees for a specific loan product, or of specific loan products best designed to serve the interests the applicant. Upon receipt of a completed loan application from a broker, Wells Fargo evaluated the proposed loan using its underwriting guidelines and determined whether to originate and fund the loan.

224.   Defendants' discretionary pricing and related compensation policies therefore monitored, authorized, and provided financial incentives to Defendants' loan officers, branch managers, and correspondent lenders to make subjective price adjustments to the loans they generated.

225.   In addition, Defendants put in place the pre-payment penalties and fees they included in many of their subprime mortgage loan products either to control the borrowers' refinance of the loan or to generate additional fee income when borrowers refinanced their loans with other lenders.

226.   Defendants' mortgage consultants, loan officers, mortgage brokers, and correspondent lenders exercised the pricing discretion that Defendants gave them on every non-prime mortgage loan applied for by a minority borrower and did so in a discriminatory manner. Indeed, according to a confidential witness statement provided by a former employee of Wells Fargo in a separate action currently pending in California, "[s]teering was rampant," because a higher commission was paid on subprime loans. Regarding first-time home buying programs, the confidential witness stated that they "were pushed heavy, heavy in lower-income neighborhoods . . . . They steered more into subprime lending."[15]

227.   According to the DOJ's investigation, outlined in its complaint against Wells Fargo, these disparities in total broker fees mean, for example, that in 2007,

---

[15] Some Wells Fargo employees referred to these types of loans as "ghetto loans."

Wells Fargo charged the average prime wholesale customer borrowing $300,000 about $2,064 more in broker fees not based on borrower risk if she were African American, and an average of about $1,251 if she were Hispanic, than the average amount charged to a white prime wholesale customer. In specific MSAs, these disparities in total broker fees mean that in 2007 Wells Fargo charged a prime wholesale customer borrowing $300,000 on average about $2,937 more in broker fees not based on borrower risk if she were African American, and an average of about $2,187 more if she were Hispanic, than the average amount charged to a white prime wholesale customer. These disparities in total broker fees also mean, for example, that in 2005, Wells Fargo charged the average subprime wholesale customer borrowing $300,000 about $1,212 more in broker fees not based on borrower risk if she were African American than the average amount charged to a white subprime wholesale customer.

228.   Defendants knew, or were grossly negligent or reckless in not knowing, that their mortgage consultants, loan officers, mortgage brokers, and correspondent lenders exercised the pricing discretion that Defendants gave them and did so in a discriminatory manner. Defendants had in their possession all the information to make that determination. Defendants had the legal obligation to make that determination and to ensure it did not happen. Defendants had incentivized its mortgage consultants, loan officers, mortgage brokers, and correspondent lenders to

use their discretion in way that resulted in the most non-prime loans possible, for the highest profit possible. And Defendants' core customers for their non-prime loan products (including Wachovia's Pick-A-Pay loans) were disproportionately FHA protected minority borrowers who are frequently the target of predatory lending activity.

229.   Indeed, Wells Fargo was directly and extensively involved in setting the complete, final terms and conditions of wholesale loan applications generated by mortgage brokers that Wells Fargo approved and originated. At the time of originating each loan, Wells Fargo was fully informed of the loan terms and conditions, including the fees it passed along to brokers, and it incorporated those terms and conditions into the wholesale loans it originated.

230.   Despite their knowledge that their discretionary pricing and compensation policies were leading to the discriminatory practices Plaintiffs complain of here, Defendants did not undertake to stop or prevent this conduct but instead approved, affirmed, or ratified these discretionary pricing decisions for each non-prime mortgage loan Defendants originated, funded, purchased, or otherwise acquired that were subject to such discretionary pricing practices.

231.   Defendants' predatory, discretionary, and discriminatory loan pricing policies — which by design imposed differing finance charges on persons with the

same or similar credit profiles — were targeted to and have disparately impacted FHA protected minority borrowers in Plaintiffs' communities and neighborhoods.

232.   Because of Defendants' increased fees and costs built into non-prime loans, along with Defendants' high loan-to-value lending practices (particularly in cash out refinance transactions and home equity loans), FHA protected minority borrowers in Plaintiffs' communities and neighborhoods often had little equity, no equity, or negative equity in their homes upon the closing of Defendants' mortgage loans to them.

## I.   Defendants Lowered or Circumvented Their Underwriting Standards, Enabling Predatory Non-Prime Mortgage Loans to Be Made on a Discriminatory Basis

233.   Underwriting guidelines are designed to enable mortgage lenders like Defendants to determine the risk of offering a loan to a borrower applicant based on the standard "three Cs" of lending: Credit (of the borrower), Capacity (of the borrower to pay the loan), and Collateral (the value of the underlying asset). Uniform application of underwriting standards minimizes the risk of credit losses, compliance risk, and legal risks resulting from discriminatory lending practices, among other things.

234.   At all relevant times, Defendants established and maintained uniform written underwriting standards or guidelines that purported to identify the objective criteria that an applicant had to meet to qualify for a particular type of loan product.

112

Defendants made these underwriting guidelines available to their underwriting departments, mortgage consultants, loan officers, and branch managers, as well as their third-party loan originators (brokers and correspondent lenders) who originated the mortgage loan products Defendants funded, purchased, or otherwise acquired. These underwriting departments, mortgage consultants, loan officers, and branch managers, as well as their third-party loan originators (brokers and correspondent lenders) that originated the mortgage loan products that Defendants funded, purchased, or otherwise acquired utilized these underwriting guidelines.

235.   As Defendants' demand for more profitable non-prime or subprime mortgage loans grew in the mid-2000s time period, to feed their mortgage securitization and RMBS activities while home prices increased or remained at historical highs, Defendants lowered their underwriting standards and/or engaged in various practices to circumvent or override them. In this way, Defendants were able to increase their revenue, income, and assets from originating, purchasing, securitizing, and servicing non-prime mortgage loans.

236.   Defendants relaxed their underwriting policies to authorize and encourage Defendants' underwriters and brokers or correspondent lenders to approve greater numbers of non-prime mortgage loans on riskier terms to under-qualified or unqualified borrowers, steer otherwise prime-eligible borrowers to non-prime loans, or improperly increase loan amounts, interest rates, and other costs.

Defendants did this to make as many loans as possible and at the highest profit levels possible.

237.   Defendants knew, or were grossly negligent or reckless in not knowing, that their underwriting standards were declining or being circumvented. Defendants had in their possession all the information to make that determination and had the risk management "safety and soundness" regulatory obligations to make that determination and ensure it did not happen.

238.   In response to public and regulatory criticism of Wells Fargo's steering practices, in 2005 Wells Fargo Financial put in place a system called the "A-Paper Filter" or the "Enhanced Care Filter," the purposes of which included enhancement of automation in providing borrower information to underwriting (a written checklist was previously used, among other things) to ensure that prime-eligible borrowers were referred to the Bank's prime division and to provide prime pricing to borrowers who qualified for debt consolidation cash-out refinancing mortgage loans.

239.   If an applied-for transaction "passed" the filter and a further underwriting process, the prospective borrower should have been offered prime pricing from Wells Fargo Financial. In early 2006, however, to increase the number of originated non-prime loans, Wells Fargo modified the A-Paper Filter so that borrower applicants potentially qualifying transactions instead would be referred to Wells Fargo Home Mortgage. At the same time, and as Plaintiffs further allege

above, Wells Fargo Financial revised its performance standards and compensation programs so that it generally was less advantageous to sales personnel to sell a prime loan to the customer than a non-prime loan.

240.   The A-Paper Filter was highly susceptible to manipulation because individual loan originators (subject to compensation incentives and quotas) were responsible for entering a prospective borrower's information into the Filter. Loan originators had the ability to enter incorrect information into the A-Paper Filter to prevent a borrower from being identified as prime-eligible, thereby ensuring that the loan would remain in the subprime division. The incorrect information included but was not limited to: (1) stating a reduced income to make a borrower's debt-to-income ratio appear higher than it actually was; (2) omitting assets to create the appearance that a borrower had no reserves; and (3) misstating the borrower's length of employment.

241.   As the DOJ Complaint confirmed, internal Wells Fargo officers indicated that senior Wells Fargo officers were aware that the Bank's compensation structure incentivized loan originators to manipulate the data they entered into the A-Paper Filter to keep prime-eligible borrowers within the subprime division.

242.   Indeed, internal Wells Fargo audits of the A-Paper Filter identified multiple problems. These audits indicated that data input into the Filter was often

inconsistent with the information contained in the loan files and that that many loans were originated as subprime although no subprime qualifiers existed in the loan files.

243.   Moreover, Wells Fargo did not prohibit loan originators from encouraging or upselling prime-eligible borrowers to take steps that would disqualify them from receiving prime loans, including, but not limited to, the following: (1) encouraging borrowers to forego providing income and/or asset documentation, and (2) encouraging borrowers to take out additional cash or forego making a down payment, thereby increasing the borrower's loan-to-value ratio. While borrowers received certain disclosures regarding the non-prime rates they were being charged, they were not advised that they may have qualified for prime priced loans or that it was generally more advantageous for the salesperson to sell a non-prime, rather than a prime loan, such that this cost the borrower more.

244.   Another way in which originators could circumvent Wells Fargo's underwriting guidelines — and steer borrowers into costly and inappropriate mortgages — was to have borrowers apply with "stated income" even if they could document their income or have borrowers put no money down on a mortgage even when they had the funds available to do so. Either of these tactics could turn what otherwise would have been a prime mortgage into a subprime — and more costly — mortgage.

245.   In addition, if the underwriting department questioned why a mortgage was subprime and not prime, loan officers could simply state that the borrower did not want to provide documentation or that the borrower had no "sourced and seasoned" assets. With these simple explanations, the underwriter could override guidelines and approve the subprime mortgage.

246.   According to the DOJ Complaint, internal Wells Fargo documents indicate that Wells Fargo senior managers were aware that loan originators were encouraging borrowers to take these and other steps adverse to borrowers' interests on a systematic basis.

247.   As the FRB Consent Order confirmed, although Wells Fargo Financial had "written policies and procedures," its "internal controls were not adequate to detect and prevent instances when certain of its sales personnel, in order to meet sales performance standards and receive incentive compensation, altered or falsified income documents and inflated prospective borrowers' incomes to qualify those borrowers for loans that they would not otherwise have been qualified to receive." Thus, in assessing an $85 million civil penalty, the FRB Consent Order confirmed that Wells Fargo's practices had resulted in unsafe or unsound banking practices, unfair or deceptive acts or practices within the meaning of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and violations of various state

laws pertaining to fraud and false or misleading statements in home mortgage loan-related documents, and to unfair or deceptive acts or practices.

248. Defendants' improper compensation and quota practices that encouraged the predatory and discriminatory conduct at issue here extended not only to Wells Fargo's loan originators and sales personnel, but also to its underwriters. As the HUD Complaint alleged, which allegations Plaintiffs also specifically make herein:

> Wells Fargo paid its underwriters a bonus (in addition to their salaries) based on the number of loans approved, rather than the number of loans reviewed. This improper *de facto* commission incentivized the underwriters to approve as many FHA loans as possible, regardless of the risk of default or the loan's eligibility for FHA insurance. Worse yet, the incentive was tied to the total number of loans approved at a particular underwriting site, thereby fostering a group dynamic whereby individual underwriters felt pressure from their peers at the site to approve loans.

> Apart from the incentive system, management applied heavy pressure on loan officers and underwriters to originate, approve, and close loans. And management required underwriters to make decisions on loans on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls.

249. Moreover, as loan originations increased throughout the period, Wells Fargo lacked an adequate number of well-trained underwriters and, accordingly, its underwriting staff was overwhelmed with loan applications, leading to numerous quality control issues. While Wells Fargo's management knew of these issues through reports of its Quality Assurance departments' review of loan files, management did nothing to prevent or remedy them.

250.   Indeed, as the HUD Complaint alleged, which allegations Plaintiffs also specifically make here, in 2003 Wells Fargo responded to the shortage of FHA loan underwriters and tremendous material deficiency rates in its loan files by "slash[ing] the number of its FHA underwriters from 919 to 401," while leaving in place "the bank's improper bonus system for underwriters. . . ."

251.   Not surprisingly, Wells Fargo also made a practice of making loans to people who clearly could not afford them by using fictitious or manipulated income data. According to a confidential witness statement given by a former Wells Fargo employee in a separate action in California, loan officers would routinely place two to three people on a loan to ensure that there was adequate income to qualify. "I would work with them to get them ready, even if we had to put 2 to 3 people on the loan." According to the witness, Wells Fargo had a program "called '125' or something like that" that allowed a borrower to document some portion of his income, then state 25% more. "It took into account what they used to call 'mattress money,'" she explained. This allowed "Hispanics or other minorities" to obtain loans based on income they received but could not document.

252.   Wells Fargo loan officers encouraged minority borrowers who had family members living in their houses to inflate their income when applying for home equity loans by generating documents that said those family members paid a certain amount in rent. A former Wells Fargo employee who provided a confidential

witness statement in the California action stated: "Let's say you own a property, and you want to do [a home equity loan]. What they would ask for, let's say you have a family member living in your home. Even though they were not paying rent, you would come up with some sort of paper document saying so-and-so pays me so much. . . . That would be the kind of stuff that I saw that did occur, other than also bringing in additional family members to cosign." Further, according to a confidential witness in the California action, Wells Fargo would often doctor credit histories to qualify a customer for a first-time home loan. "There were zillions of loans that should never have been approved according to what was written in [Wells Fargo's] guidelines."

253.   Indeed, according to confidential witness statements provided by former employees, Wells Fargo employees would enter fraudulent income data into Wells Fargo's underwriting program to approve a loan: "If a guy told you he made $3000, you'd put in $5000" in the underwriting software program. There was no backstop system at Wells Fargo to prevent this kind of blatant income inflation. Loan officers were "putting people into loans that they didn't qualify for. Obviously, it would put them [the borrowers] into a bad predicament."

254.   Also critical to the underwriting process is the establishment of the value of the underlying real estate asset through property appraisals. The appraised home value is required to determine adequate LTV ratios.

255.   Like their underwriting policies, Defendants' standards for property appraisals became increasingly lax, if not willfully fraudulent, during the relevant period to maximize loan amounts to meet even Wells Fargo's loosened underwriting requirements.

256.   Since the early 2000s, and during much of the relevant time period, Wells Fargo controlled the appraisal process (and other settlement processes) through its subsidiary's joint venture ownership of Valuation Information Technology, L.L.C., doing business as Rels Valuation ("Rels"). Wells Fargo owned 49.9% of Rels until its interest was acquired by CoreLogic in 2016.

257.   In connection with the underwriting process, Wells Fargo required borrowers to use Rels' appraisal services. Rels then provided purportedly independent appraisers with a predetermined figure supporting the desired loan amount (the "Borrower Estimated Value") and supplied predetermined comparable properties to support that value. Rels and Wells Fargo then expected the local independent appraiser to deliver an appraisal report with a property value exceeding the figures supplied by Rels. If the independently appraised value came in below what Rels and Wells Fargo wanted, Rels pressured the appraiser to revalue the property. Rels and Wells Fargo effectively blacklisted appraisers who refused.

258.   Following its merger with Wells Fargo, Wachovia also required its mortgage borrowers to utilize Rels' appraisal and other closing services.

259.   Finally, when other avenues to circumvent underwriting standards were unavailable or unsuccessful, Wells Fargo's branch managers and wholesale managers frequently made "business decisions" to override Defendants' underwriters to approve unqualified loans. This was particularly the case in the wholesale channel when the loans were originated by brokers and correspondent lenders who were responsible for a significant number of originations for Wells Fargo or were Wells Fargo bulk purchases of originated loans.

260.   Thus, in many instances where a loan applicant still could not meet relaxed underwriting standards, Defendants' branch managers and wholesale managers had discretion to grant "exceptions" to the underwriting guidelines and approve the loans anyway. Because Defendants' entire mortgage lending compensation system rewarded loan volume (and quotas penalized lack of volume), there was a tremendous incentive to grant underwriting exceptions on non-prime loans or circumvent the underwriting system through a variety of mechanisms.

261.   To the extent Defendants would rely on any compliance training for its loan officers, loan processors, underwriters, managers and correspondent lenders, to demonstrate that Defendants' written underwriting or other corporate policies prevented, discouraged, or identified the discriminatory and predatory lending practices at issue here, Defendants' corporate culture, training practices, actual operating policies and practices, quota system, and compensation structure all ran

counter to any such compliance training that Defendants may have conducted, rendering such compliance training irrelevant or perfunctory.

262.   Because of Wells Fargo's extensive involvement in establishing (and abandoning) the underwriting guidelines its correspondent and affiliate lenders were to use in originating residential mortgage loan products, Wells Fargo is responsible for the many loans it funded or purchased that were originated through its correspondent and affiliate networks, including the loans originated by PNC after mid-2005.

263.   As the direct result of the predatory terms of the mortgage loan products disproportionately sold to them, and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) paid materially higher costs, discretionary fees, materially higher monthly mortgage payments on relatively higher LTV percentage balances, and did so on more unfavorable terms than similarly situated non-minority borrowers.

264.   As the direct result of the predatory terms of the mortgage loan products disproportionately sold to them and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) experienced higher rates of

mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies on loans for which Defendants are responsible.

265.   Also, as the direct result of the predatory terms of the mortgage loan products disproportionately sold to them and/or the predatory and discriminatory manner in which those loans were underwritten, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) face higher rates of mortgage loan delinquencies, defaults, foreclosures and/or home vacancies on loans for which Defendants are responsible and have not yet defaulted or been foreclosed upon.

266.   As Plaintiffs further allege below, Plaintiffs have been damaged as a direct result of the predatory terms of the mortgage loan products disproportionately sold and/or the predatory and discriminatory manner in which those loans were underwritten to minority borrowers who reside in Plaintiffs' communities and neighborhoods.

## J.     Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory and Discriminatory

267.   Wells Fargo is one of the largest mortgage loan servicers in the United States, operating eight mortgage servicing/customer centers and nine specialized loss mitigation centers across the country and headquartered in Des Moines, Iowa. By virtue of its acquisition and merger with Wachovia, Wells Fargo now holds and services Wachovia's prior servicing pool of mortgage loans and MSRs.

268.   Defendants have engaged in predatory and discriminatory mortgage loan servicing and foreclosure activities that are part and parcel of their predatory and discriminatory equity stripping scheme and which further increased the number of FHA protected minority borrowers' mortgage delinquencies, defaults, and ultimately home vacancies and foreclosures on loans for which Defendants are responsible.

269.   Defendants continue to service the predatory, higher cost, and subprime mortgage loans they originated or acquired (or to service for others), which enables them to charge loan servicing fees. Defendants' loan servicing practices include the evaluation and processing of borrower requests for loan modifications and refinances, servicing defaulted loans and charging fees and increased interest, default work outs, and foreclosure proceedings and activities. At issue are each of Defendants' decisions and practices in the chain of a foreclosure event; namely, whether or not to modify a defaulted or higher cost loan at a borrower's request and whether to foreclose on a particular defaulted borrower's home or maintain it in their shadow inventory. While these activities serve to continue and perpetuate Defendants' discriminatory lending conduct, more importantly they reflect stand-alone discriminatory housing practices that are continuing.

270.   Pursuant to their mortgage servicing strategy, Defendants typically maintain control over the loan servicing, loan default, and loan foreclosure processes

involving the mortgage loans they originated or purchased. Defendants routinely charged marked-up fees to minority borrowers through various means, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures.

271.   With full control over the loan servicing, modification, default, and foreclosure processes, Defendants have the power to maximize their servicing fees. As explained in a July 29, 2009, New York Times article, "Lucrative Fees May Deter Efforts to Alter Loans," by Peter S. Goodman and J. Emilio Flores, reporting on the rationale behind financial institutions' failure to modify higher cost mortgage loans:

> Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure. So, the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue — fees for insurance, appraisals, title searches and legal services. Mortgage companies, some of which are affiliated with the nation's largest banks, are paid to manage pools of loans owned by investors. The companies typically collect a percentage of the value of the loans they service. They extract their share regardless of whether borrowers are current on their payments. Indeed, their percentage often increases on delinquent loans. Legal experts say the opportunities for additional revenue in delinquency are considerable, confronting mortgage companies with a conflict between their own financial interest in collecting fees and their responsibility to recoup money for investors who own most mortgages.

272.   Defendants' interrelated discriminatory and predatory mortgage loan servicing, foreclosure, and loan modification activities are a critical part of Defendants' equity stripping scheme, enabling that scheme to be fulfilled (i.e., continuing to generate income for Defendants) until the last discriminatory and

predatory loan is either repaid or foreclosed upon. More importantly, however, and as reflected in the empirical allegations below concerning Defendants' foreclosure practices, these activities by Defendants also are discriminatory standing alone.

273.  The predatory and discriminatory mortgage servicing practices engaged in by Defendants have included, and in several instances continue to include (but are not limited to):

- Continuing to service each predatory mortgage loan that was made on a discriminatory basis and that has not been repaid and closed (or modified or refinanced in a non-predatory manner) until default and then foreclosing upon the home securing such loan;

- Failing properly and/or timely to respond to, process, and underwrite borrower efforts to modify or refinance predatory mortgage loans;

- Failing properly and/or timely to notify borrowers of required and/or missing documentation necessary for a requested loan modification and/or failing to provide adequate time for borrowers to submit such documentation before denying a loan modification;

- Failing to notify borrowers adequately of reasons for denial of a modification request and/or the opportunity to demonstrate the request was denied in error;

- Wrongfully denying loan modification applications;

- Failing properly and/or timely to respond to, process or mitigate borrower delinquencies or defaults, including the failure to apply payments made by borrowers and failing to maintain accurate account statements in a timely and accurate fashion;

- Providing false or misleading information to borrowers while referring loans to foreclosure during the loan modification application process and initiating foreclosures when the borrower was in good faith actively pursuing a loss mitigation alternative Wells Fargo offered and/or while scheduling and conducting foreclosure sales during the loan

modification application process and during trial loan modification periods;

- Misrepresenting to borrowers that any loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

- Failing in monthly billing statements to identify accurately unpaid principal loan balances, total payment amounts due, assessed fees and charges, and allocation of payments, including whether to a suspense or unapplied funds account;

- Imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

- Failing to respond in a sufficient and timely manner to the increased level of loss mitigation activities by increasing management and staffing levels to ensure timely, effective, and efficient communication with borrowers with respect to loss mitigation activities and foreclosure activities and to provide a full exploration of loss mitigation options or programs prior to completion of foreclosure activities;

- Falsifying or manufacturing, and filing, documents during the mortgage servicing and foreclosure process that falsely or recklessly asserted ownership, amounts due, and fees and expenses chargeable to the borrower

- Charging excessive or improper fees for default-related services and foreclosures, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures;

- Failing to notify borrowers of the identity of the foreclosing party in an adequate or timely fashion;

- Preparing, executing, notarizing, or presenting (either directly or through third parties and agents) false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments that falsely represented they were made pursuant to personal knowledge

when they were not (otherwise known as the "robo-signing" scandal), including those activities Wells Fargo conducted pursuant to its internal manual designed to enable Wells Fargo to foreclose on properties quickly; and

- Inappropriately dual-tracking foreclosure and loan modification activities and failing to communicate with borrowers with respect to foreclosure activities.

274.   The above predatory mortgage servicing and foreclosure practices have been the subject of investigations and civil lawsuits by the Department of Justice, State Attorneys General, and Defendants' federal banking regulators.

275.   For example, on March 14, 2012, the Department of Justice, forty-nine state Attorneys General, and the Attorney General for the District of Columbia sued Wells Fargo (and several other major financial institutions) for, among other things, unfair and deceptive practices in their mortgage origination, loan servicing, loan modification, and loss mitigation (e.g., foreclosure) activities, particularly regarding Federal Housing Administration (FHA) insured mortgage loans ("Robosigning Complaint"). As to its mortgage loan originations, the complaint alleged that Wells Fargo "engaged in a pattern of unfair and deceptive practices" that "caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States."

276.   The Robosigning Complaint alleged, which allegations Plaintiffs specifically incorporate and make herein, that Wells Fargo unfairly, deceptively, and unlawfully discharged its mortgage loan servicing activities by, among other things:

129

- failing to apply payments made by borrowers and failing to maintain accurate account statements timely and accurately;

- charging excessive or improper fees for default-related services;

- failing to oversee properly third-party vendors involved in servicing activities;

- imposing force-placed insurance without properly notifying the borrowers, even when borrowers already had adequate coverage;

- providing borrowers false or misleading information in response to borrower complaints; and

- failing to maintain appropriate staffing, training, and quality control systems.

277. The Robosigning Complaint also alleged, which allegations Plaintiffs specifically incorporate and make herein, that Wells Fargo unfairly, deceptively, and unlawfully failed to "engage in loss-mitigation efforts to avoid the foreclosure of HUD-insured single family residential mortgages . . . where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available." For example, Wells Fargo:

- failed to perform proper loan modification underwriting;

- failed to gather or lost loan modification application documentation and other paperwork;

- failed to provide adequate staffing to implement programs;

- failed to train staff responsible for loan modifications adequately;

- failed to establish adequate processes for loan modifications;

- allowed borrowers to stay in trial modifications for excessive time periods;

- wrongfully denied modification applications;

- failed to respond to borrower inquiries;

- provided false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

- provided false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

- provided false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

- misrepresented to borrowers that loss mitigation programs would provide relief from the initiation of foreclosures or further foreclosure efforts;

- failed to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

- falsely advised borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

- miscalculated borrowers' eligibility for loan modification programs and improperly denied loan modification relief to eligible borrowers;

- misled borrowers by representing that loan modification applications would be handled promptly although it regularly failed to act on loan modifications in a timely manner;

- failed to process borrowers' applications for loan modifications properly, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

- failed to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

- misled borrowers by providing false or deceptive reasons for denial of loan modifications.

278.   The Robosigning Complaint further alleged, which allegations Plaintiffs specifically incorporate and make herein, that Wells Fargo "engaged in a pattern of unfair and deceptive" foreclosure practices including:

- failing to identify the foreclosing party properly;

- charging improper fees related to foreclosures;

- preparing, executing, notarizing, or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

- preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of Wells Fargo, they did so with the knowledge and approval of Wells Fargo;

- executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

- misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

- inappropriately charging servicing, document creation, recordation, and other costs and expenses related to foreclosures; and

- inappropriately dual-tracking foreclosure and loan modification activities and failing to communicate with borrowers with respect to foreclosure activities.

279.   Perhaps most disturbing, the Robosigning Complaint highlights the duplicity in Wells Fargo's unfair, deceptive, and illegal treatment of borrowers defaulting on its predatory mortgage loan products while in receipt of an investment of tens of billions of dollars of U.S. taxpayer funds to help bail it out of the very same financial disaster it helped create through its predatory subprime mortgage lending activities, including some of those activities at issue here.[16]

280.   On April 4, 2012, Wells Fargo entered into a Consent Judgment, agreeing to remediation and restitution of approximately *$5 billion*, and a variety of modifications to its mortgage servicing and foreclosure practices. In particular, the settlement required Wells Fargo to make direct civil penalty payments to the Plaintiff governments of $1,005,233,716; provide mortgage loan consumer relief to distressed borrowers, including principal forgiveness, refinancing, and other forms of relief; and to change its mortgage servicing practices by complying with certain mortgage servicing standards.

---

[16] On or about October 28, 2008, Wells Fargo received a $25 billion cash investment from the United States Treasury pursuant to the Troubled Asset Relief Program ("TARP"). TARP was created through the Emergency Economic Stabilization Act of 2008 ("EESA") to help prevent a deepening of the liquidity and financial crisis (which resulted from Wells Fargo's subprime mortgage lending conduct alleged herein and the conduct of other industry participants), to stabilize the housing market, and to assist troubled homeowners. As alleged in the Robosigning Complaint, that investment was conditioned in part on Wells Fargo's commitment to modify defaulting borrowers' single family residential mortgages pursuant to a variety of federal programs created in conjunction with EESA and TARP, including the Making Home Affordable Program, the Home Affordable Modification Program, The Home Price Decline Protection Incentives initiative, The Principal Reduction Alternative, The Home Affordable Unemployment Program, The Home Affordable Foreclosure Alternatives Program, The Second Lien Modification Program, The FHA-HAMP Program, The Treasury/FHA Second-Lien Program, The FHA Refinance for Borrowers with Negative Equity Program, and the Housing Finance Agency Hardest Hit Fund.

281.   Wells Fargo did not timely comply with all of its obligations under the Consent Judgment to implement the servicing standards, failing to comply with the requirement to respond in a timely manner to borrowers regarding missing information or documentation relating to borrower loan modification packages it had received.

282.   Defendants' predatory mortgage servicing and foreclosure practices have occurred both on a direct discriminatory basis and, necessarily, on a disparate impact basis as a result of the relatively greater numbers of predatory and discriminatory mortgage loans Defendants to FHA protected minority homeowners. Empirical and statistical data, which Plaintiffs allege below, evidences that Wells Fargo has initiated mortgage foreclosure proceedings in minority communities to a far greater extent than in non-minority communities.

283.   Moreover, in April 2012, the non-profit National Fair Housing Alliance ("NFHA") and four of its member organizations filed a complaint with the Department of Housing and Urban Development against Wells Fargo accusing it discriminating in the maintenance of its bank-owned real estate ("REO"), i.e., the properties it had foreclosed upon on otherwise acquired ownership following borrower default.[17] Plaintiffs specifically incorporate and make the same allegations

---

[17] The Conciliation Agreement, which addresses the allegations, is publicly available at:
https://nationalfairhousing.org/wp-
content/uploads/2017/04/ExecutionVersionofNFHAConciliationAgreement.pdf.

herein with respect to Wells Fargo's REO properties in its neighborhoods and communities.

284.   Based on NFHA's undercover investigation of 218 properties in eight cities (Atlanta, GA; Baltimore, MD; Dallas, TX; Dayton, OH; Miami/Fort Lauderdale, FL; Oakland/Richmond/Concord, CA; Philadelphia, PA; and Washington, DC), there are "stark racial disparities in the maintenance and marketing of REO properties between communities of color and predominantly White communities" where Wells Fargo's has REO properties. Increased maintenance deficiencies with significant differences in communities of color compared to white communities include substantial amounts of trash; dead grass; broken doors, door locks, and windows; damaged roof or physical structures including holes; peeling or chipped paint and damaged siding; missing gutters and water damage.

285.   These actions individually and/or collectively with Defendants' other practices alleged herein have further led to disproportionate rates of delinquencies, defaults, home vacancies and/or foreclosures on loans originated, purchased, and/or serviced by Defendants that were made to FHA protected minority borrowers.

286.   As the direct result of the unfair, deceptive, and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority

borrowers who reside in Plaintiffs' communities and neighborhoods, those borrowers have experienced higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies than non-minority borrowers.

287. Also, as the direct result of the unfair, deceptive, and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods, those borrowers will face higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies than non-minority borrowers on loans that have not yet defaulted or been foreclosed upon.

288. As Plaintiffs further allege below, Plaintiffs have been damaged and will continue to be damaged in the future as a direct result of the unfair, deceptive, and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods.

289. Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue here and will continue to do so until the last predatory and discriminatory mortgage loan Defendants originate, purchase, or otherwise acquire, and/or service, has been repaid and closed or has been foreclosed upon. Defendants' predatory and discriminatory loans at issue will continue to

become delinquent and will be defaulted on for at least several more years, leading to further property vacancies and foreclosures. Thus, Defendants' discriminatory housing practices in violation of the FHA continue, such that the statute of limitations on Defendants' scheme has not yet begun to run.

**K.    Empirical Data Evidences Defendants' Targeting of, and the Discriminatory Impact on, Minority Borrowers in Plaintiffs' Communities**

290.    Plaintiffs' allegations of Defendants' mortgage lending and foreclosure patterns below reflect, on their face, Defendants' discriminatory housing practice of equity stripping, conducted by Defendants through discriminatory housing practices of targeting FHA protected minority borrowers, and reverse redlining minority communities, for the extension of credit on unfavorable terms, and/or steering minority borrowers into higher cost or non-prime mortgage loans on terms more unfavorable than loans made to non-minority borrowers.

291.    While discovery of non-publicly available loan level data contained in Defendants' Loan Application Registry (LAR) and mortgage servicing/foreclosure platforms will be necessary to prove at trial certain of Defendants' discriminatory actions alleged herein, publicly available HMDA loan origination data that Defendants and their affiliates themselves collect and report evidence Defendants' intentional targeting, reverse redlining, and steering of FHA protected minority borrowers in Plaintiffs' communities for higher cost and non-prime mortgage loans,

as well as the discriminatory impact on those borrowers of such lending policies and practices. Indeed, this is precisely the purpose for which the Home Mortgage Disclosure Act required this data to be collected, maintained, and reported by mortgage lenders such as Defendants here.

292. Publicly available HMDA data regarding the numbers and census tract locations of Defendants' mortgage loan origination, purchase, funding, and acquisition activity provides direct and prima facie evidence of Defendants' disparate treatment of minority borrowers in Plaintiffs' neighborhoods and communities, particularly in those neighborhoods with higher concentrations of minority homeowners, as well as the disparate impact on them.

293. In addition, information on the numbers and census tract locations of Defendants' foreclosure activities in Plaintiffs' communities provides further direct and prima facie evidence of Defendants' disparate treatment of minority borrowers in Plaintiffs' neighborhoods and communities, particularly in those neighborhoods with higher concentrations of minority homeowners, as well as the disparate impact on them.

294. Defendants' mortgage lending, funding, purchasing, and foreclosure patterns alleged below exist even after correcting for differences in objective borrower underwriting criteria.

295.   As Plaintiffs allege, and as the empirical evidence demonstrates below, the increased percentages and numbers of non-prime mortgage loans that Defendants made to ethnic/racial minorities in Plaintiffs' communities, when compared to the actual demographics of ethnic/minority homeownership in Plaintiffs' communities, provides direct evidence of Defendants' targeting, reverse redlining, and marketing penetration into minority communities.

296.   U.S. Census owner-occupied housing unit data provides the best measure of each of the Plaintiff County's minority homeownership demographics to compare to Defendants' reported HMDA loan data. This is because the mortgage loans at issue here were secured on borrowers' single family (1-4 unit) owner-occupied residences.

297.   Each of the Defendants is responsible for a disproportionately larger number of their total mortgage loans to FHA protected ethnic/racial minority homeowners in Plaintiffs' communities and neighborhoods than to non-minorities in light of the key comparative demographic—single family, owner-occupied housing units—in Plaintiffs' communities and neighborhoods. This evidences Defendants' disparate treatment of minorities through reverse redlining and targeting, and the disparate impact on Plaintiffs' minorities and minority communities and neighborhoods.

298.   Each of the Defendants also is responsible for a disproportionately larger number of their "high cost" and, more importantly, their higher cost, and/or higher leveraged, non-prime mortgage loans to FHA protected ethnic/racial minority homeowners in Plaintiffs' communities and neighborhoods than to non-minorities. This also evidences Defendants' disparate treatment of minorities through reverse redlining and targeting, and the disparate impact on Plaintiffs' minorities and minority communities and neighborhoods.

299.   The data that shows which of Defendants loans were "high cost" is contained in the HMDA data that Defendants submit annually. The data that shows which of Defendants loans were "higher cost" (*i.e.*, which loans were priced higher to minorities versus non-minorities), however, can only be determined by receiving and analyzing Defendants' loan data. Thus, the only way that the Counties can identify Defendants' higher cost loans is by obtaining, reviewing, and analyzing Defendants' loan data from discovery in this case.

300.   If Defendants had not intentionally targeted minority borrowers for their mortgage lending activity, minorities in Plaintiffs' communities would not have received significantly greater numbers and percentages of Defendants' mortgage loan products than the percentages of minority homeownership as reflected in the demographics.

1.    **Defendants' Minority Lending & Funding Activity in Fulton County**

301.   Over the entire period of 2000 to 2019, Defendants are responsible for originating, funding, purchasing, or otherwise acquiring at least 16,356 mortgage loans made to minorities in Fulton County that are discriminatorily suspect.  The origination, funding, purchasing or otherwise acquiring of such loans was the initial necessary step that was part of Defendants' equity stripping scheme.

302.   The total percentage of Fulton County housing units owned and occupied by minorities in 2000 was approximately 45% according to data from the 2000 Census conducted by the United States Census Bureau.

303.   Between 2000 and 2013, Defendants and their affiliates collectively originated at least 51,116 mortgage loans in Plaintiff Fulton County in which Defendants also reported the minority status of the borrower in their public HMDA data. Of these loans, Defendants collectively reported originating at least 2,346 high-cost loans; 1,586 (67%) of these high-cost loans Defendants collectively reported originating to minority borrowers. Further, 93% (1,473) of the high-cost loans that Defendants collectively reported originating to minority borrowers were originated in census tracts with the highest foreclosure rates. This starkly contrasts with Fulton County's demographics of only 45% minority homeownership as of the 2000 Census.

304.   Out of the 2,346 high-cost loans that Defendants collectively reported originating and reported minority borrower status, Defendants Wells Fargo Bank, NA, and Wells Fargo Fin'l GA, reported originating at least 1,263 and 355 high-cost loans, respectively. Of these high-cost loans, Defendants Wells Fargo Bank, and Wells Fargo Fin'l GA, reported originating 831 and 261 of their high-cost loans to minority borrowers constituting approximately 66% and 73% of their total high-cost loans in which they reported minority status, respectively. These entities, collectively, were also 4.7 times more likely to originate a high-cost loan to a minority borrower compared to a non-minority borrower. Further, of the total 831 high-cost loans Wells Fargo Bank, NA, originated to minorities, almost 91% (783) were originated in census tracts with the highest foreclosure rates. Similarly, of the total 261 high-cost loans that Wells Fargo Fin'l GA, originated to minorities, almost 97% (252) were originated in census tracts with the highest foreclosure rates.

305.   Similarly, of the 384 high-cost loans that Wells Fargo's Wachovia Entities, Wachovia Bank NA, and Wachovia Mortgage, reported minority borrower status, at least 248 of these high-cost loans were originated to minorities, representing over 64% of the high-cost loans in which they reported the minority borrower status. These entities, collectively, were also 2.6 times more likely to originate a high-cost loan to a minority borrower compared to a non-minority borrower. Further, of the total 248 high-cost loans Wachovia Bank, NA, and

Wachovia Mortgage originated to minorities, almost 96% (237) were originated in census tracts with the highest foreclosure rates.

306.   Over the same period of 2000 to 2013, Defendants and their affiliates collectively reported purchasing at least another 3,562 mortgage loans that were originated to minority borrowers in Fulton County. While many of the Defendants and their affiliates did not report minority borrower status on a tremendous percentage of the loans they purchased, funded, or otherwise acquired, of the 3,562 mortgage loans Defendants collectively reported as being originated to minorities, almost 84% (2,982) were located in census tracts with the highest foreclosure rates compared to 60% of the mortgage loans Defendants collectively reported as being originated to non-minorities.

307.   This publicly available empirical loan data – reported by the Defendants themselves - evidences their respective targeting, reverse redlining and disproportionate marketing penetration of mortgage loans into minority communities in Fulton County because they originated far more of their high-cost mortgage loans to minorities compared to non-minorities, the high-cost loans to minorities were more concentrated in census tracts with the highest foreclosure rates, and a greater percentage of their total loans that they reported were made to minorities, through origination or purchase, were originated in census tracts with the highest foreclosure rates. This empirical data also supports the allegations regarding

Defendants' marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Fulton County. As Plaintiffs further allege herein, the financial and other terms of such non-prime loans that Defendants and their affiliates made to minorities, and the manner Defendants underwrote such loans, were more unfavorable to minority borrowers than to non-minority borrowers making them more likely to default. Defendants continue to service and foreclose on such loans as they default.

### 2. Defendants' Minority Lending & Funding Activity in Cobb County

308. Over the entire period of 2000 to 2019, Defendants are responsible for originating, funding, purchasing or otherwise acquiring at least 10,939 mortgage loans made to minorities in Cobb County that are discriminatorily suspect.

309. The total percentage of Cobb County housing units owned and occupied by minorities in 2000 was approximately 24%, according to data from the 2000 Census conducted by the United States Census Bureau.

310. Between 2000 and 2013 Defendants and their affiliates collectively originated at least 39,476 mortgage loans in Plaintiff Cobb County in which Defendants also reported the minority borrower status in their public HMDA data. At least 8,549 of those loans were reported as made to minority borrowers.

311.   Defendants and their affiliates reported originating at least 1,594 high-cost loans to minorities and non-minorities. 630 of these high-cost loans were originated to minority borrowers, representing approximately 40% of all of the high-cost loans they originated. Further, over 92% (582) of the high-cost loans Defendants collectively originated to minorities were originated in census tracts with the highest foreclosure rates. Wells Fargo's Wachovia Entities, Wachovia Bank, NA, and Wachovia Mortgage reported originating 75 high-cost loans to minority borrowers; 95% (71) were originated in census tracts with the highest foreclosure rates. Defendants Wells Fargo Bank, N.A., and Wells Fargo Fin'l GA, collectively reported originating 424 high-cost loans to minority borrowers; 91% (387) were originated in census tracts with the highest foreclosure rates. Collectively, Defendants originated high-cost loans to minorities 2.3 times more than non-minorities.

312.   Over the same period of 2000 to 2013, Defendants and their affiliates collectively reported purchases of at least another 2,390 mortgage loans that were originated to minority borrowers in Cobb County. While many of the Defendants and their affiliates did not report minority borrower status on a tremendous percentage of the loans they purchased, funded, or otherwise acquired, Defendant Wells Fargo Bank, NA, reported minority status on 5,144 loans it purchased. 699 of those loans had been originated to minority borrowers, with 579 (83%) originated in

census tracts with the highest foreclosure rates. Defendant Wells Fargo Funding reported minority status on 10,193 loans it purchased. 1,666 of those loans had been originated to minority borrowers, with 1,501 (90%) originated in census tracts with the highest foreclosure rates.

313.   This publicly available empirical loan data – reported by the Defendants themselves - evidences their respective targeting, reverse redlining and disproportionate marketing penetration of mortgage loans into minority communities in Cobb County because they originated a far greater percentage of their high-cost mortgage loans to minorities compared to non-minorities, these high-cost loans to minorities were more concentrated in census tracts with the highest foreclosure rates, and a greater percentage of their total loans that they reported were made to minorities, through origination or purchase, were originated in census tracts with the highest foreclosure rates. This empirical data also supports the allegations regarding Defendants' marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Cobb County. As Plaintiffs further allege herein, the financial and other terms of such non-prime loans that Defendants and their affiliates made to minorities, and the manner Defendants underwrote such loans, were more unfavorable to minority borrowers than to non-

minority borrowers making them more likely to default. Defendants continue to service and foreclose on such loans as they default.

### 3. Defendants' Minority Lending & Funding Activity in DeKalb County

314. Over the entire period of 2000 to 2019, Defendants are responsible for originating, funding, purchasing, or otherwise acquiring at least 15,985 mortgage loans made to minorities in DeKalb County that are discriminatorily suspect.

315. The total percentage of DeKalb County housing units owned and occupied by minorities in 2000 was approximately 56% according to data from the 2000 Census conducted by the United States Census Bureau.

316. Between 2000 and 2013 Defendants and their affiliates collectively originated at least 31,157 mortgage loans in Plaintiff DeKalb County in which Defendants also reported the minority borrower status in their public HMDA data. At least 11,774 of those loans were reported as being originated to minority borrowers. Of these 11,774 loans, Defendants collectively originated 1,496 high-cost loans to minorities, representing 77% (1,945) of all the high-cost loans Defendants originated and reported the borrower's minority status. Minorities were almost 5.5 times more likely to receive a high-cost loan compared to a non-minority. Further, 93% (1,392) of the high-cost loans that Defendants originated to minorities were originated in the census tracts with the highest foreclosure rates.

317.   Wells Fargo's Wachovia Entities, Wachovia Bank, NA, and Wachovia Mortgage reported originating 202 high-cost loans to minority borrowers. This represented 71% of the total high-cost loans they reported the minority's borrower status (282). Minorities were about twice as likely to receive a high-cost loan compared to non-minorities. Further, 91% (184) of the high-cost loans originated to minorities were originated in census tracts with the highest foreclosure rates. Defendants Wells Fargo Bank, N.A., and Wells Fargo Fin'l GA, collectively reported originating 1,369 high-cost loans along with the borrower's minority status. 77% or 1,055 of these high-cost loans were originated to minority borrowers. Minorities were approximately 6.6 more likely to receive a high-cost loan than non-minorities. Further, almost 94% (988) of the high-cost loans originated to minority borrowers were originated in census tracts with the highest foreclosure rates.

318.   Over the same period of 2000 to 2013, Defendants and their affiliates collectively reported purchases of at least another 4,211 mortgage loans that were originated to minority borrowers in DeKalb County. While many of the Defendants and their affiliates did not report minority borrower status on a tremendous percentage of the loans they purchased, funded, or otherwise acquired, Defendant Wells Fargo Funding reported minority status on 8,122 loans it purchased. 2,021 of those loans had been originated to minority borrowers, with 1,510 (75%) originated in census tracts with the highest foreclosure rates. Only 39% of the loans Wells Fargo

Funding purchased that were originated to non-minorities were originated in census tracts with the highest foreclosure rates. Similarly, Defendant Wells Fargo Bank, NA, reported minority status on 4,835 loans it purchased. 739 of those loans had been originated to minority borrowers, with 420 (57%) originated in census tracts with the highest foreclosure rates. Only 35% of the loans Wells Fargo Bank, NA, purchased that were originated to non-minorities were originated in census tracts with the highest foreclosure rates.

319.  This publicly available empirical loan data – reported by the Defendants themselves - evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in DeKalb County because they originated  a far greater percentage of their high-cost mortgage loans to minorities compared to non-minorities, and a greater percentage of their total loans that they reported were made to minorities, through origination or purchase, were originated in census tracts with the highest foreclosure rates. This empirical data also supports the allegations regarding Defendants' marketing, underwriting and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in DeKalb County. As Plaintiffs further allege herein, the financial and other terms of such non-prime loans that Defendants and their affiliates made to minorities, and the manner Defendants underwrote such

loans, were more unfavorable to minority borrowers than to non-minority borrowers making them more likely to default. Defendants continue to service and foreclose on such loans as they default.

## L.  Defendants' Discriminatory Foreclosure Activity

320.   Publicly available foreclosure data evidences the impact of Defendants' predatory and discriminatory lending and mortgage servicing practices, in and of themselves, and in combination with one another as part of Defendants' equity stripping scheme. That data shows that the average foreclosure rates increase among census tracts in Plaintiffs' neighborhoods as the percentage of minority population increases. It also reflects that Defendants have discriminatorily serviced and foreclosed upon minority borrower homes secured by defaulted "high cost," higher cost, and other non-prime mortgage loans for which Defendants are responsible.

321.   As data in the maps below reflects, the mortgage loans Defendants originated in Plaintiffs' communities to FHA protected borrowers were more likely to result in delinquency, default, and foreclosure than the loans Defendants made to Caucasian borrowers, with many of the loans made with the highest HUD designated HFR foreclosure rate areas. But regardless of discrimination in the underlying originations, Defendants have plainly foreclosed on minority homeowners to a far greater and disproportionate extent than non-minority homeowners, and their foreclosures have been disproportionately concentrated in higher minority

neighborhoods. This empirical and statistical information provides direct and *prima facie* evidence of the disparate impact, as well as additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending, servicing, and foreclosure activities in Plaintiffs' communities and neighborhoods.

## 1.    Fulton County

322.    According to data from the 2010 Census conducted by the United States Census Bureau, the total percentage of Fulton County housing units owned and occupied by minorities in 2010 was approximately 43%.

323.    In Fulton County, the initial foreclosure rates from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners had jumped from the historical average of 1% to approximately 7%. However, the initial foreclosure rates in census tracts with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was approximately 11%, 13% and 18%, respectively, reflecting nearly a 275% increase in foreclosure rates between census tracts with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

324.    On those mortgage loans at issue in this complaint (i.e., the loans with an origination date since January 2000) and for which it is responsible, Wells Fargo initiated a disproportionate number of foreclosure proceedings in Fulton County in those census tracts with higher populations of FHA protected borrowers compared

to census tracts with lower populations of minority borrowers. From the period February 2006 to May 2019, at least 7,682 of Wells Fargo's total 10,671 foreclosure filings in Fulton County (approximately 72%) were initiated in higher minority census tracts (i.e., where at least 30.1% of owner-occupied housing units had minority household members) as compared to just the 2,989 foreclosure filings (about 28%) in low minority census tracts (i.e., where 30% or less of the owner-occupied housing units contained minority household members).

325.   In Fulton County census tracts with high and increasingly higher minority populations, as reflected in percentages of owner-occupied homes of at least 50.1% that include a minority, the number of Wells Fargo foreclosure filings increase as the percentage of minority homeownership increases. This foreclosure activity, which is particularly striking when considering the total percentage of Fulton County housing units owned and occupied by minorities in 2000 was approximately 45% according to data from the 2000 Census conducted by the United States Census Bureau, reflects both the targeting and discriminatory impact of Wells Fargo's foreclosure activity in Fulton County's minority neighborhoods. Wells Fargo's foreclosure filing activity since February 2006 is numerically, geographically, and demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



326.   The foregoing map clearly shows Defendants' pattern and practice of discriminatory foreclosures over the thirteen-year period ending in May 2019. In neighborhoods consisting of 70.1-100% minority homeowners, Defendants foreclosed on 5,772 homes versus 2,989 homes in neighborhoods consisting of 0-30% minority homeowners. Foreclosures increase to 6,423 homes when neighborhoods composed of 50.1-70% minority homeowners are included. What is even more telling than the gross numbers of foreclosures, is the increasing foreclosure rate as minority home ownership increases. Defendants were almost 1.5 times more likely to foreclose on a home in a neighborhood with 30.1-50% minority homeowners, 2.5 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, 3.6 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and 4 times more likely to foreclose on a home in a neighborhood with 90.1-100% minority homeowners.

327.   Defendants' pattern and practice of discriminatory foreclosures is even more pronounced when looking at Defendants' foreclosures between January 2012 and December 2015 and foreclosures between January 2015 and May 2019.

328.   From January 2012 to December 2015, Defendants filed 2,745 foreclosures in Fulton County. Approximately 59% of the foreclosures (1,627 homes) were in neighborhoods where 50.1% or more of the homeowners were minority. Even more telling, compared with homes in neighborhoods with 0-30%

minority ownership, Defendants were approximately 2.3 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, almost 4.2 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and almost 3.6 times more likely to foreclose on a home in a neighborhood with 90.1-100% minority homeowners. Wells Fargo's foreclosure filing activity between January 2012 and December 2015, is numerically, geographically, and demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



FULTON COUNTY, GEORGIA

• Wells Fargo Bank Foreclosures,
  January 2012 - December 2015

Owner Occupied Housing (OOH) with
Minority Householder* and Foreclosure Summary

| Percent of Minority OOH | Wells Fargo foreclosures | Total OOH units | Wells Fargo foreclosure rate |
|---|---|---|---|
| 0% - 30% | 753 | 106,681 | 0.706% |
| 30.1% - 50% | 365 | 30,818 | 1.184% |
| 50.1% - 70% | 151 | 9,179 | 1.645% |
| 70.1% - 90% | 458 | 15,516 | 2.952% |
| 90.1% - 100% | 1,018 | 40,528 | 2.512% |

**Total Foreclosures: 2,745**

*Percent minority householder mapped by Census Tract
Data Source: U.S. Census Bureau, 2016

329.   January 2015 to May 2019, Wells Fargo filed 1,190 foreclosures in Fulton County. Almost 68% of Defendants' foreclosures (804 homes) were in neighborhoods where 50.1% or more of the homeowners were minority. Consistent with its historical pattern and practice, as reflected in the maps above, Defendants were almost 2.5 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, almost 6 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and 5.3 times more likely to foreclose on a home in a neighborhood with 90.1-100% minority homeowners compared to a neighborhood with 0-30% minority homeowners. Wells Fargo's foreclosure filing activity between January 2015 and May 2019 is numerically, geographically, and demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



330.   As all of the data in the maps reflect, the mortgage loans Defendants originated in Plaintiffs' communities to FHA protected borrowers were more likely to result in delinquency, default, and foreclosure than the loans Defendants made to Caucasian borrowers, with many of the loans made with the highest HUD designated HFR foreclosure rate areas. But regardless of discrimination in the underlying originations, Defendants have plainly foreclosed on minority homeowners to a far greater and disproportionate extent than non-minority homeowners and their foreclosures have been disproportionately concentrated in higher minority neighborhoods. This empirical and statistical information provides direct and prima facie evidence of the disparate impact, as well as additional evidence of the targeting and disparate treatment, of Defendants' predatory mortgage lending, servicing and foreclosure activities in Plaintiffs' communities and neighborhoods.

331.   While Plaintiffs can provide a list of the addresses of each of the approximately 10,671 foreclosure proceedings Defendants have initiated on mortgage loans originated since January 2000 in Fulton County, all as reflected in the GIS Maps above, Defendants know which loans they made to minorities in Fulton County or service; know the location of vacant properties where such loans have defaulted; and know the location of all properties they have foreclosed on in Fulton County, all because they maintain this information in the ordinary course of their business.

### 2.      Cobb County

332.   According to data from the 2010 Census conducted by the United States Census Bureau, the total percentage of Cobb County housing units owned and occupied by minorities in 2010 was approximately 24%.

333.   In Cobb County, the initial foreclosure rates from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners increased from an average of about 1% to approximately 8.0%. The initial foreclosure rates in census tracts with demographics of 40%-59%, 60%-79%, and 80%-100% protected minority homeowners over the same period, however, exceeded 11.0%, 11.0%, and 13.0%, respectively, reflecting nearly a 62% increase in foreclosure rates between census tracts with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

334.   On those mortgage loans at issue in this complaint (i.e., the loans with an origination date since January 2000) and for which it is responsible, Wells Fargo initiated a disproportionate number of foreclosure proceedings in Cobb County in those census tracts with higher populations of FHA protected borrowers compared to census tracts with lower populations of minority borrowers. During the period of February 2006 to May 2019, at least 4,132 of Wells Fargo's total 6,616 foreclosure

filings in Cobb County (approximately 62.5%) were initiated in higher minority census tracts (i.e., where at least 30.1% of owner-occupied housing units had minority household members) as compared to just 2,484 foreclosure filings (about 37.5%) in low minority census tracts (i.e., where 30% or fewer of the owner-occupied housing units contained minority household members).

335.   In Cobb County census tracts with high and increasingly higher minority populations, as reflected in percentages of owner-occupied homes of at least 50.1% that include a minority, the number of Wells Fargo foreclosure filings increase as the percentage of minority homeownership increases. This foreclosure activity, which is particularly striking when considering that only 24% of Cobb County's owner-occupied housing units have minority household members, reflects both the targeting and discriminatory impact of Wells Fargo's foreclosure activity in Cobb County's minority neighborhoods. Wells Fargo's foreclosure filing activity between February 2006 and May 2019 is numerically, geographically, and demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



336.   The foregoing map clearly shows Defendants' pattern and practice of discriminatory foreclosures over the course of a thirteen-year period ending in May 2019. As reflected on the map, Defendants are more likely to foreclose on homeowners in neighborhoods as the number of minority homeowners increase. Thus, compared to a neighborhood with 0-30% minority homeownership, Defendants were approximately 1.7 times more likely to foreclose on a home in a neighborhood with 30.1-50% minority homeowners, 2.6 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, 2.8 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and 3.3 times more likely to foreclose on a home in a neighborhood with 90.1-100% minority homeowners.

337.   Defendants' pattern and practice of discriminatory foreclosures is even more pronounced when looking at Defendants' foreclosures between January 2012 and December 2015 and foreclosures between January 2015 and May 2019.

338.   From January 2012 to December 2015, Wells Fargo foreclosed on 2,011 homes in Cobb County. Despite only representing approximately 21% of the total owner-occupied housing units, approximately 35% of Defendants' foreclosures (704 homes) were in neighborhoods where 50.1% or more of the homeowners were minority. Even more telling, compared with homes in neighborhoods with 0-30% minority ownership, Defendants were almost 7 times more likely to foreclose on a

home in a neighborhood with 50.1-100% minority homeowners. Wells Fargo's foreclosure filing activity between January 2012 and December 2015 is numerically, geographically, and demographically depicted in the following map created by Plaintiffs' GIS Departments:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



339.   From January 2015 to May 2019, Defendants filed 784 foreclosures in Cobb County. Almost 36% of the foreclosures (282 homes) were in neighborhoods where 50.1% or more of the homeowners were minority. Consistent with its historical pattern and practice, as reflected in the maps above, Defendants were almost 2.6 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, almost 3 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and almost 1.6 times more likely to foreclose on a home in a neighborhood with 91-100% minority homeowners than in a neighborhood with 0-30% minority homeowners. Wells Fargo's foreclosure filing activity between January 2015 to May 2019 is numerically, geographically, and demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



340.   While Plaintiffs can provide a list of the addresses of each of the approximately 6,616 foreclosure proceedings Defendants have initiated on mortgage loans originated since January 2006 in Cobb County, all as reflected in the GIS Maps above, Defendants know which loans they originated or serviced to minorities in Cobb County or service, know the location of vacant properties where such loans have defaulted, and know the location of all properties they have foreclosed on in Cobb County, because Defendants maintain this information in the ordinary course of their business.[18]

### 3.   DeKalb County

341.   According to data from the 2010 Census conducted by the United States Census Bureau, the total percentage of DeKalb County housing units owned and occupied by minorities in 2010 was approximately 56%.

342.   In DeKalb County, the initial foreclosure rates from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners increased from approximately 1% to approximately 6%. However, the initial foreclosure rates in census tracts with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period were over 9%, 12%, and 18%, respectively, reflecting nearly a 300% increase in foreclosure rates

---

[18] Discovery of Defendants' mortgage loan marketing, pricing, origination, underwriting, servicing and default servicing information since January 2000 will enable Plaintiffs to prove the linkage between each of Defendants' discriminatory mortgage loans, the terms of each loan, and Defendants' servicing and foreclosure activities related to each such loan through the entire period.

between census tracts with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

343. On those mortgage loans at issue in this complaint (i.e., the loans with an origination date since January 2000) and for which it is responsible, Wells Fargo initiated a disproportionate number of foreclosure proceedings in DeKalb County in those census tracts with higher populations of FHA protected borrowers compared to census tracts with lower populations of minority borrowers. From the period February 2006 to May 2019, at least 7,998 of Wells Fargo's total 8,914 foreclosure filings in DeKalb County (approximately 89.7%) were initiated in higher minority census tracts (i.e., where at least 30.1% of owner-occupied housing units had minority household members) as compared to just the 916 foreclosure filings (approximately 10.3%) in low minority census tracts (i.e., where less 30% or fewer of the owner-occupied housing units contained minority household members).

344. In DeKalb County census tracts with high and increasingly higher minority populations, as reflected in percentages of owner-occupied homes of at least 50.1% that include a minority, the number of Wells Fargo foreclosure filings increase as the percentage of minority homeownership increases. This foreclosure activity reflects both the targeting and discriminatory impact of Wells Fargo's foreclosure activity in DeKalb County's minority neighborhoods. Wells Fargo's

foreclosure filing activity since February 2006 is numerically, geographically, and

demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



**DEKALB COUNTY, GEORGIA**

Wells Fargo Bank Foreclosures,
February 2006 - May 2019

**Owner Occupied Housing (OOH) with
Minority Householder* and Foreclosure Summary**

| Percent of Minority OOH | Wells Fargo foreclosures | Total OOH units | Wells Fargo foreclosure rate |
|---|---|---|---|
| 0% - 30% | 916 | 52,925 | 1.731% |
| 30.1% - 50% | 671 | 18,454 | 3.636% |
| 50.1% - 70% | 687 | 9,192 | 7.474% |
| 70.1% - 90% | 2,208 | 24,145 | 9.145% |
| 90.1% - 100% | 4,432 | 44,792 | 9.895% |

**Total Foreclosures: 8,914**

*Percent minority householder mapped by Census Tract
Data Source: U.S. Census Bureau, 2016

171

345.   The foregoing map clearly shows Defendants' pattern and practice of discriminatory foreclosures over the course of a thirteen-year period ending in May 2019. In neighborhoods consisting of 70.1-100% minority homeowners, Defendants foreclosed on those homeowners seven times more frequently (6,640 home) compared to neighborhoods consisting of 0-30% minority homeowners (916 homes). Foreclosures increase to 7,327 homes when neighborhoods composed of 50.1-70% minority homeowners are included. What is even more telling than the gross numbers of foreclosures, is the increasing foreclosure rate as minority home ownership increases. Compared to neighborhoods with 0-30% minority homeownership, Defendants are approximately 2 times more likely to foreclose on a home in a neighborhood with 30.1-50% minority homeowners, 4 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, 5 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and almost 6 times more likely to foreclose on a home in a neighborhood with 90.1-100% minority homeowners.

346.   Defendants' pattern and practice of discriminatory foreclosures is even more pronounced when looking at Defendants' foreclosures during the periods January 2012 to December 2015 and January 2015 to May 2019.

347.   From January 2012 to December 2015, Wells Fargo foreclosed on 2,535 homes in DeKalb County. Approximately 81% of Defendants' foreclosures

(2,064 homes) were in neighborhoods where 50.1% or more of the homeowners were minority. Even more telling, Defendants were approximately 4 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, almost 5 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and almost 6 times more likely to foreclose on a home in a neighborhood with 90.1-100% minority homeowners compared to a neighborhood with 0-30% minority homeowners. Wells Fargo's foreclosure filing activity between January 2012 and December 2015 is numerically, geographically, and demographically depicted in the following map:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



174

348.   From January 2015 to May 2019, Defendants filed 1,065 foreclosures in DeKalb County. Approximately 88% of the foreclosures (938 homes) were in neighborhoods where 50.1% or more of the homeowners were minority. Consistent with its historical pattern and practice, as reflected in the maps above, Defendants were approximately 7 times more likely to foreclose on a home in a neighborhood with 50.1-70% minority homeowners, almost 8 times more likely to foreclose on a home in a neighborhood with 70.1-90% minority homeowners, and almost 10 times more likely to foreclose on a home in a neighborhood with 91-100% minority homeowners compared to a neighborhood with 0-30% minority homeowners. Wells Fargo's foreclosure filing activity between January 2015 and May 2019 is numerically, geographically, and demographically depicted in the following map created by Plaintiffs' GIS Departments:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



349.   While Plaintiffs can provide a list of the addresses of each of the approximate 8,914 foreclosure proceedings Defendants have initiated on mortgage loans originated since February 2006 in DeKalb County, all as reflected in the GIS Maps above, Defendants know which loans they made to minorities in DeKalb County or service; know the location of vacant properties where such loans have defaulted; and know the location of all properties they have foreclosed on in DeKalb County, all because they maintain this information in the ordinary course of their business.

## M.   Defendants' Discrimination is Evidenced by the Concentration of Their Lending & Funding Activities in Plaintiffs' Neighborhoods with the Highest Foreclosure Risk ("HFR") - Plaintiffs' Higher Minority Neighborhoods

350.   Defendants' discriminatory conduct is evidenced by the concentration of Defendants' non-prime mortgage lending activity within the highest foreclosure risk areas in Plaintiffs' communities and neighborhoods and in the numbers of mortgage loans they made to minority borrowers within those high foreclosure risk areas.

351.   "High foreclosure risk" ("HFR") census tracts/neighborhoods designated by the U.S. Department of Housing & Urban Development ("HUD"), reflect characteristics that HUD estimates to have a high level of risk for foreclosure. This includes neighborhoods with a relatively high concentration of non-prime mortgage loans with higher costs and/or higher LTV or DTI leverage ratios.

177

352.   As Plaintiffs allege above, because of Defendants' and their affiliates' discriminatory targeting and reverse redlining of minorities for non-prime mortgage loans since the early 2000s, Defendants are responsible for both the disproportionately larger numbers of mortgage loans to minority borrowers in Plaintiffs' communities and the concentrations of such loans in Plaintiffs' neighborhoods with higher percentages of FHA protected minority homeowner/borrowers.

353.   As a direct and foreseeable result of the increased and disproportionate numbers of non-prime loans to minorities, the predatory and discriminatory terms and underwriting of such loans, and the concentration of such loans in minority communities, Plaintiffs' neighborhoods (reflected in census tracts) with higher percentages of FHA protected minority borrowers have experienced tremendously greater numbers of loan defaults and foreclosures than Plaintiffs' neighborhoods and communities with lower percentages of minority homeowners. Thus, Plaintiffs' neighborhoods/census tracts with higher concentrations of minority homeowners directly coincide with the highest foreclosure risk areas (HFRs) designated by HUD.

354.   Indeed, as Plaintiffs further allege below, empirical data shows that Defendants' mortgage lending, funding, and purchasing activities were concentrated in Plaintiffs' communities and neighborhoods that eventually received the highest HUD designated foreclosure risk (HFRs). And, as the empirical evidence alleged

below further reflects, Plaintiffs' neighborhoods with the highest HUD designated foreclosure risk typically have the highest percentages of FHA protected minority homeowners, and it is where Defendants made the largest numbers of non-prime mortgage loans to minority borrowers. Thus, empirical information alleged below provides additional direct and *prima facie* evidence of targeting and disparate treatment, as well as the disparate impact, of Defendants' predatory mortgage lending activities in Plaintiffs' communities and neighborhoods.

### 1.  Defendants' Lending & Funding Activities in Fulton County's HFR Areas

355.   Of the total 59,142 mortgage loans Defendants and their affiliates collectively originated in Fulton County between 2000 and 2013, 41,697 of those mortgages (nearly 71%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts (*e.g.*, HFR scores of "19" or "20").[19]

356.   As between each of the Defendants, of the total 6,202 mortgage loans that Wachovia Bank originated in Fulton County between 2000 and 2013 and

---

[19] As a result of a massive increase in the number of defaults on non-prime mortgage loans that Defendants' (and other industry participants') made – which defaults primarily were caused by the higher cost terms and adjustable rates on many such loans, the higher LTV and DTI leverage on such loans, and Defendants' (and other industry participants') reduced underwriting on such loans (particularly during the boom years of 2006 to 2008) -- the severity of the risk of foreclosures in Plaintiffs' communities and neighborhoods (and across the nation) became so great that HUD changed its original HFR ranking system from a scale of 1-10 (10 formerly being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas).

reported the minority status of borrowers, 4,657 such loans (75%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.

357.   Of the total 26,201 mortgage loans Wells Fargo Bank, NA, originated in Fulton County between 2000 and 2013 and reported the minority status of borrowers, 18,218 such loans (70%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.

358.   Of the 18,688 mortgage loans that Defendants collectively funded, purchased, or otherwise acquired from 2000-2013 in Fulton County and reported the minority status, 12,073 of such loans (nearly 65%) were originated within Fulton County's highest HFR census tracts.

359.   This publicly available empirical loan data – reported by the Defendants themselves – further evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in Fulton County. This empirical data also supports the causation of increased foreclosures in Fulton County's higher minority areas resulting from Defendants' marketing, underwriting and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Fulton County and concentrated those loans in Fulton's highest HFR areas. Defendants continue to service and foreclose on many such loans as they default.

2.   **Defendants' Lending & Funding Activities in Cobb County's HFR Areas**

360.   Of the total 39,476 mortgage loans Defendants and their affiliates collectively originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 33,538 such loans (85%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts (*e.g.*, HFR scores of "19" or "20").

361.   As between each of the Defendants, of the total 5,048 mortgage loans Wachovia Bank originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 4.468 such loans (over 88%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.

362.   Of the total 8,332 mortgage loans Wells Fargo Home Mortgage originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 7,323 such loans (88%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.

363.   Of the total 15,693 mortgage loans Defendants and their affiliates collectively funded, purchased, or otherwise acquired during the same period that were originated in Cobb County, and which Defendants reported the minority status of borrowers, 13,170 such loans (nearly 84%) were originated within Cobb County's highest HUD designated HFR census tracts.

364.   This publicly available empirical loan data – reported by the Defendants themselves – further evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in Cobb County. This empirical data also supports the causation of increased foreclosures in Cobb County's higher minority areas resulting from Defendants' marketing, underwriting and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Cobb County and concentrated those loans in Cobb's highest HFR areas. Defendants continue to service and foreclose on many such loans as they default.

### 3.   Defendants' Lending & Funding Activities in DeKalb County's HFR Areas

365.   Of the total 31,157 mortgage loans Defendants and their affiliates collectively originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 16,985 such loans (over 54%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts (*e.g*., HFR scores of "19" or "20").

366.   As between each of the Defendants, of the total 4,767 mortgage loans Wachovia Bank originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 3,099 such loans (65%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts.

367.   Of the total 14,601 mortgage loans Wells Fargo Bank, NA, originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 7,213 such loans (over 49%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts.

368.   Of the total 18,720 mortgage loans Defendants and their affiliates collectively funded, purchased, or otherwise acquired during the same period that were originated in DeKalb County, and which Defendants reported the minority status of borrowers, 8,467 such loans (45%) were originated within DeKalb County's highest HUD designated HFR census tracts.

369.   This publicly available empirical loan data – reported by the Defendants themselves – further evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in DeKalb County because the mortgage loans that Defendants originated, purchased, or acquired that were originated to minorities were concentrated in DeKalb County's highest HFR census tracts, which census tracts have higher concentrations of minority homeowners. This empirical data also supports the causation of increased foreclosures in DeKalb County's higher minority areas resulting from Defendants' marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to

minorities in DeKalb County and concentrated those loans in DeKalb's highest HFR areas. Defendants continue to service and foreclose on such loans as they default.

### 4.   Defendants' Discriminatory Foreclosures in Plaintiffs Counties

370.   To further illustrate the ongoing nature of Defendants' predatory and discriminatory mortgage lending, servicing and foreclosure practices alleged herein, Plaintiffs identify examples of Defendants' mortgage loans made to borrowers and foreclosed upon in the Plaintiff Counties by Defendants.

371.   For example, Plaintiffs believe the following loans were predatory and discriminatory when made, and/or were foreclosed on in a discriminatory manner during the relevant period, based on: (1) the property address location of the loan and foreclosure (i.e., within the Plaintiffs Counties' highest minority homeownership areas); (2) the adjustable-rate nature of Adjustable Rate Mortgage ("ARM") loans (detailed in the allegations throughout this complaint as predatory and discriminatory); (3) the purported interest rates on the loan at the time of the foreclosure (that are substantially higher than most other foreclosed loans); (4) the full names of the borrowers reflecting a likely African American or Latino/Hispanic borrower (which have not been included in these pleadings but can be readily provided); (5) the identity of the Defendant originating lender or issuer of the loan; and (6) the identity of the Defendant foreclosing entity:

   a.   ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of Ameriquest Mortgage

Co. on 11/22/2005 for a home in Smyrna, GA with an interest rate of 10.4% was foreclosed on by Wachovia Bank N.A. on or around 12/30/2008.

b.  ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of MERS Inc. on 3/5/2004 for a home in Mableton, GA with an interest rate of 11.50% was foreclosed on by Wachovia Bank N.A. on or around 3/27/2007.

c.  ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of American Freedom Mortgage Inc. on 10/16/2003 for a home in Marietta, GA with an interest rate of 7.08% was foreclosed on by Wachovia Mortgage Corp. on or around 6/19/2007.

d.  ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of MERS Inc. on 3/26/2008 for a home in Mableton, GA with an interest rate of 7.25% was foreclosed on by Wachovia Mortgage Corp. on or around 1/25/2010.

e.  ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 1/22/2007 for a home in Kennesaw, GA with an interest rate of 8.375% was foreclosed on by Wells Fargo Bank N.A. on or around 1/8/2016.

f.  ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of New Equity Financial Corp. on 11/2/2005 for a home in Powder Springs, GA with an interest rate of 8% was foreclosed on by Wells Fargo Bank N.A. on or around 12/7/2018.

g.  Mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 8/3/2004 for a home in Union City, GA with an interest rate of 6.875% was foreclosed on by Wells Fargo Bank N.A. on or around 12/12/2018.

h.  ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Home123 Corp. on 11/15/2005 for a home in Austell, GA with an interest rate of 9.1% was foreclosed on by Wells Fargo Bank N.A. on or around 2/5/2016.

i. ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Alliance Capital Corp. on 5/30/2006 for a home in Marietta, GA with an interest rate of 7.975% was foreclosed on by Wells Fargo Bank N.A. on or around 4/7/2017.

j. ARM mortgage loan originated or acquired by Wells Fargo Home Mortgage Inc. that was issued in the name of Wells Fargo Home Mortgage Inc. on 11/11/2002 for a home in Smyrna, GA with an interest rate of 8.375% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

k. ARM mortgage loan originated or acquired by Wells Fargo Home Mortgage Inc. that was issued in the name of Wells Fargo Home Mortgage Inc. on 12/17/2002 for a home in Mableton, GA with an interest rate of 9.12% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

l. ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of Southstar Funding LLC on 10/22/2001 for a home in Decatur, GA with an interest rate of 10.625% was foreclosed on by Wachovia Bank N.A. on or around 3/26/2008.

m. ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of Chase Manhattan Mortgage Corp. on 1/20/2004 for a home in Atlanta, GA with an interest rate of 8.75% was foreclosed on by Wachovia Bank N.A. on or around 3/26/2008.

n. ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of Long Beach Mortgage Co. on 9/9/2003 for 1133 a home in Stone Mountain, GA with an interest rate of 9.925% was foreclosed on by Wachovia Bank N.A. on or around 3/26/2008.

o. ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of MERS Inc. on 8/28/2006 for a home in Decatur, GA with an interest rate of 7.35% was foreclosed on by Wachovia Mortgage Corp. on or around 4/9/2014.

p.    ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of MERS Inc. on 5/30/2006 for a home in Clarkston, GA with an interest rate of 7.25% was foreclosed on by Wachovia Mortgage Corp. on or around 4/8/2010.

q.    ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Option One Mortgage Corp. on 7/5/2005 for a home in Lithonia, GA with an interest rate of 8.99% was foreclosed on by Wells Fargo Bank N.A. on or around 5/7/2015.

r.    ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of New Century Mortgage Corp. on 4/4/2006 for a home in Ellenwood, GA with an interest rate of 8.95% was foreclosed on by Wells Fargo Bank N.A. on or around 3/11/2015.

s.    ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 8/27/2007 for a home in Lithonia, GA with an interest rate of 11.49% was foreclosed on by Wells Fargo Bank N.A. on or around 1/19/2016.

t.    ARM mortgage loan originated or acquired by Wells Fargo that was issued in the name of Wells Fargo Home Mortgage Inc. on 7/3/2002 for a home in Lithonia, GA with an interest rate of 9.5% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

u.    ARM mortgage loan originated or acquired by Wells Fargo that was issued in the name of Wells Fargo Home Mortgage Inc. on 5/22/2003 for a home in Stone Mountain, GA with an interest rate of 7.125% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

v.    ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of MERS Inc. on 2/21/2006 for a home in Atlanta, GA with an interest rate of 8.2% was foreclosed on by Wachovia Bank N.A. on or around 5/7/2007.

w.     ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of Argent Mortgage Co., LLC on 11/17/2004 for a home in Atlanta, GA with an interest rate of 8.5% was foreclosed on by Wachovia Bank N.A. on or around 7/18/2007.

x.     ARM mortgage loan originated or acquired by Wachovia Bank N.A. that was issued in the name of MERS Inc. on 3/7/2006 for a home in Union City, GA with an interest rate of 9.95% was foreclosed on by Wachovia Bank N.A. on or around 10/2/2007.

y.     ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of MERS Inc. on 5/18/2006 for a home in Atlanta, GA with an interest rate of 6.99% was foreclosed on by Wachovia Mortgage Corp. on or around 12/22/2006.

z.     ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of MERS Inc. on 7/7/2006 for a home in Roswell, GA with an interest rate of 7.25% was foreclosed on by Wachovia Mortgage Corp. on or around 1/28/2010.

aa.    ARM mortgage loan originated or acquired by Wachovia Mortgage Corp. that was issued in the name of MERS Inc. on 8/18/2006 for a home in Atlanta, GA with an interest rate of 7.5% was foreclosed on by Wachovia Mortgage Corp. on or around 9/12/2008.

bb.    ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Argent Mortgage Co. LLC on 5/19/2005 for a home in Atlanta, GA with an interest rate of 9.825% was foreclosed on by Wells Fargo Bank N.A. on or around 3/11/2015.

cc.    ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 5/27/2005 for a home in Atlanta, GA with an interest rate of 9.85% was foreclosed on by Wells Fargo Bank N.A. on or around 10/26/2015.

dd.    ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Option One Mortgage Corp. on 11/1/2006 for a home in Alpharetta, GA with an interest rate of 9.55% was foreclosed on by Wells Fargo Bank N.A. on or around 7/12/2018.

ee.    ARM mortgage loan originated or acquired by Wells Fargo that was issued in the name of Wells Fargo Home Mortgage Inc. on 6/14/2002 for a home in Atlanta, GA with an interest rate of 7.875% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

ff.    ARM mortgage loan originated or acquired by Wells Fargo that was issued in the name of Wells Fargo Home Mortgage Inc. on 4/25/2003 for a home in Atlanta, GA with an interest rate of 7.62% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

gg.    ARM mortgage loan originated or acquired by Wells Fargo that was issued in the name of Wells Fargo Home Mortgage Inc. on 2/8/2002 for a home in Atlanta, GA with an interest rate of 10.75% was foreclosed on by Wells Fargo Home Mortgage Inc. on or around 3/26/2008.

372.   In addition to the exemplar loans listed in the paragraph immediately above, and for all the same reasons alleged in the paragraph immediately above, Plaintiffs believe the following foreclosed loans (and thousands of other similar loans foreclosed upon by the Defendants during the same period) will evidence that Defendants' discriminatory housing practices alleged in this Complaint did not terminate within two years prior to the date of the filing of this Complaint and, in fact, remain ongoing as of the filing of this Complaint:

a.    On or about 7/29/2019 Wells Fargo Bank N.A. foreclosed on a mortgage loan originated or acquired by Wells Fargo Bank N.A.

on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Option One Mortgage Corp. on 3/19/2007 for a home in Duluth, GA with an interest rate of 8%.

b.     On or about 5/9/2019 Wells Fargo Bank N.A. foreclosed on a mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 2/26/2008 for a home in Atlanta, GA with an interest rate of 6%.

f.     On or about 5/8/2019 Wells Fargo Bank N.A. foreclosed on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of National Mortgage Acceptance Services, Inc. on 4/24/2000 for a home in Atlanta, GA with an interest rate of 12.125%.

g.     On or about 5/8/2019 Wells Fargo Bank N.A. foreclosed on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Argent Mortgage Co. on 4/14/2005 for a home in Ellenwood, GA with an interest rate of 7.55%.

h.     On or about 6/28/2019 Wells Fargo Bank N.A. foreclosed on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of First Franklin Financial Corp. on 6/21/2004 for a home in College Park, GA with an interest rate of 6.25%.

i.     On or about 5/9/2019 Wells Fargo Bank N.A. foreclosed on a FHA mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 2/26/2008 for a home in Atlanta, GA with an interest rate of 6%.

j.     On or about 1/14/2020 Wells Fargo Bank N.A. foreclosed on a mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 4/24/2003 for a home in Austell, GA.

Plaintiffs further anticipate that after any Covid-related foreclosure moratorium is lifted, Defendants will commence foreclosures on its discriminatory and predatory mortgage loans that were in default prior to the Covid crisis. Defendants' mortgage servicing and default servicing loan data will reflect all such loans and future pending foreclosures.

## N.  The Full Extent of Defendants' Discriminatory Housing Practices Are Concealed Through Defendants' Underreporting of Minority Status in HMDA Data and Through MERS®

373.  Defendants underreported race and ethnicity HMDA data on the mortgage loans they originated and purchased and have concealed their lending and foreclosure activity through use of Mortgage Electronic Registration Systems, Inc.'s MERS® System (the "MERS® System"). Wells Fargo and its joint venture partner First American Title Insurance Company were founding members of MERSCORP Holdings, Inc. ("MERSCORP"), the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS"), which operates the MERS® System. As a founding member of MERSCORP, Wells Fargo helped fund the development and initial start-up of the use of the MERS® System. Wells Fargo and First American are both current members of MERS®. On October 4, 2018, Intercontinental Exchange, Inc., announced that it had acquired all outstanding equity of MERSCORP.[20]

---

[20] https://ir.theice.com/press/news-details/2018/Intercontinental-Exchange-Completes-Acquisition-of-MERS/default.aspx

374.  The MERS® System is a "national electronic registry system that tracks the changes in servicing rights and beneficial ownership interests in mortgage loans that are registered on the registry."[21] Critically, "[w]hen mortgage loans are registered on the MERS® System, MERS acts as nominee in county land records for the lender and servicer and is the mortgagee of record and nominee for the beneficial owner of the mortgage."[22]

375.  MERS previously described the MERS® System on its website as "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold, and tracked. Created by the real estate finance industry, MERS® eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."

376.  According to MERS' prior public website disclosures, it also provides money savings to lenders by eliminating assignment costs, document correction costs, and tracking fees: "Once the loan is assigned to MERS . . . tracking servicing and beneficial rights can occur electronically for all future transfers. The need for any additional assignments after this point will be eliminated unless the servicing rights are sold to a non-MERS member." MERS has saved industry participants —

---

[21] https://www.mersinc.org/about/board-of-directors
[22] Id.

and denied public recording systems operated by County governments such as Plaintiffs here — a total of over $2 billion in public recording fees.

377.   As a founding member, Wells Fargo helped fund the development and initial start-up of MERS, which enabled mortgage lenders to circumvent public lien assignment recording processes. Defendants' use of MERS skews the discriminatory effect of Defendants' predatory and discriminatory lending and servicing practices at issue here in Defendants' favor. Thus, only discovery of Defendants' loan level data and mortgage servicing data will reveal the full extent of Defendants' discriminatory housing practices at issue here and the full extent of Plaintiffs' resulting damages.

378.   The involvement of MERS obscures the extent of Defendants' mortgage loan origination, ownership, assignment, securitization, and servicing activities. The fact that many loans originated, purchased, or acquired by Wells Fargo were originally closed in the name of MERS, or subsequently assigned to MERS, makes it extremely difficult for Plaintiffs to determine ownership interests in vacant or abandoned properties that have not yet been foreclosed upon, which, in turn, makes it extremely difficult to cure building code deficiencies, ensure compliance with building codes, obtain unpaid taxes and/or utility bills, and/or determine the ownership or lien holders to enable *in rem* or tax foreclosure sales.

379.   Because Plaintiffs do not have access to the full MERS® System, there was virtually no way for Plaintiffs to identify the parties — e.g., mortgage note holders or securitization trustees — legally and financially obligated to pay the costs of maintaining abandoned or vacant properties in the MERS® System within its jurisdiction. As such, MERS' admitted deliberate circumvention of the public recording process has damaged, and continues to damage, Plaintiffs, including by denying Plaintiffs the revenue from recording fees and related taxes that Plaintiffs otherwise would have received had the various assignments and other changes in title been properly recorded.

380.   More importantly, however, by circumventing public lien holder recording processes by design, MERS has obscured Defendants' mortgage foreclosure processes, making it extremely difficult for Plaintiffs — and other interested parties — to identify the predatory lenders "whose practices led to the high foreclosure rates that have blighted some neighborhoods." Mike McIntire, *Tracking Loans Through a Firm That Holds Millions*, N.Y. Times (April 24, 2009). MERS effectively "removes transparency over what's happening to these mortgage obligations and sow's confusion, which can only benefit the banks." *Id.*

381.   Mortgage loans foreclosed in the name of MERS, as agent or assignee, may conceal the identity of the loan originator, subsequent assignees, and/or the loan servicer, making it extremely difficult for Plaintiffs to determine the party

responsible for originating or servicing a predatory or discriminatory mortgage loan that has resulted in foreclosure.

382.   The majority of foreclosures (estimated at 60% nationwide) have been conducted in the name of MERS as designee, assignee, or title holder, making it virtually impossible to determine from publicly available data who holds the mortgages to, is in possession of, and/or is or may be foreclosing on properties in Plaintiffs' communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants.

383.   Complicating the issue, it has been widely reported, investigated, litigated, and publicly acknowledged that the Defendants' and MERS' electronic mortgage lien and assignment records contain errors. It also has been widely reported, investigated, litigated, and publicly acknowledged that this has been exacerbated by and/or led to Defendants' "robosigning" and other predatory mortgage servicing and foreclosure practices.

384.   Finally, Defendants also used their bank holding company corporate structure to conceal their discriminatory lending practices by shifting loans and loan applications between their mortgage lending operations at their regulated banking entities and their non-regulated mortgage lending subsidiaries and affiliates. According to confidential witness statements provided by former employees of Wells Fargo and cited in another action against Wells Fargo: "It was common

knowledge that, to avoid problems, loans from one office were sent to another office to make both look more balanced. We needed to put some white loans in that [minority] community and some black loans in this community because [otherwise] we'll get some sh!+ from the Fed."

385.   The only realistically feasible way to precisely determine all the properties possessed by, in the control of, or foreclosed upon at the direction, or for the benefit, of Defendants, is through discovery of Defendants' and MERS®' electronic mortgage origination (including loan purchases and sales), underwriting, pricing, servicing, and foreclosure data that Defendants specifically collect, track, and utilize for their day-to-day operational activities, and HMDA reporting obligations.

386.   Thus, discovery of Defendants mortgage loan data is necessary to determine the full extent of the predatory and discriminatory loans Defendants have made that are at issue here and Defendants' complicity in the continuing predatory and discriminatory equity stripping scheme alleged, including through the continuing servicing of each such predatory and discriminatory loan.

## DEFENDANTS' PREDATORY AND DISCRIMINATORY MORTGAGE LENDING, SERVICING, AND FORECLOSURE PRACTICES HAVE HARMED PLAINTIFFS

387.   Defendants' discriminatory housing practices of equity stripping — conducted through Defendants' interrelated predatory and discriminatory mortgage

lending, servicing, and foreclosure activities — as well as Defendants' stand-alone discriminatory foreclosure practices, have seriously harmed Plaintiffs, their tax payor residents, and the communities and neighborhoods that Plaintiffs embody.

388. The foreclosure maps above, and the empirical data reflected in those maps, show that the Defendants have foreclosed on minorities and minority homes to a disproportionately greater extent in Plaintiffs' communities and neighborhoods with higher levels of minority residents compared to Plaintiffs' lower-level and non-minority communities and neighborhoods. This empirical evidence reflects the general historical findings in academic research, congressional testimony, and governmental reports, that home foreclosures disproportionately occur in predominantly minority neighborhoods and their harmful impact is increased where the numbers of foreclosures are concentrated.

389. Plaintiffs' damages will continue to occur into the future. In addition to the accrual of lost tax revenues and out-of-pocket costs relating to existing foreclosures and home vacancies, new foreclosures and related home vacancies will cause additional damage.

390. Monetary damages to Plaintiffs include: (i) the loss of property taxes on those foreclosed properties resulting from Defendants' discriminatory housing practices, and the lost property taxes on properties surrounding those foreclosures; (ii) the cost to provide eviction, judicial and non-judicial foreclosure, and other

related services for inspecting, monitoring, securing, cleaning, maintaining, and/or demolishing those vacant foreclosed or abandoned properties resulting from Defendants' discriminatory housing practices, which costs include the necessary reallocation and utilization of Plaintiffs' limited financial resources to provide such services, and (iii) the loss of municipal service income from those abandoned foreclosed and vacant properties resulting from defaults on Defendants' discriminatory and predatory loans.

391.   Plaintiffs have also suffered non-monetary damages. These include damages resulting from the deterioration and blight to Plaintiffs' minority neighborhoods and communities. These damages can be established with statistical evidence and expert testimony. Plaintiffs, however, seek only injunctive relief with respect to non-monetary injuries.

392.   Defendants' discriminatory housing practices have effectively diluted — or completely eliminated — the equity of minority borrowers' homes, placing those borrowers in far greater jeopardy of loan payment delinquencies or defaults, dramatically increasing the numbers and rates of home vacancies and foreclosures Plaintiffs' communities and neighborhoods are currently experiencing (and will continue to experience into the future) and, ultimately, causing extensive monetary and non-monetary damages to Plaintiffs.

393.   Defendants' illegal discriminatory conduct has directly caused substantial, tangible damages to Plaintiffs that can be traced directly to the real properties involved in Defendants' discriminatory lending, servicing, and foreclosure practices. These direct injuries to Plaintiffs include, but are not limited to:

(i)      the loss of property taxes on those foreclosed properties resulting from Defendants' discriminatory housing practices, and the lost property taxes on properties surrounding those foreclosures;

(ii)     the cost to provide eviction, judicial and non-judicial foreclosure, and other related services for inspecting, monitoring, securing, cleaning, maintaining, and/or demolishing those vacant foreclosed or abandoned properties resulting from Defendants' discriminatory housing practices, which costs include the necessary reallocation and utilization of Plaintiffs' limited financial resources to provide such services, and

(iii)    the loss of municipal service income from those abandoned foreclosed and vacant properties resulting from Defendants' discriminatory housing practices

394.   Such injuries directly arise from both the completed foreclosure process itself (property vacancy, lower home values) and from property vacancies or abandonment where the homeowners are facing foreclosure (i.e., the shadow inventory of foreclosures). This injury to Plaintiffs is magnified in Plaintiffs' communities and neighborhoods with higher concentrations of FHA protected minority borrowers where higher concentrations of foreclosures have occurred, although the harm has spread throughout Plaintiffs' communities.

395.   Relying on data supplied by the Mortgage Bankers Association — a mortgage industry business association — the GAO found in November 2011 that high foreclosure rates correlate to increased numbers of home vacancies. For example, the GAO found that Georgia experienced over an 87% increase in non-seasonal home vacancies between 2000 and 2010 and a 125% increase in other vacant housing units over the same period. In comparison, on a nationwide basis, non-seasonal vacancies over the same period increased only 51% and other vacancies increased only 59%.

396.   Fulton County's overall vacancy rate increased from 7.90% in 2000 to 13.90% in 2010, peaking at 16.10% in 2007 as the initial waves of defaults and foreclosures began to hit. DeKalb County's overall vacancy rate increased from 4.60% in 2000 to 10.9% in 2010, peaking at 11.70% in 2007. Similarly, Cobb County's overall vacancy rate steadily increased from 4.20% in 2000 to 10.6% in 2010. In creased vacancies and reduced home prices due to foreclosures reduce Plaintiffs' property tax and other revenue and cause the Plaintiffs to expend funds to provide services as a direct result of the vacancies.

397.   The GAO also found in November 2011 that vacant and/or foreclosed properties reduced prices of nearby homes between $8,600 to $17,000 per property.

398.   Academic studies — prepared prior to the collapse in U.S. housing prices — of the financial impact of foreclosures on entire communities such as

Atlanta reflect up to $34,000 in community-wide damages resulting from ***each foreclosure***. This includes actual governmental expenditures in the form of costs for foreclosure related services, vacancy related services (e.g., police, fire, code enforcement, trash removal, property boarding up, inspections, etc.), losses of revenue (foregone property taxes and utility taxes) and losses in property value forming the tax base.

399.   Based on recent, related academic studies, Plaintiffs estimate that the average cost to them and their minority communities for each foreclosure on a loan made by Defendants is approximately $19,000, with additional damages as a result of deteriorated property values and harm to Plaintiffs' communities and neighborhoods, and pre-judgment interest accruing on the expenditures necessary to provide foreclosure related services. As such, compensatory damages alone in this case are very substantial given that Defendants are responsible — through direct originations or their wholesale channel of brokers and correspondent lenders — for thousands of predatory and discriminatory mortgage loans made within Plaintiffs' minority communities and neighborhoods.

400.   Plaintiffs have incurred out-of-pocket costs in the form of their expenditure to provide foreclosure related services, as well as other services to vacant foreclosure and pre-foreclosure properties, that would not have been necessary if such properties had not been foreclosed upon or left vacant after default.

401.   In addition, Plaintiffs have been required to shift their resources, and expend their resources, to provide foreclosure related services and address problems created by vacancies due to defaults on Defendants' predatory and discriminatory loans. Defendants' predatory servicing and foreclosure activity occurring on a discriminatorily disproportionate level in Plaintiffs' minority communities has further exacerbated this. For example, Plaintiffs have sustained financial injuries for providing services to such vacant homes that have not been cared for, have been vandalized and/or have provided a location for illegal activities, all leading to violations of Plaintiffs' building code, including the creation of physically unsafe structures that threaten public safety. This, in turn, has led to substantial personnel time and other direct out-of-pocket costs incurred by Plaintiffs, including for building code enforcement having to inspect, investigate and respond to violations at such vacant properties that threaten public safety or address public health concerns; and taking legal action to investigate and prosecute building code violations at the vacant properties.

402.   The task of Plaintiffs' legal function in identifying responsible parties in order to take legal action has been made all the more difficult, causing greater financial injury to Plaintiffs, as a direct result of the difficulty in determining the identity of the correct lender on vacant homes. This is because transfers and assignments of the loans were not properly recorded by Defendants, including their

transferees, assignees, agents and/or trustees of the pools of loans that issued MBS secured by such loans.

403.   Using foreclosure property addresses, and Defendants' loan origination, pricing, underwriting, servicing and loan default and foreclosure data obtained from Defendants in discovery, Plaintiffs can calculate their fully loaded, pro rata, costs, including the utilization or dissipation of Plaintiffs' limited resources and any other out-of-pocket costs that are attributable to each individual foreclosure for which Defendants are responsible.

404.   A major source of Plaintiffs' revenue is *ad valorem* taxes on real property, particularly residential real estate. O.C.G.A. 48-5-2(3)(B)(iv) (fair market value of real property) requires county tax assessors to consider bank sales (i.e., foreclosure sales) when determining the fair market value of real property for determining the tax digests. The fair market value of the residential real estate in Plaintiffs' jurisdiction has been adversely impacted by foreclosures on predatory and discriminatory mortgage loans, particularly including those loans originated, funded, and/or purchased by Defendants at issue here.

405.   As a result of the predatory loan terms, higher loan costs, and reduced home equity resulting from Defendants' discretionary policies and practices, Plaintiffs' communities, and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage

delinquencies, defaults and home foreclosures on the loans Defendants were responsible for. This, in turn, contributed to a downward spiral of additional mortgage delinquencies, defaults, and home foreclosures in Plaintiffs' communities and neighborhoods both with higher percentages of FHA protected minority borrowers as well as surrounding areas that have lower percentages of FHA protected minority borrowers.

406.   The empirical data alleged above shows that defaults and foreclosures on mortgage loans for which Defendants are responsible have occurred to a greater extent in Plaintiffs' higher minority communities and neighborhoods compared to Plaintiffs' lower and non-minority communities and neighborhoods. This is further supported by academic research, testimony, and governmental reports reflecting that home foreclosures disproportionately occur in predominantly minority neighborhoods and their impact is increased in segregated communities where the numbers of foreclosures are concentrated.

407. Defendants' discriminatory housing practices have dramatically increased the numbers and rates of home vacancies and foreclosures that Plaintiffs' communities and neighborhoods have experienced, and will continue to experience, particularly within those neighborhoods with higher concentrations of minority homeowners. This has caused extensive monetary and non-monetary damage to

Plaintiffs and the communities they embody, and likely will continue to cause damage as new foreclosures are filed.

408.   Additional delinquencies, defaults, and foreclosures on Defendants' predatory and discriminatory loans likely will continue to occur. Accordingly, in addition to the damages Plaintiffs already incurred, Plaintiffs will continue to incur damages on properties that remain vacant, will become vacant and/or will be foreclosed upon that are secured by a predatory/discriminatory loan for which Defendants are responsible.

409.  Plaintiffs will prove that their monetary damages have been proximately caused by Defendants' alleged discriminatory housing practices at issue here primarily on a foreclosure-by-foreclosure basis, i.e., a property-by-property basis.

410.   As further alleged below, using foreclosure property addresses, borrower names, and foreclosure event date information — which will be obtained in discovery from Defendants' loan origination, loan servicing, and loan default and foreclosure data — Plaintiffs will isolate and establish their damages due to foreclosures on properties secured by mortgage loans originated, acquired, serviced, or foreclosed on by Defendants on the discriminatory bases alleged herein.

411.   The critical aspect of proving Plaintiffs' monetary damages is to identify the individual properties where Plaintiffs' damages have occurred as a result

of Defendants' discriminatory practices. There is only one source of data that links affected borrowers and their property locations to Defendants' discriminatory practices — Defendants' mortgage loan origination and servicing data for those residential 1-4 family first and second lien mortgage and home equity loans and lines of credit that Defendants originated, purchased, funded, sold, serviced, and/or foreclosed upon in Plaintiffs' communities from January 1, 2000 through the present (the "Loan Data").

412.   Defendants' Loan Data typically includes thousands of data fields in which Defendants record and maintain every useful data point over the life of a mortgage loan.   Defendants use this data in the ordinary course of business for virtually every aspect of their mortgage lending and servicing operations, including marketing, loan origination, loan underwriting, loan servicing, loan modifications, foreclosures, financial reporting, profitability, and compliance. Among many other data points, this includes extensive information about:

    a.    The loan application process, such as a borrower's race, ethnicity, sex, age, income, debt, employer, job title, credit score, and the property address of the borrower's home;

    b.    The loan origination and underwriting process, such as a borrower's debt-to-income ratio, the appraised value of the borrower's home, the loan-to-value ratio, the borrower's documentation status, ability to repay, and information on overrides of underwriter decisions;

    c.    The loan terms and pricing, such as the loan product (prime, non-prime, sub-prime, FHA, Fannie Mae, jumbo, stated-income,

stated-asset, stated-income-stated-asset), the loan term (e.g., 30 years or 15 years), the loan documentation type (e.g. full, partial or no-doc), whether the loan has an adjustable or fixed interest rate, the initial stated note interest rate, the features of adjustable rate loans (including adjustment periods, rate ceilings and floors, and annual capped amount of rate increases or decreases), whether the loan has a balloon payment, the amount of any pre-payment penalties, the amount of fees charged and capitalized (e.g., points and origination), the total amount of capitalized costs (e.g., including appraisal, application, and other closing costs), and the Annual Percentage Rate (APR), which incorporates these numerous factors, among others;

d.      Loan originator compensation, including the amount of yield spread premiums, overages, total fees, and other compensation components;

e.      Loan servicing, including borrower payment history (amounts and timing), adjustable interest rate history, borrower default history (including amounts, reasons, and dates), borrower modification requests (timing, results, and reasons, which are also part of loan origination information), borrower vacancy status and timing, foreclosure process timing, status, and completion, and foreclosure docket numbers;

f.      Loan profitability, including the loan interest rate margin, the amount of principal outstanding at any time, the amount of borrower payments received, fees charged and collected, and insurance claim status (*e.g.* FHA, Fannie Mae, third party);

g.      Loan purchase, sale, and servicing right transfer information, including the identities of third-party loan purchasers, sellers, brokers, and trustees, the timing of sales, purchases, and transfers, the data acquired or transferred in connection with such assets sales, the property addresses and borrower information of transferred loans, and assignments; and

h.      Real Estate Owned (REO) information, such as whether a foreclosed property is owned by the Defendants or was sold to a

third party, the timing of the purchase or sale of the property, and the condition of the property.

413.   Plaintiffs' liability experts' analysis of this loan data using standard statistical and regression techniques will compare and contrast borrower race/ethnicity status across the various loan term, feature, pricing, and servicing factors. This analysis will isolate Defendants' discriminatory loans/foreclosures from non-discriminatory loans/foreclosures and identifies Defendants' associated discriminatory practices. This results in a list of the borrower names and physical property addressees, the dates of critical events such as loan modification denials, defaults, and foreclosures, as well as other associated loan and servicing data, for all the discriminatory foreclosures (and/or vacancies) caused by Defendants' discriminatory practices.

414.   Thus, it is Plaintiffs' liability experts' analysis of Defendants' Loan Data that enables Plaintiffs to then identify the specific foreclosures and vacancies, including the names of the borrower-homeowners, their property addresses, and the timing of those vacancies and foreclosures, caused by Defendants' discriminatory practices. Only after determining this information can Plaintiffs' damages experts then calculate their tax base-related damages using regression analysis and Plaintiffs can determine and calculate their fully loaded pro rata costs for providing their

services, that are associated with each foreclosure within the appropriate time frame for which Defendants are responsible.

415.   In short, Defendants' Loan Data, and Plaintiffs' experts' analysis of that data, are the lynchpins to proving both Defendants' liability and Plaintiffs' damages.

## A.   Tax-Base Related Damages

416.   Plaintiffs, as county governments, exist to administer and ensure that state and local programs and policies are carried out, including the operation of the courts, the enforcement of laws, the filing and maintenance of official records, ensuring the safety of neighborhoods, and providing various services for the health, benefit, and welfare of its citizens.

417.   Plaintiffs do not exist or operate to generate a profit. Instead, Plaintiffs provide services to the communities and neighborhoods they serve at the cost of providing those services. Over time, such costs typically rise due to a variety of factors, with inflation and increased demand for services among the most important factors. As a result, over time, Plaintiffs' costs of providing similar services ordinarily will increase. Regardless of any increase in such cost, Plaintiffs, their agencies, and divisions, must nevertheless utilize and expend their limited, budgeted, allocated, financial resources in order to provide their foreclosure-related services resulting from Defendants' discriminatory practices.   When such resources are expended, they are not available to be expended on other services that Plaintiffs'

constituents require or that Plaintiffs must provide. It is, therefore, appropriate that Plaintiffs' damages include all such cost expenditures directly resulting from Defendants' discriminatory practices causing foreclosures and vacancies in the Plaintiff Counties.

418.   Plaintiffs obtain the funds to pay the costs to provide services primarily through the collection of taxes. Property taxes are a primary way in which Plaintiffs pay for the costs of the services they provide. The amount of property taxes Plaintiffs collect depends on the value of the property being taxed and the tax rate that is applied (the millage rate).

419.   Plaintiffs are generally injured when the value of their tax bases decline, e.g., when the value of residential real estate in their tax bases decline due to foreclosures. This is because at a given millage rate, the amount of property taxes Plaintiffs can collect from their tax bases to pay for the services they provide declines on an aggregated property basis. Similarly, when the value of individual residential properties declines as a result of foreclosures, Plaintiffs are directly injured with respect to those individual properties because, at a given millage rate, the amount of taxes Plaintiffs can collect on those specific properties is reduced on a going forward basis. This latter injury results in calculable damages to Plaintiffs on each such property.

420.   Foreclosures, and particularly concentrations of foreclosures, reduce the value of the foreclosed properties and the value of those properties surrounding the foreclosed property. As further alleged below, this is because when a foreclosure sale occurs, the amount paid is typically lower than other comparable properties, the reduced sales price is recorded, and thereafter the reduced sales price adversely impacts the prices of subsequent comparable sales and the assessed property values of the individual foreclosed properties, surrounding properties, and the tax base at large. When the assessed value of a residential property declines, the amount of taxes that can be charged to, and collected from, that property declines on a going forward basis.

421.   Purchasers of homes also consider foreclosures and vacancies in their decisions whether to buy a foreclosed home or a home surrounding foreclosed and/or vacant homes. Foreclosed homes, and homes in communities with concentrations of foreclosures, are generally less desirable and, therefore, a purchaser is usually unwilling to pay as much for such a home as one that was not foreclosed on or not in a community with concentrations of foreclosures. The reduced sales price of the foreclosed home further drives down pricing of comparable homes and the market values of surrounding homes assessed by Plaintiffs' tax assessors.

422.   Sellers of foreclosed homes, such as Defendants here, typically will accept lower prices to remove the foreclosed loan asset from its books or avoid

taking possession of and being responsible for the maintenance and taxes on a foreclosed home. Individual sellers of homes facing foreclosure often will accept less than fair market when a house is sold under duress to avoid the stigma and credit impact of having their homes foreclosed on.

423.  Concentrations of foreclosures and increasing rates of foreclosures create a downward spiral in home prices, in assessed home values, and in property tax collections. The fair market value of the residential real estate in Plaintiffs' communities has been adversely impacted by Defendants' foreclosures on predatory and discriminatory mortgage loans, particularly those loans originated, funded, and/or purchased by Defendants at issue here.

424.  Plaintiffs are also injured when they are forced to raise millage rates to normalize the amount of property taxes that can be levied and collected at a reduced tax base value. Because increases in millage rates are applied across all similar properties, it redistributes the property tax burden and the collection of property taxes from foreclosed homes (and communities with many foreclosures) onto other taxpayers, neighborhoods, and communities with fewer foreclosures.

425.  Despite any increases in the millage rates (which have legal and practical caps) to address declines in the overall value of Plaintiffs' tax base from foreclosures, Plaintiffs are directly injured because they will collect significantly less in property taxes — on a going forward basis — on each of those residential

properties that have experienced declines in value due to foreclosures. This is because the increased millage rate on those specific foreclosed properties does not equalize the reduced property taxes that can be levied and collected on those properties due to their decreased value.

426.   Defendants' foreclosures reduced the value of the residential properties they foreclosed on in Plaintiffs' communities, reduced the value of surrounding residential properties, and reduced the respective taxes that can be collected on all those properties on a going forward basis, and this injury occurs regardless of whether or not the total aggregate amount of Plaintiffs' tax revenues is stable from one year to the next.

427.   Routinely maintained property tax and other financial data allow precise calculation of the diminution in Plaintiffs' tax digests caused by Defendants' discriminatory housing practices, and the resulting property vacancies and foreclosures. For example, once Plaintiffs identify the property address at issue and the timing of foreclosure related events for that property, Plaintiffs can search the regularly maintained databases used by their tax assessors and tax collectors for the assessed values, changes in assessed values, taxes levied, and taxes collected for each property on an annual basis. The culled data can then be run through regression models by Plaintiffs' experts to determine the changes in assessed values and taxes collected on each property, and surrounding properties, that are directly related to

Defendants' discriminatory foreclosures. In this way, Plaintiffs' tax base and collection related damages caused by Defendants are precisely calculated as the amounts of the reductions in the property values and property taxes collected on the foreclosed properties for which Defendants are responsible and the reductions in the property values and amount of property taxes collected on the surrounding properties affected by such foreclosures. This also is determined from the point in time of each foreclosure event as identified in Defendants' loan servicing and foreclosure data and is isolated from other factors, including the effects of foreclosures by other lenders.

428.   In addition, using well-established GPS mapping techniques that locate specific properties within census tracts, property addresses, other mortgage lien and foreclosure data, including foreclosure event timing data, and well-established statistical regression techniques, Plaintiffs' injuries attributable to a reduced tax base and the lost property tax collections can be compared across high and low minority communities.

429.   Plaintiffs' tax assessors use a form of regression analysis to assess the values of residential properties. That analysis considers the impact of foreclosures and concentrations of foreclosures on the value of the foreclosed properties themselves, and on the value of surrounding properties. The analysis also considers

the location of the property being assessed and the value of surrounding properties. Each of these factors is adversely impacted by foreclosures.

430. Regression analysis is a ubiquitous, scientific, and reliable mathematical method of identifying the relationships between and among variables and how they impact a particular topic of interest. Hedonic regression techniques enable Plaintiffs to show the reduction in the assessed values and decline in property tax collections on specific foreclosed properties, and the properties surrounding them, at various points in time. This enables Plaintiffs to accurately and confidently isolate the amount of their tax base related damages that were directly caused by the Defendants' discriminatory practices, as opposed to other factors.

431. Hedonic regression is commonly used by economists and researchers to determine the extent to which, or the relative importance of, the variables that affect the price or value of a product like a home. Indeed, the Organization for Economic Cooperation and Development's (OECD) Handbook on Residential Property Prices Indices (RPPI) refers to hedonic regression as "probably the best method that could be used in order to construct quality RPPIs for various types of property."

432. Hedonic regression analysis uses the factors that Plaintiffs' property tax assessors consider in determining residential property value, which in turn affect the amount of property taxes levied and collected, including factors such as recent sales

215

prices of the subject property and surrounding properties, and the number of rooms, number of bathrooms, square footage, age, construction materials and location of the subject properties. Plaintiffs' property tax assessors also consider foreclosure sales in valuing residential properties.

433.   Since the assessed value of residential real estate is determined by these different factors, hedonic regression analysis is also used to determine the relative importance of each such factor on the value of a particular home, surrounding homes, and the entire tax base. Accordingly, hedonic regression analysis can isolate a particular characteristic, like foreclosure sales prices, to determine its impact on the value of particular residential properties and eliminate the impact of other characteristics (including external factors unrelated to the characteristics of the property) on those values.

434.   The process of performing an expert hedonic regression analysis on the assessed values of those foreclosed residences for which Defendants are responsible will enable Plaintiffs to accurately and confidently isolate the amount of Plaintiffs' tax base related damages on each affected property that are proximately caused by the Defendants' discriminatory housing practices alleged herein. The total of those amounts will equal the amount of damage to Plaintiffs' tax bases and tax collections for the properties whose values and tax collections have declined due to Defendants' discriminatory housing practices alleged in this complaint. This amount will not

include amounts due to factors unrelated to Defendants' discriminatory housing practices eliminated in connection with the regression analysis.

**B.    Lost Municipal Income Related Damages**

435.    Many of Defendants' foreclosures at issue were delayed or were not completed in a timely manner (a/k/a "zombie foreclosures").  The reason for this practice by Defendants was to avoid paying taxes and upkeep on vacant properties. Because of this, the affected residential properties in Plaintiffs' communities have been vacant for extended periods of time. The longer the vacancy on a property that should have had a resident, the greater Plaintiffs' lost municipal income related damages are for that property.

436.    During the period of a home vacancy, Plaintiffs do not generate certain types of municipal revenue. For example, a government-affiliated water utility is unable to collect the fixed portion of a water bill attributable to just providing the service of public water, i.e., not including the water usage portion of the bill. That results in lost revenue which the governmental affiliated utility would otherwise have, ***but for*** the vacancy. Governmental affiliated sanitation departments provide another example of entities that cannot collect revenue for regular services on vacant properties. When thousands of vacant properties are involved, and the vacancies continue over a significant period of time, the amount of this lost revenue is material.

437.   Similarly, vacant residences do not generate franchise taxes for things like local telephone service and cable television because no one is using those services. Franchise taxes are paid to local governmental entities when a homeowner uses any of the services that are subject to franchise taxes by the local taxing authority. When thousands of vacant properties are involved, and the vacancies continue over a significant period of time, the amount of this lost franchise tax revenue is material.

438.   Plaintiffs' monetary damages for lost municipal income related revenue can be established from Plaintiffs' records and databases, and the records and databases of their affiliated utility providers, once the property addresses and periods of vacancy of the affected properties are determined from Defendants' Loan Data. This is accomplished by searching Plaintiffs' databases and records for the property address, using the time frame that the property was vacant. For example, Defendants' records will show that a particular borrower defaulted on a discriminatory loan on a certain date, vacated their home on a certain date thereafter, and that Defendants foreclosed on that property several years later. Defendants' records will also show that during such time the property remained vacant. Plaintiffs can then confirm the amount of any lost municipal revenue they would have received over the period the property was vacant and calculate their damages on that property and other similarly affected properties.

438.   Plaintiffs' use of borrower property addresses and the timing of the foreclosure-related events from Defendants' records will ensure that Plaintiffs' damages are a direct result of Defendants' conduct alleged herein, i.e., they are directly related in time and property location to a foreclosure or vacancy caused by Defendants' discriminatory housing practices.

## C.   Foreclosure Processing-Related Damages

439.   Plaintiffs have been damaged as a result of the foreclosure process itself. Plaintiffs must pay employees to perform the numerous functions and tasks relating to the foreclosure process. Like any organization, if Plaintiffs' employees are performing one task, it takes them away from performing another task. Plaintiffs' efforts to provide foreclosure-related services on the discriminatory foreclosures Defendants have filed impedes Plaintiffs' ability to provide similar services to others who have not engaged in the discriminatory housing practices alleged herein. As a result, Plaintiff's foreclosure processing-related damages are the fully loaded, pro-rata cost to provide each service relating to the foreclosure process, including the utilization or dissipation of Plaintiffs' limited resources that reflect those costs (and which thereby preclude Plaintiffs the opportunity to perform other required services or provide other services in a more timely and efficient manner) and any related out-of-pocket expenditures that were incurred.

440.    Plaintiffs' tasks associated with foreclosure processing functions can be directly tied to specific foreclosed properties during the time frames for which Defendants are responsible for the foreclosure. For example, Plaintiffs' judicial systems and clerk's offices have been overloaded with foreclosure filings and proceedings, including the foreclosures filed by Defendants as part and parcel of their discriminatory housing practices alleged herein. As another example, when Defendants foreclose on homeowners and they leave or abandon their homes, Defendants have not secured or cared for those properties and, as a result, the properties have been vandalized, provided a location for illegal activities, violated Plaintiffs' building codes, served as dumps for garbage, and/or become structurally unsafe, all of which threaten public health and safety. This, in turn, has required Plaintiffs to expend substantial personnel time and out-of-pocket costs to send Plaintiffs' building code enforcement, police departments, and fire departments to inspect, investigate, repair, clean up, monitor, and/or respond to events that threaten public health and safety.

441.    Plaintiffs' regularly maintained databases — e.g., those used by the court systems and sheriffs' departments — can be searched for the names of borrower-homeowners or foreclosure docket cases and numbers that are identified after an analysis of Defendants' Loan Data. For example, Plaintiffs' court computer

systems track plaintiff (lender) and defendant (borrower) names, docket events, and event timing in their foreclosure and eviction dockets.

442.   Once   Plaintiffs   determine   whether   a   particular   foreclosure, homeowner, or property address is affected by a discriminatory practice, after analyzing Defendants' Loan Data, Plaintiffs can then search their foreclosure docket databases for the specific borrower-defendant names that can be tied to Defendants and that caused monetary damages to Plaintiff. And Plaintiffs' sheriff's departments can search their systems for individual names of borrower-homeowners, foreclosure docket numbers, and/or property addresses where enforcement, eviction, or foreclosure sale proceedings have taken place. Plaintiffs can then produce their support to prove the amount of their fully loaded, pro rata, costs, including the utilization or dissipation of Plaintiffs' limited resources and any out-of-pocket costs, which may include Plaintiffs' budgets and appropriations, various contracts, and task performance information, including average task-time estimates.

443.   In short, evidence of Plaintiffs' costs of administering foreclosure proceedings and related enforcement will come, in part, from the data maintained by Plaintiffs' court systems and sheriffs. All that data will be linked to the specific foreclosure and eviction proceedings for which Defendants are responsible.

444.   Once again, Plaintiffs' identification of damages on a property-by-property or foreclosure-by-foreclosure basis by using borrower property addresses

and the timing of the foreclosure-related events from Defendants' records will ensure that Plaintiffs' damages are a direct result of Defendants' discriminatory housing practices alleged herein.

**D.   Non-Monetary Damages**

445.   Finally, Plaintiffs have been harmed non-monetarily by Defendants' discriminatory housing practices. Plaintiffs seek injunctive relief for these damages.

446.   In particular, Plaintiffs have been injured as a result of the frustration of the purposes and missions of their various departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for their residents at large.

447.   Plaintiffs, which are the embodiment of their residents, neighborhoods, and communities, suffer from the segregative effects of the increased foreclosures and vacant properties for which Defendants are responsible. This occurs as a result of increased blight, urban decay, and the perpetuation and increase in racial slum formation, including from "white flight," all of which are concentrated in Plaintiffs' neighborhoods and communities with higher percentages of minority homeowners.

448.   Minority neighborhoods suffer severe deleterious effects from increased foreclosures. A Woodstock Institute Study has demonstrated that "foreclosures, particularly in lower-income neighborhoods, can lead to vacant,

boarded-up, or abandoned properties. These properties, in turn, contribute to the stock of 'physical disorder' in a community that can create a haven for criminal activity, discourage social capital formation, and lead to further disinvestment . . . and lower property values for existing residential homeowners." Dan Immergluck & Geoff Smith, There Goes the Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values, Woodstock Institute Study (June 2005) (applying regression analysis to demonstrate effect of foreclosures on surrounding property values and damages).

449.   Plaintiffs also suffer from the combined racial and gender segregative effect resulting from an increased number of defaults and foreclosures on mortgage loans that Defendants targeted to female borrowers, particularly African American female borrowers, many of which also are concentrated in Plaintiffs' high minority neighborhoods. Plaintiffs have a legitimate interest under the FHA in promoting fair and equal housing opportunities on both a racial and a gender-neutral basis in its communities.

450.   As alleged above, Defendants discriminatorily originated, or funded, purchased, or otherwise acquired predatory mortgage loans and/or serviced and foreclosed on those loans on a discriminatory basis in Plaintiffs' communities and neighborhoods. Defendants continue to service, refuse to refinance, and/or foreclose on such loans on a predatory and/or discriminatory basis. Thus, the loan default,

home vacancy, and foreclosure rates in Plaintiffs' communities with increased ethnic and racial minorities are greater than in comparable white communities. And, because single women generally received a greater share of such loans than male borrowers, and because minorities received them to a greater extent than non-minorities, the loan default, home vacancy, and foreclosure rates in Plaintiffs' communities are particularly high among female African American borrowers with Defendants' predatory mortgage loan products.

451.   Plaintiffs are harmed even if Defendants' mortgage loans do not result in foreclosure. Defendants' equity stripping practices have increased minority borrowing costs, reduced or limited minority borrower's ability to accumulate wealth from the equity in their homes, depleted or eliminated borrower savings, and thereby restricted or reduced such borrower's ability or desire to maintain and/or improve their property. This further leads to deterioration of such property and surrounding property values and results in increased vacancy rates as borrowers with negative home equity are more likely to simply abandon their homes.

## WELLS FARGO IS LIABLE FOR THE ACTS OF WACHOVIA AS A RESULT OF ITS MERGER WITH WACHOVIA

452.   On December 31, 2008, Wachovia merged into Wells Fargo & Company with Wells Fargo as the surviving entity.

453.   In the merger, Wells Fargo exchanged 0.1991 shares of its common stock for each outstanding share of Wachovia common stock, issuing a total of

422.7 million shares of Wells Fargo common stock with a December 31, 2008, value of $12.5 billion to Wachovia shareholders. Shares of each outstanding series of Wachovia preferred stock were converted into shares (or fractional shares) of a corresponding series of Wells Fargo preferred stock having substantially the same rights and preferences.

454.   Based upon its merger with Wachovia, as the surviving entity, Wells Fargo is liable for the wrongful acts of Wachovia and its subsidiaries alleged herein, including World Savings Bank, FSB.

455.   By virtue of the steps taken by Wells Fargo to consummate its acquisition of Wachovia, Wells Fargo also became the successor-in-interest to Wachovia and its subsidiaries.

456.   Wachovia ceased ordinary business on its own account soon after the acquisition was consummated.

457.   Wells Fargo assumed the liabilities ordinarily necessary for the uninterrupted continuation of Wachovia's business.

458.   Wells Fargo assumed Wachovia's liabilities for violations of the Fair Housing Act, Wachovia's predatory and discriminatory lending, and for any other matter relating to Wachovia's and its predecessors' mortgage lending, securitization, and servicing practices.

459.   There has been a continuity of ownership of Wachovia's assets between Wells Fargo and Wachovia, and Wachovia's management, personnel, physical location, and general business operations have been continued by Wells Fargo.

## CAUSES OF ACTION

### COUNT I
**Violation of Fair Housing Act
42 U.S.C. §§ 3601-31**

**Defendants' Equity Stripping Scheme Based on Facially Neutral Loan Origination, Servicing & Foreclosure Policies and Practices Resulted in Disparate Impact in Minority Neighborhoods**

460.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 459 as if fully set forth herein.

461.   Defendants' mortgage lending, origination (pricing, underwriting, and compensation), and servicing (payment acceptance, loan modification, and foreclosure) acts, policies, and practices have had an adverse, disproportionate, and disparate impact on FHA protected African American and Latino/Hispanic minority borrowers (including women) in Plaintiffs' communities and neighborhoods as a result of the greater percentage of predatory, higher cost, subprime, ALT-A, and/or other mortgage loans (including primary, secondary, and home equity loans) the minority borrowers received on terms less favorable than loans made to similarly situated non-African American or Latino/Hispanic borrowers.

462.   These adverse and disproportionate impacts are the direct result of Defendants' facially neutral policies of making loans destined to fail and giving substantial discretion and incentivizing loan officers, brokers, and others responsible for mortgage lending to make and steer people into higher cost loans regardless of whether borrowers could repay the loans or might qualify for better loans.

463.   The predatory and discriminatory discretionary pricing policies and underwriting practices alleged above individually and collectively constitute patterns or practices of housing discrimination because, as an integral part of the Defendants' mortgage banking business models, it was the standard operating procedure of Defendants that had a disparate impact on minority borrowers.

464.   Statistical information provides direct and prima facie evidence of the disparate impact of Defendants' predatory mortgage lending activities in Plaintiffs' communities and neighborhoods. If Defendants had not encouraged and incentivized predatory lending practices, Plaintiffs' communities (and Plaintiffs' higher minority neighborhoods) would not have suffered significantly greater numbers and percentages of loan defaults and foreclosures on Defendants' mortgage loan products than the percentages of minority homeownership reflected in Plaintiffs' demographic data. But for Defendants' predatory and discriminatory actions alleged herein, the number and concentration of predatory non-prime mortgage loans and the number and concentration of corresponding defaults, vacancies, and foreclosures

experienced by FHA protected minority borrowers in Plaintiffs' communities and neighborhoods would have been far lower and Plaintiffs' alleged injuries would not have occurred to the extent they did occur. And, as further alleged below in Count II, Defendants' actual foreclosure filings over the period reflect a stand-alone continuing discriminatory housing practice.

465. Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity stripping, non-prime mortgage loan that Defendants originate, fund, purchase, refuse to modify or refinance and/or service, is repaid and closed and/or is foreclosed upon.

466. Individually, and/or collectively, Defendants' acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-31, in so far as:

> a.   Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);
>
> b.   Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b); and

\* \* \*

    c.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

467.  Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. §3602(i) because Plaintiffs, as organizations subject to the provisions of the FHA, have been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe they will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above. Thus, Plaintiffs expressly bring this Count as aggrieved persons in their own rights pursuant to the private persons civil enforcement provisions of 42 U.S.C. §3613(a) for their own injuries and organizational harms arising from Defendants' discriminatory housing practices that violate the FHA.

468.  Plaintiffs have been, and continues to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiffs' injuries and organizational harms are continuing and will increase unless and until Defendants cease their equity stripping activities, including through their continuing

discriminatory and predatory mortgage servicing and foreclosure activities. Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiffs.

## COUNT II
### Violation of Fair Housing Act
### 42 U.S.C. §§ 3601-31

### Defendants' Facially Neutral Mortgage Servicing and Foreclosure Practices Resulted in Disparate Impacts in Minority Neighborhoods

469.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 459 as if fully set forth herein.

470.   Defendants' mortgage servicing and foreclosure acts, policies, and practices described in greater detail above have had a disparate impact on the basis of ethnicity and/or race by foreclosing on the homes of African American, Latino/Hispanic, and women's homes to a greater extent than foreclosures on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

471.   Defendants' servicing and foreclosure acts, policies, and practices themselves have had an adverse, disproportionate and/or disparate impact on FHA protected African American and Latino/Hispanic minority borrowers (including women) in terms of the relative percentages of foreclosures in higher concentrated African American and Latino/Hispanic neighborhoods, as compared to the

percentages of foreclosures on nonminority homeowners and in neighborhoods with low concentrations of African American or Latino/Hispanic homeowners.

472. Defendants' servicing and foreclosure acts, policies, and practices also have had an adverse, disproportionate, and/or disparate impact on FHA protected minority borrowers in Plaintiffs' communities and neighborhoods in terms of the percentage of mortgage loan delinquencies, defaults, home vacancies, and foreclosures suffered by FHA protected minority borrowers relative to similarly situated non-minority borrowers.

473. Defendants' mortgage servicing and foreclosure acts, policies, and practices constitute disparate impact on the basis of ethnicity and/or race by foreclosing on the homes of African American, Latino/Hispanic, and women's homes to a greater extent than foreclosures on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

474. Defendants' predatory and discriminatory discretionary mortgage servicing and foreclosure practices individually and collectively constitute patterns or practices of housing discrimination because, as an integral part of the Defendants' mortgage banking business models, it was the standard operating procedure of Defendants that had a disparate impact on minority borrowers.

475. The facially neutral mortgage servicing and foreclosure practices include engaging in unsound practices with respect to foreclosures and related

activities, such as robo-signing, that failed to comply with legal requirements, and determinations regarding timing of foreclosure. Defendants' foreclosure practices and activities themselves reflect *stand-alone discriminatory housing practices*, resulting in disproportionate numbers of foreclosures on minority homes and disproportionately increasing foreclosure activity in minority areas in Plaintiffs' communities and neighborhoods.

476.   Defendants' predatory mortgage servicing and foreclosure policies and practices were artificial, arbitrary, and unnecessary and do not serve any business purpose. Defendants' mortgage foreclosure practices were improper in and of themselves because they failed to comply with legal requirements. Practices that fail to comply with legal requirements do not serve any business purpose.

477.   Defendants' pattern and practice of predatory mortgage servicing and foreclosures cannot be justified by business necessity and could have been avoided by using alternative business policies and procedures that had a smaller discriminatory impact. Engaging in improper and predatory mortgage foreclosure practices cannot be justified by business necessity. Defendants failed to have in place fair lending controls to ensure that employees and independent brokers were not exercising discretion in mortgage servicing and foreclosure in a non-discriminatory manner.

478. Defendants' discriminatory housing practices in Plaintiffs' neighborhoods and communities are further evidenced by, and explicitly include, the increased foreclosure rates, the high numbers of foreclosures, and the clustering of foreclosures on mortgage loans made to minority borrowers for which Defendants are responsible.

479. As Plaintiffs allege above, publicly reported foreclosure data evidences that Defendants' discriminatory foreclosure activity is disproportionately increased for minorities, is concentrated in Plaintiffs' minority communities, and evidences the disparate impact of both Defendants' discriminatory mortgage lending activity and its current discriminatory mortgage servicing/foreclosure practices.

480. Individually, and/or collectively, Defendants' acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-31, in so far as:

      a.    Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

      b.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in

connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b); and

\* \* \*

c.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

481.   Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. §3602(i) because Plaintiffs, as organizations subject to the provisions of the FHA, have been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe they will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above. Thus, Plaintiffs expressly bring this Count as aggrieved persons in their own rights pursuant to the private persons civil enforcement provisions of 42 U.S.C. §3613(a) for the injuries and organizational harms arising from Defendants' discriminatory housing practices that violate the FHA.

482.   Plaintiffs have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiffs'

injuries and organizational harms are continuing and will increase unless and until Defendants cease their equity stripping activities, including through their continuing discriminatory and predatory mortgage servicing and foreclosure activities. Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiff.

## COUNT III
### Violation of Federal Fair Housing Act
### 42 U.S.C. §§ 3601-31

### Defendants' Discriminatory Housing Practices Were Intentional and Constitutes Disparate Treatment

483.   Plaintiffs repeat and incorporate by reference all allegations contained in paragraphs 1 through 459 as if fully set forth herein.

484.   Defendants' predatory and discriminatory subprime and higher cost mortgage lending, servicing, and foreclosure practices and policies were not the result of random or non-discriminatory factors. Rather, they were the direct and intended result of Defendants' business models, and they were intended to maximize corporate profits pursuant to those business models by directly targeting minority borrowers through marketing efforts.

485.   Defendants' equity stripping scheme — conducted through their mortgage lending, securitization, servicing, and foreclosure activities and practices — constitutes intentional discrimination on the basis of ethnicity and/or race by intentionally targeting FHA protected African American and Latino/Hispanic

minority borrowers (including women) in Plaintiffs' communities and neighborhoods for predatory, higher cost, subprime, ALT-A, and/or other mortgage loans (including primary, secondary, and home equity loans) made on terms less favorable than loans made to similarly situated non-African American or Latino/Hispanic borrowers, and/or without regard to such minority borrowers' ability to repay such loans; charging improper and inflated servicing-related fees when such borrowers could not repay the loans; and foreclosing on such properties to a far greater extent than foreclosures on non-African American or Latino/Hispanic homeowners in Plaintiffs' communities and neighborhoods.

486. The predatory and discriminatory equity stripping scheme — conducted through Defendants' mortgage lending, securitization, servicing and foreclosure activities and practices — constitutes a pattern or practice of housing discrimination because the discriminatory treatment of minority borrowers was an integral part of the Defendants' equity stripping activities and mortgage banking business models.

487. Defendants' predatory and intentionally discriminatory actions have caused African Americans, Latino/Hispanic Americans, and residents of predominantly African American and Hispanic neighborhoods in Plaintiffs' communities to receive mortgage loans that were destined or expected to fail, and in

fact did fail as a result of a higher percentage of foreclosures than on loans made to similarly situated non-minority borrowers and in low-minority areas.

488.   Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity stripping, non-prime mortgage loan that Defendants originate, fund, purchase, and/or service is repaid and closed and/or is foreclosed upon. Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for Plaintiffs' federally protected rights.

489.   Individually, and/or collectively, Defendants' acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-16, in so far as:

      a.    Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

      b.    Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b); and

* * *

c.   Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

490.   Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. §3602(i) because Plaintiffs, as organizations subject to the provisions of the FHA, have been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe they will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above. Thus, Plaintiffs expressly bring this Count as aggrieved persons in their own rights pursuant to the private persons civil enforcement provisions of 42 U.S.C. §3613(a) for their injuries and organizational harms arising from Defendants' discriminatory housing practices that violate the FHA.

491.   Plaintiffs have been, and continue to be, adversely affected by the acts, policies, and practices of Defendants, their employees, and/or their agents. Plaintiffs' injuries and organizational harms are continuing and will increase unless and until Defendants cease their equity stripping activities, including through their continuing

discriminatory and predatory mortgage servicing and foreclosure activities. Injunctive relief is therefore necessary to prevent further financial and non-financial harm to Plaintiff.

## DEMAND FOR JURY TRIAL

492.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

(a)    enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate 42 U.S.C. §§ 3604 and 3605;

(b)    enter a permanent injunction enjoining Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce their illegal, discriminatory conduct described herein through the foreclosure process and directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(c)     award actual or compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendants alleged herein;

(d)     award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(e)     award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. §3613(c)(2); and

(f)     order such other and further relief as this Court deems just and equitable, including any nominal damages and pre-judgment interest.

Dated: April 30, 2021          By:   /s/ *James M. Evangelista*
                                     James M. Evangelista
                                     Georgia Bar No. 707807
                                     jim@ewlawllc.com
                                     David J. Worley
                                     Georgia Bar No. 776665
                                     dworley@ewlawllc.com
                                     Kristi Stahnke McGregor
                                     Georgia Bar No. 674012
                                     kristi@ewlawllc.com
                                     Stuart J. Guber
                                     stuart@ewlawllc.com
                                     Georgia Bar No. 141879
                                     **EVANGELISTA WORLEY, LLC**
                                     500 Sugar Mill Road, Suite 245A
                                     Atlanta, GA 30350
                                     Telephone: (404) 205-8400

                                     Sanford P. Dumain (*Pro Hac Vice Pending*)
                                     sdumain@milberg.com

Jennifer S. Czeisler (*Pro Hac Vice Pending*)
jczeisler@milberg.com
Leigh Smith (*Pro Hac Vice Pending*)
lsmith@milberg.com
J. Birt Reynolds (*Pro Hac Vice Pending*)
breynolds@milberg.com
**MILBERG PHILLIPS GROSSMAN LLP**
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Telephone: (212) 594-5300

*Counsel for Plaintiffs*