# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Fulton County, Georgia, et al.,

                Plaintiffs,

v.                             Case No. 1:21-cv-1800-MLB

Wells Fargo & Co., et al.,

                Defendants.

_____/

## **OPINION & ORDER**

Plaintiffs Fulton, DeKalb, and Cobb Counties claim Defendant Wells Fargo & Company (and related entities) engaged in a broad, predatory lending scheme to target minority citizens living in their counties and push them into high-interest, high-cost subprime mortgages they could not afford for the purpose of stripping the borrowers' equity in their homes to Defendants' profit. Plaintiffs say Defendants' misconduct led to rampant foreclosures and abandonments in primarily minority neighborhoods, causing reduced county revenue from taxes and fees typically recovered from homeowners and inflicting various increased costs on the Counties.

Plaintiffs Fulton, DeKalb, and Cobb Counties assert claims under the Fair Housing Act, 42 U.S.C. §§ 3601–31, 3613 ("FHA") against Defendant Wells Fargo & Company and several related entities. (Dkt. 1.) Plaintiffs seek injunctive relief and monetary damages. (*Id.*) Defendants move to dismiss. (Dkt. 24.) Defendants also move for leave to file supplemental authority. (Dkts. 37; 49.) The Court grants both motions and permits Plaintiffs to file an amended complaint.

## I.   Background

Defendant Wells Fargo & Co. is a nationwide diversified financial holding company and bank holding company. (Dkt. ¶ 26.) It provides banking, insurance, investment, mortgage, and consumer financial services through storefronts, the internet, and other distribution channels. (*Id.*) It is the parent company of Wells Fargo Bank, N.A. (*Id.*) Defendant Wells Fargo Financial, LLC is a subsidiary of Wells Fargo & Co. (*Id.* ¶ 27.) Before September 2008, it conducted home mortgage lending through nonbank subsidiaries all over the United States. (*Id.*) But, by September 2008, Wells Fargo & Co. transferred lending operations to Defendant Wells Fargo Bank, N.A. (*Id.*) Defendant Wells Fargo Financial Georgia, Inc. was a foreign for-profit corporation that

originated loans in Plaintiffs' communities. (*Id.* ¶ 28.)  Defendant Wells Fargo Bank, N.A. is a national banking association and one of the nation's largest residential mortgage originators and servicers.  (*Id.* ¶ 29.)  It maintains offices in Plaintiffs' communities for the purpose of soliciting applications for residential mortgage loans and making those loans.  (*Id.*)

Throughout the complaint, Plaintiffs refer to Defendants' alleged misconduct as an "equity stripping" scheme that involved a combination of predatory and discriminatory lending, servicing, and foreclosure practices over the life of a mortgage.  (*Id.* ¶ 5.)  Plaintiffs say the scheme began at loan origination when Defendants forced borrowers to pay higher costs and improper fees (while also receiving loans with higher interest rates), continued throughout the life of the loans as borrowers paid inflated interest rates, manifested through the imposition of pre-payment penalties when borrowers refinanced or paid off loans, progressed into default when Defendants subjected borrowers to fees and costs, and reached completion upon foreclosure when Defendants "[took] away the borrower[s'] home, thereby removing any remaining equity and

eliminating the borrower[s'] ability to generate future equity through home value appreciation or loan principal pay down." (*Id.*)

Plaintiffs say Defendants targeted minority borrowers in Fulton, DeKalb, and Cobb Counties because those borrowers provided the easiest path for Defendants to maximize mortgage originations from people most likely to accept less favorable terms. (*Id.* ¶¶ 7, 165.) As part of this, Defendants had a practice of allowing loan originators and brokers to push minority applicants into higher cost, non-prime loans even when those applicants qualified for prime loans. (*Id.* ¶ 90.) Defendants also developed and originated riskier and costlier mortgage products that generated more income for Defendants than traditional loans, while also allowing Defendants to avoid losses from foreclosures. (*Id.* ¶ 84.) Publicly available origination and foreclosure data shows Defendants intentionally targeted minority borrowers in Plaintiffs' communities for higher cost and non-prime mortgage loans. (*Id.* ¶¶ 291–319.) Indeed, Defendants originated high-cost loans to minorities 2.3 times more than they did to non-minorities. (*Id.* ¶ 311.)

Defendants engaged in predatory actions against minority borrowers in Fulton, DeKalb, and Cobb Counties, including approving

4

them for loans they could not afford, imposing additional and unnecessary surcharges on minority borrowers, steering minority borrowers into higher cost loan products, and inflating appraisals of homes that minorities were seeking to purchase—all of which increased the likelihood of defaults and foreclosures. (*Id.* ¶ 11.) Defendants incentivized this conduct through several policies. In its retail operations, Defendants adopted compensation policies that encouraged both prime loan officers and subprime loan officers to steer borrowers into subprime mortgages, even if the borrowers qualified for prime mortgages. (*Id.* ¶¶ 195-98.) Defendants also had a quota system requiring subprime loan officers to close a certain number of loans per month. (*Id.* ¶ 199.)

Defendants also had a practice of making loans to people who could not afford them by using fictitious or manipulated data. (*Id.* ¶ 251.) Defendants' loan officers, for example, encouraged minority borrowers to inflate their income when applying for loans by falsely claiming family members living with them were paying rent. (*Id.* ¶ 252.) Defendants' standards for property appraisals also became increasingly lax (or willfully fraudulent) in order to ensure properties met appraisal

requirements. (*Id.* ¶ 255.) When a loan applicant still could not meet the underwriting standards, Defendants' branch managers and wholesale managers had discretion to grant exceptions to the underwriting guidelines and approve loans. (*Id.* ¶ 260.) Defendants also relaxed their underwriting policies to permit its underwriters, brokers, and correspondent lenders to approve more non-prime mortgage loans on riskier terms to underqualified or unqualified borrowers, steer prime-eligible borrowers into non-prime loans, and increase loan amounts, interest rates, and other costs. (*Id.* ¶ 236.) Defendants extended the compensation and quota practices that encouraged predatory and discriminatory conduct to its underwriters. (*Id.* ¶ 248.)

To further its equity stripping practice, Defendants maintained a "Diverse Segments" unit, specifically tasked with increasing mortgage loans to ethnic minorities and low to moderate income borrowers. (*Id.* ¶ 168.) The unit formed strategic relationships with realtors, nonprofit organizations, faith-based organizations, builders, and other community-based organizations to obtain referrals to minority borrowers. (*Id.* ¶¶ 171–76.) Defendants utilized a computer function to customize marketing materials towards African Americans by choosing "African

American" in a pull-down menu of "language options." (*Id.* ¶ 187.) Defendants imposed specific goals on Diverse Segment employees for mortgage loans to minorities and low-to-moderate income borrowers. (*Id.* ¶ 182.) Those employees received a so-called "override bonus" based entirely on the number of loans they made to these groups. (*Id.*)

As already explained, Defendants' discriminatory equity stripping practice continued into loan servicing and foreclosures. Defendants' loan servicing practices include the evaluation and processing of borrower requests for loan modifications and refinances, servicing defaulted loans and charging fees and increased interest, default work outs, and foreclosure proceedings and activities. (*Id.* ¶ 269.) Defendants failed to properly or timely respond to, process, and underwrite minority borrowers' requests to modify or refinance predatory mortgage loans. (*Id.* ¶ 273.) As part of this, Defendants failed to notify these borrowers of documents they needed to complete to request loan modifications, thus delaying the process. (*Id.*) And Defendants wrongfully denied loan modifications to these customers. (*Id.*)

Defendants' predatory mortgage practices had a disparate impact on minority customers. (*Id.* ¶ 282.) Data, in fact, shows Defendants

initiated mortgage foreclosure proceedings in minority communities to a far greater extent than they did in non-minority communities. (*Id.*) The mortgage loans Defendants originated in Plaintiffs' counties to FHA protected minority borrowers were more likely to result in delinquency, default, and foreclosure than the loans Defendants made to Caucasian borrowers in these areas. (*Id.* ¶ 321.) Defendants have foreclosed on minority homeowners to a far greater and disproportionate extent than non-minority homeowners, and their foreclosures have been disproportionately concentrated in higher minority neighborhoods. (*Id.* ¶¶ 321–49.) Defendants' discriminatory conduct is also evidenced by the concentration of Defendants' non-prime mortgage lending activity within the highest foreclosure risk areas in Plaintiffs' communities and in the numbers of mortgage loans they made to minority borrowers within those high foreclosure risk areas. (*Id.* ¶¶ 350, 355–72.)

Plaintiffs have suffered damages as a result of Defendants' discriminatory equity stripping practices. Damages arose both when homeowners who were unable to pay Defendants' predatory mortgages defaulted on their loans and when homeowners who were otherwise victimized by Defendants' practices simply abandoned their homes. (*Id.*

¶ 394.) Foreclosures and abandonments reduced the value of the residential properties at issue, thus reducing the value of surrounding properties and the taxes collected on those properties. (*Id.* ¶¶ 420–26.) While a home was vacant, Plaintiffs also did not generate municipal revenues (including government-affiliated utilities) or franchise taxes (for things like telephone service and cable television). (*Id.* ¶¶ 436, 437.) Plaintiffs also incurred costs in having to provide judicial services to the discriminatory foreclosures rather than similar services to others who have not engaged in discriminatory housing practices. (*Id.* ¶ 349.) Defendants also did not secure abandoned or foreclosed properties as required, providing a location for illegal activities and forcing Plaintiffs to spend money addressing these issues. (*Id.* ¶ 441.) Plaintiffs also suffered non-monetary damages, including damages resulting from the deterioration and blight to their minority communities. (*Id.* ¶ 391.)

Plaintiffs sued Defendants, raising two disparate impact claims and one disparate treatment claim under the FHA. (Dkt. 1.) In Count 1, Plaintiffs allege Defendants' mortgage lending, origination, and servicing acts, policies, and practices had an adverse, disproportionate, and disparate impact on minority borrowers in violation of the FHA. (*Id.*

¶¶ 461–68.)  In Count 2, Plaintiffs allege Defendants' mortgage servicing and foreclosure acts, policies, and practices, including engaging in unsound practices, have had a disparate impact on minority borrowers in violation of the FHA.  (*Id.* ¶¶ 470–82.)  In Count 3, Plaintiffs allege Defendants' equity stripping scheme was intentional and resulted in disparate treatment of minority borrowers.  (*Id.* ¶¶ 484–91.)  Plaintiffs seek injunctive relief to prevent Defendants' predatory and discriminatory residential mortgage lending and servicing activities as well as a claim for monetary damages.  (*Id.* ¶ 3.)

Defendants move to dismiss on the bases that: (1) Plaintiffs' claims fall outside the FHA's two-year statute of limitations, (2) Plaintiffs cannot establish the required proximate cause, (3) Plaintiffs failed to properly allege their disparate impact claims, and (4) Plaintiffs allege no unlawful conduct against Wells Fargo & Co.  (Dkt. 24.)

## II.   Legal Standard

A court may dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable

to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This so-called "plausibility standard" is not a probability requirement. *Id.* Even if a plaintiff will probably not recover, a complaint may still survive a motion to dismiss for failure to state a claim, and a court reviewing such a motion should bear in mind that it is testing the sufficiency of the complaint, not the merits of the case. *Twombly*, 550 U.S. at 556.

## III. Discussion

### A. Statute of Limitations

Defendants moved to dismiss the complaint, arguing Plaintiffs' claims are barred by the FHA's two-year statute of limitations. Plaintiffs argue Defendants' practice of ongoing discriminatory services had not *terminated* when the complaint was filed, thus allowing their claims to proceed. (Dkt. 35 at 9.)

11

"'A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred' because '[a] statute of limitations bar is an affirmative defense, and . . . plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint.'" *Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815 (11th Cir. 2013) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)). "At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Tello v. Dean Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (quotation marks omitted). The question for this Court is thus whether Plaintiffs essentially pleaded themselves out of court.

The FHA provides that an aggrieved person may file a civil enforcement action "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). Congress added the words "or the termination" to the statute in 1988 to codify the continuing violations doctrine recognized by the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363

(1982).  *See* H.R.Rep. No. 100-711, at 33 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2194 ("A complaint must be filed within [two years] from the time the alleged discrimination occurred or terminated. The latter term is intended to reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice.").  Under that doctrine, "where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." *Havens*, 455 U.S. at 380-81; *see Dekalb Cnty. v. HSBC N. Am. Holdings Inc.*, No. 1:12-CV-03640, 2015 WL 8699229, at *4 (N.D. Ga. Nov. 16, 2015) ("[U]nder the FHA's statutory text there is no distinction between the continuing violation doctrine and conduct that is ongoing.").

The continuing violations doctrine does not prevent the statute of limitations from running.  Instead, it tolls the statute for any claim that would be time barred so long as the unlawful practice giving rise to the claim continues.  *Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316, 1322 (11th Cir. 2007) ("Under the continuing

violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period."); *see also Cobb Cnty. v. Bank of Am. Corp.* (*Cobb Cnty. I*), 183 F. Supp. 3d 1332, 1342 (N.D. Ga. May 2, 2016) (same).

Plaintiffs here have not merely alleged one incident of unlawful discrimination (or even multiple acts of discrimination) but rather challenge an unlawful practice that they say began long ago and continued into the limitations period. They say Defendants engaged in a longstanding practice of discriminatory, predatory lending targeting minorities to strip them of equity in their homes. While widespread, they also allege it was coordinated and planned to target these borrowers and move them into more expensive and risky subprime loans. Plaintiffs' detailed allegations of Defendants' alleged practices are enough to plausibly invoke the continuing violation doctrine, particularly at the pleading stage of the litigation. *See DeKalb Cnty.*, 2015 WL 8699229, at *4 ("continuing violation doctrine is applicable . . . defendants engaged in a policy and practice of discrimination in violation of the FHA"); *Cnty. of Cook v. Bank of Am. Corp.*, 181 F. Supp. 3d 513, 520 (N.D. Ill. 2015)

("discriminatory conduct alleged in the . . . complaint is not limited to discrete home loan decisions" but rather involves an on-going practice).[1]

Defendants try hard to avoid application of *Havens*. They note the Supreme Court in that case allowed only one claim to proceed under that doctrine, specifically a "steering" claim alleging the defendant discriminated against plaintiffs by denying them the right to rent properties in the area. 455 U.S. at 381. But, the Court did not allow to proceed a claim the defendant provided one plaintiff misinformation on four occasions, finding that conduct amounted to discrete acts against a single person. *Id.* Defendants then cite *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) and *Villareal v. R.J. Tobacco Co.*, 702 F. App'x 797 (11th Cir. 2017), in which the Supreme Court and Eleventh Circuit refused to apply the continuing violations doctrine to individual claims of employment discrimination. From those cases, Defendants

---

[1] Plaintiffs specifically state they are not relying on the common law continuing violations doctrine to toll an otherwise expired limitations period because their claims are timely under the plain language of the FHA. (Dkt 35 at 9.) They insist the discriminatory conduct had not ended at the time they filed the complaint. Other than that conclusory allegation, they do not identify either a single allegedly predatory loan originated within the statutory period or a specific incident of predatory servicing or foreclosure within the time. The Court applies *Havens*.

argue the continuing violations doctrine does not apply here because each act of alleged discrimination was a discrete act against a discrete borrower, giving rise to discrete incident of FHA liability. (Dkt. 24-1 at 13-14.)  But, the *Havens* court did not allow the "misinformation" claim to move forward under the continuing violations doctrine because that claim was not part of the timely "steering" claim that invoked the doctrine.  In other words, it was not part of the "unlawful practice" at issue in the steering claim.  Likewise, *Morgan* and *Villareal* involved employment actions and allegations of specific incidents of discrimination.  "And the Supreme Court in *Morgan* specifically recognized that 'refusal to hire' is 'easy to identify' as a discrete act." *Villareal*, 702 F.3d at 799 (quoting *Morgan*, 536 U.S. at 114).

An on-going practice of continuous violations will, by its very nature, involve discrete violations.  To adopt Defendants' interpretation of the doctrine would do away with its application in nearly every instance.  Plaintiffs' allegations fall squarely within the Supreme Court's pronouncement in *Havens* as to when an FHA plaintiff may evoke the

continuing violations doctrine.  The Court applies the plain meaning of that pronouncement rather than limiting it as Defendants' request.[2]

The question thus becomes whether Plaintiffs have alleged an occurrence of the unlawful practice within the limitations period— specifically on or after April 30, 2019.  Plaintiffs allege Defendants violated section 3604(a) and (b), which prohibit discrimination in the sale or rental of housing or in the provision of services in connection with such a transaction, and section 3605, which prohibits discrimination in making residential real estate transactions.  In describing their claim

---

[2] Defendants alternatively contend Plaintiffs cannot rely on the continuing violation doctrine because they should have known of their claims by 2012 or 2015 at the latest.  (Dkt. 24-1 at 16.)  "In the case of a continuing violation [of the FHA], the statute of limitations will run from the moment the violation begins if the violation continues only because of the plaintiff's knowing failure to seek relief."  *Wood v. Briarwinds Condo. Ass'n Bd. of Directors*, 369 F. App'x 1, 4 (11th Cir. 2010); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001) (continuing violation doctrine does not apply in age discrimination cases if claimant knew about his or her claim before the statutory period but failed to act).  Defendants argue Plaintiffs filed similar claims in 2012 and 2015 against other lenders, showing they were aware of the alleged misconduct well outside the statute of limitations.  (Dkt. 24-1 at 16.)  But those prior suits were against different defendants, meaning they do not signal knowledge of misconduct by Defendants here.  *See Cobb Cnty. I*, 183 F. Supp. 3d at 1343 ("[The plaintiffs'] prior suit does not necessarily show that they would have been on notice of these exact claims against these exact defendants.").  The Court thus rejects Defendants' argument based on the pleadings before it.

away from the statutes, Plaintiffs essentially allege discriminatory treatment in the origination, servicing, and foreclosure of loans.  (*See e.g.*, Dkt. 35 n.13 (claiming that, apart from responsibility for discriminatory originations, Defendants "can still be responsible for discriminatory servicing and foreclosure as part of its equity-stripping scheme").)  It seems obvious that the FHA precludes discrimination in the origination of loans.  *See Boykin v. Bank of Am. Corp.*, 162 F. App'x 837, 838 (11th Cir. 2005) (the FHA makes it unlawful for any person or entity whose business includes engaging in residential real estate-related transactions, including the making of loans, to discriminate against any person in making available such a transaction because of race).  And the Court notes that at least two other courts have concluded the FHA reaches discriminatory servicing or foreclosure practices under the guise those actions make housing more restrictive or unavailable to minorities. *DeKalb Cnty. v. HSBC N. Am. Holdings Inc.*, No. 1:12-CV-03640, 2016 WL 3958732, at *3 (N.D. Ga. June 29, 2016) ("[V]iew[ing] this case as presenting origination, servicing, and related foreclosure claims."); *Cobb Cnty. I*, 183 F. Supp. 3d at 1341 ("[T]he Court agrees with Plaintiffs' contention that pleading a discriminatory practice causing a decrease in

housing availability or services to minorities, either directly or indirectly, states a claim for a violation § 3604 of the FHA.").   While the Court has doubts about such claims, the parties have not briefed the issue and the Court thus assumes, without accepting, that servicing and foreclosure claims like the ones alleged here are viable under the FHA.

Plaintiffs fail to identify any loan originated after April 30, 2019. So, they cannot invoke the continuing violations doctrine based on discriminatory loan originations.  Plaintiffs also presented no loan-level allegations of discriminatory servicing within the relevant period.  The complaint alleges Defendants continue to service predatory and discriminatory loans and because Defendants retained the servicing rights on the mortgage loans underlying their loan originations and purchases, Defendants are actively involved in the entire mortgage servicing and foreclosure process.  (Dkt. 1 ¶¶ 91, 94.)  Plaintiffs also allege Defendants continue servicing the predatory, higher cost, and subprime mortgage loans they originated or acquired, including evaluating and processing borrower requests for loan modifications and other relief.  (*Id.* ¶ 269.)  But none of these allegations relate to a specific loan or allege certain dates of action.   And the bald allegation that

Plaintiffs' misconduct continued or that the equity stripping scheme continued until the filing of the complaint is insufficient to invoke the continuing violations doctrine. The complaint references deceptive practices in servicing set forth in the "Robosigning Complaint," but that matter included no claim of discrimination. (*Id.* ¶¶ 275–79.)

As to foreclosures, the complaint identifies six foreclosures post-April 2019, that Plaintiffs say evidence Defendants' discriminatory housing practices continued into the statutory period. (*Id.* ¶ 372.) Plaintiffs claim the loans were predatory and discriminatory based on (1) the property address; (2) the adjustable-rate nature of Adjustable Rate Mortgage loans; (3) the purported interest rates (substantially higher than most other foreclosed loans); (4) the full names of the borrowers reflect likely African American or Latino/Hispanic borrowers; (5) the identity of the Defendant originating lender or issuer of the loan; and (6) the identity of the Defendant foreclosing entity. (*Id.* ¶ 371.) Defendants contend the allegations (1) never articulate a plausible basis for concluding they discriminatorily foreclosed on these loans, (2) omit key facts about the foreclosures including addresses, each borrower's race, and why the foreclosures were discriminatory; and (3) fail to claim

Plaintiffs have been injured by the loans or foreclosures.  (Dkt. 24-1 at 8–9.)

The Court agrees with Defendants.  The complaint merely identifies the loans and foreclosures without any plausible allegation that these loans actually involved the predatory, discriminatory scheme alleged.  In total, the complaint merely claims:

    a.    On or about 7/29/2019 Wells Fargo Bank N.A. foreclosed on a mortgage loan originated or acquired by Wells Fargo Bank N.A. on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Option One Mortgage Corp. on 3/19/2007 for a home in Duluth, GA with an interest rate of 8%.

    b.    On or about 5/9/2019 Wells Fargo Bank N.A. foreclosed on a mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 2/26/2008 for a home in Atlanta, GA with an interest rate of 6%.

    f.    On or about 5/8/2019 Wells Fargo Bank N.A. foreclosed on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of National Mortgage Acceptance Services, Inc. on 4/24/2000 for a home in Atlanta, GA with an interest rate of 12.125%.

    g.    On or about 5/8/2019 Wells Fargo Bank N.A. foreclosed on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of Argent Mortgage Co. on 4/14/2005 for a home in Ellenwood, GA with an interest rate of 7.55%.

h.      On or about 6/28/2019 Wells Fargo Bank N.A. foreclosed on an ARM mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of First Franklin Financial Corp. on 6/21/2004 for a home in College Park, GA with an interest rate of 6.25%.

i.      On or about 5/9/2019 Wells Fargo Bank N.A. foreclosed on a FHA mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 2/26/2008 for a home in Atlanta, GA with an interest rate of 6%.

j.      On or about 1/14/2020 Wells Fargo Bank N.A. foreclosed on a mortgage loan originated or acquired by Wells Fargo Bank N.A. that was issued in the name of MERS Inc. on 4/24/2003 for a home in Austell, GA.

(Dkt. 1 ¶ 372.)  Plaintiffs fail to allege specific addresses of the properties, names of borrowers, or why these foreclosures allege unlawful discrimination.   Plaintiffs generally allege that they "believe" the foreclosed loans will evidence Defendants' discriminatory housing practices, but that is not enough to plausibly allege an FHA violation.[3] (*Id.*)

The Court, however, will allow Plaintiffs an opportunity to amend their complaint to include more specific facts for their claims.  Plaintiffs

---

[3] Plaintiffs contend discovery is required to establish patterns of discrimination, but the discovery process is unavailable where a plaintiff only has speculations.  (Dkt. 35 at 9 n.3.)

must allege a violation within the limitations period with the requisite specificity to allege plausibly that the unlawful practice continued past April 30, 2019.  It will not be enough to merely allege that it did. Plaintiffs must identify some act or event—be it origination, servicing, modification, or foreclosure—that evidences the continuation of the unlawful equity stripping scheme within the relevant period.

## B.  Proximate Cause

Defendants also argue the complaint must be dismissed because Plaintiffs have not sufficiently alleged the equity stripping scheme proximately caused the Counties any injury.  This is a complicated issue. In *Bank of Am. Corp. v. City of Miami, Fla.* (*Miami I*), the Supreme Court examined the concept of proximate cause under the FHA.  The Court quickly rejected the Eleventh Circuit's conclusion that the standard for proximate cause under the FHA was foreseeability.  *Bank of Am. Corp. v. City of Miami, Fla.* (*Miami I*), 137 S. Ct. 1296, 1304–06 (2017) ("In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires.").  Instead, the Supreme Court explained the "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the

23

harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 1305 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)).  Proximate cause under the FHA thus "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

In applying the direct relationship requirement to statutes that have "common-law foundations, . . . [t]he general tendency . . . is not to go beyond the first step." *Id.*  "What falls within that first step depends in part on the nature of the statutory cause of action and an assessment of what is administratively possible and convenient." *Id.* (citing *Lexmark*, 572 U.S. at 1305 and *Holmes*, 503 U.S. at 268).  The Supreme Court refused to define "the contours of proximate cause under the FHA" but rather remanded to the lower courts to do so. *Id.*  Several courts have delivered opinions on the matter. *See e.g.*, *City of Miami v. Wells Fargo & Co.* (*Miami II*), 923 F.3d 1260, 1279 (11th Cir. 2019), *vacated as moot sub nom. Bank of Am. Corp. v. City of Miami*, 140 S. Ct. 1259 (2020) (mem.); *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1042 (9th Cir. 2021) (en banc) (dismissing city's claims under the FHA for failing to

meet the direct proximate cause requirement set forth in *Miami I*); *City of Philadelphia v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at *5 (E.D. Penn. Jan. 16, 2018) (FHA requires "plausible proximate cause [for non-economic injuries] by alleging a connection between [defendant's] lending practices and the non-economic injuries to the City"); *Cnty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 982 (N. D. Ill. 2018) ("To proceed with an FHA claim, a plaintiff must fall within the Act's zone of interests and also must allege proximate cause."); *Cnty. of Cook v. Bank of Am. Corp.* (*County of Cook (Bank of Am.)*), No. 14 c 2280, 2018 WL 1561725, at *4 (N.D. Ill. 2018) ("[P]roximate cause . . . requires 'some direct relation' between the injury claimed and the wrongful conduct alleged, and . . . a claim for damages under the FHA— which [has been] likened to a tort claim—is generally limited to the 'first step' of the directness inquiry."); *Cnty. of Cook v. HSBC N. Am. Holdings Inc.* (*County of Cook (HSBC)*), 314 F. Supp. 3d 950, 962 (N.D. Ill. 2018) ("[T]he question becomes whether [the plaintiff] alleges a sufficiently direct relationship between [the defendant's] conduct and the various injuries it claims it has suffered."). Those opinions tend to analyze

proximate cause as to each type of injury the plaintiffs allege.  This Court will do the same.

Plaintiffs assert five categories of injuries: (1) lost property taxes, (2) increased expenditures on services, (3) increased foreclosure-processing costs, (4) lost franchise taxes and other municipal service income, and (5) other alleged non-economic harms.

### 1.    Property Taxes

Defendants argue they did not proximately cause any property-tax injury because (1) Plaintiffs control tax receipts and (2) there is no direct connection between loans and tax receipts.   (Dkt. 24-1 at 18–22.) Plaintiffs contend the alleged harm is not a general decline in property-tax revenue, but a harm to Plaintiffs' tax base—"the loss of property taxes on those foreclosed properties resulting from Defendants' discriminatory housing practices, and the lost property taxes on properties surrounding those foreclosures." (Dkt. 1 ¶¶ 393, 416–34.)  Plaintiffs claim Defendants' wrongful foreclosures in violation of the FHA reduced the assessed values of the foreclosed homes and surrounding properties, which, in turn, reduced property tax revenues on those properties.  (Dkt. 35 at 20.)

On remand from the Supreme Court's decision in *Miami I*, the Eleventh concluded such allegations plausibly allege proximate cause. *Miami II*, 923 at 1264.  In doing so, the Eleventh Circuit concluded "[p]roximate cause asks whether there is a direct, logical, and identifiable connection between the injury sustained and its alleged cause.  If there is no discontinuity to call into question whether the alleged misconduct led to the injury, proximate cause will have been adequately pled."  *Id.* The Court explained that "intervening steps in a causal chain cannot automatically and invariably end" proximate cause.  *Id.* at 1275.  As a result, the fact that defaults and foreclosures by individual borrowers stood between Defendants' alleged misconduct and its impact on Plaintiffs' revenue did not vitiate proximate cause.  *Id.*   The issue is "whether the injury is 'surely attributable' to the statutory violation," not whether it is the first impact. *Id.* (*quoting Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014)).  Put differently, "under common-law principles, a plaintiff can be directly injured by a misrepresentation even where" someone else relied on it.  *Id.*

The Eleventh Circuit then considered the text and history of the FHA, concluding it is a "broad and inclusive" statute, with an expanded

definition of "an aggrieved person" that demonstrates "congressional intention to define standing as broadly as it is permitted by Article III" and a broad definition of prohibited conduct that "takes aim at discrimination that might be found throughout the real estate market and throughout the process of buying, maintaining, or selling a home." *Id.* at 1279. The Court recognized Congress passed the FHA at a time when the President had "identified residential segregation and unequal housing and economic conditions in the inner cities as significant, underlying causes of the social unrest." *Id.* (quoting *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 530 (2015)). From this the Court of Appeals concluded the statute was aimed at broad social ills, such as ending segregated neighborhoods rather than just preventing discrimination in individual housing transactions. *Id.*

Finally, the Court of Appeals followed the Supreme Court's directive that it look to "what is administratively possible and convenient." *Miami I,* 137 S. Ct. at 1306. Three so-called *Holmes* factors guided this inquiry: (1) the ability to distinguish the "damages attributable to the violation, as distinct from other, independent factors"; (2) "the risk of multiple recoveries"; and (3) whether more direct plaintiffs

could "be counted on to vindicate the law as private attorneys general."
*Holmes*, 503 U.S. at 269–70. The Eleventh concluded all three factors
supported its conclusion that proximate cause under the FHA extended
to injuries inflicted on the city's tax base. *Id.* at 1294. The Court of
Appeals summarized its conclusion as follows:

> [impact of the Banks' [discriminatory conduct] can readily be
> identified at a citywide or neighborhood level, so even if there
> were not "something very close to a 1:1 relationship," . . . the
> City has plausibly explained how it will calculate damages in
> a reasonably precise way; the injury is profoundly different
> from any injuries suffered by a homeowner; and there's no
> reason to think that homeowners would make for more
> efficient plaintiffs

*Id.* (internal citation omitted).

This Court understands it is not bound by the Eleventh Circuit's
decision in *Miami II* since the Supreme Court later vacated that
judgment as moot. *Bank of Am. Corp. v. City of Miami*, 140 S. Ct. 1259
(2020) (mem.). But the Court finds it compelling and concurs in its
conclusion that proximate cause under the FHA may extend to a taxing
authority's lost tax revenue.[4]

---

[4] The Court recognizes the Ninth Circuit disagrees and found a tax
revenue claim went beyond the first step—harm to minority borrowers
who receive predatory loans—and therefore failed the proximate cause

Similar to the Eleventh Circuit, the Court finds application of the three *Holmes* factors shows the administrative feasibility of tracing Defendants' alleged misconduct to Plaintiffs' tax-related injuries. Plaintiffs seek damages based on diminution of tax revenue resulting from decreased property values allegedly caused by Defendants' discriminatory housing practices. (Dkt. 1 ¶ 393; 416–34.) They say the Defendants' conduct led to excessive foreclosures which reduced property values for those locations and surrounding areas. (*Id.*) That, in turn, led to lower tax revenue. To satisfy the first *Holmes* factor Plaintiffs—like the plaintiffs in *Miami II*—contend they will use hedonic regression analysis to isolate and calculate their property tax damages attributable to Defendants' FHA violations. (*Id.* ¶¶ 430–34.) Plaintiffs allege they will use "regression models . . . to determine the changes in assessed values and taxes collected on each property, and surrounding properties, that are directly related to Defendants' discriminatory foreclosures" and

---

analysis. *See City of Oakland*, 14 F. 4th at 1035–36. The Court, however, disagrees, in part because the Ninth Circuit solely focused on loan origination. *See id.* at 1036. But the conduct here consists of both origination and "inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms." *Miami I*, 137 S. Ct. at 1305. No one here suggests such claims are beyond the FHA.

the "hedonic regression analysis on the assessed values of those foreclosed residences for which Defendants are responsible will enable Plaintiffs to accurately and confidently isolate the amount of Plaintiffs' tax base related damages on each affected property that are proximately caused by the Defendants' discriminatory housing practices." (*Id.* ¶¶ 427, 434.) Hedonic regression analysis uses the factors Plaintiffs' property tax assessors consider in determining residential property value, which in turn affects the amount of property taxes levied and collected, including factors such as recent sales prices of the subject property and surrounding properties, and the number of rooms, number of bathrooms, square footage, age, construction materials, and location of the subject properties. (*Id.* ¶ 432.) Plaintiffs allege a hedonic regression analysis will enable them to isolate the amount of their tax base related damages on each affected property, while excluding factors unrelated to Defendants' discriminatory housing practices. (*Id.* ¶ 434.) Plaintiffs' allegations are not vague or overly conclusory. (*Id.* ¶ 427 ("Routinely maintained property tax and other financial data allow precise calculation of the diminution in Plaintiffs' tax digests caused by Defendants' discriminatory housing practice, and the resulting property

vacancies and foreclosures. . . . The culled data can then be run through regression models by Plaintiffs' experts to determine the changes in assessed values and taxes collected on each property, and surrounding properties, that are directly related to Defendants' discriminatory foreclosures.").)

The Ninth Circuit rejected the use of regression analysis to "close a gap in the causal chain" because it concluded that analysis only "show[s] whether the fact that a loan had discriminatory terms made that loan more likely to result in foreclosure." *City of Oakland*, 14 F.4th at 1040. The Court, however, finds regression analysis techniques may demonstrate "some direct relation between the injury asserted and the injurious conduct alleged." *Miami I*, 137 S. Ct. at 1306.  The pleadings suggest the tax revenue injury is readily calculable by "indicating and explaining at considerable length the kind of analysis that would be conducted to quantify the loss of revenue attributable to discriminatory lending." *Miami II*, 923 F.3d at 1283.  Plaintiffs have plausibly pled that it is practicable and convenient to quantify the property tax injury arising from Defendants' policies.

The Court also will not have to adopt complicated rules to avoid multiple recoveries. The injuries to Plaintiffs' treasuries are not shared by any other possible plaintiff. *See id.* at 1287; *City of Oakland*, 14 F. 4th at 1040–41. That is because only Plaintiffs can recover lost property tax revenue. Perhaps individual homeowners could bring claims on their own injuries. But any such claims would not seek recovery for Plaintiffs' lost tax revenue. The second *Holmes* factor is not a problem here.

The final factor builds on the others: "[T]he need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269–70. While Plaintiffs may be a step further down the chain of causation than the homeowners, Plaintiffs' suit could achieve better deterrence because it aims to recover for a larger injury sustained on a citywide basis and to remedy a broader violation than a single homeowner's suit could. Plaintiffs' suit challenges entire policies. A discrimination claim by a homeowner would challenge only the bank's action against that homeowner. Defendants could face suits by many

homeowners, but those suits still would not serve to condemn the discriminatory pattern or policy. "The question of efficacy is harder to resolve here because, although the homeowners are arguably closer in the chain, they are too numerous and diffuse to be counted on for deterrence. They are better situated only in a narrow, literal sense." *Miami II*, 923 F.3d at 1289. The Court finds Plaintiffs have plausibly alleged their property tax injuries.

Defendants alternatively argue Plaintiffs have not established proximate cause because there is no actual reduction in tax revenue. (Dkt. 24-1 at 18–20.) Defendants contend "[i]n Georgia, the counties control the amount of taxes levied to ensure 'the total aggregate amount of Plaintiffs' tax revenues is stable from one year to the next.'" (*Id.* at 18 (citing Dkt. 1 ¶ 426).) Each county sets an annual budget identifying (1) the total amount of property taxes to be levied and (2) the county-determines the millage rate (the percent of taxes paid per dollar of assessed property value). (Dkts. 24-1 at 18; 1 ¶ 418.) Defendants argue Plaintiffs do not allege an injury because, if there are declines in the tax base, Plaintiffs can raise the millage rate. (Dkt. 24-1 at 18–19.) Plaintiffs respond arguing their ability to increase millage rates is not unfettered

as they have legal and practical caps and tax assessors consider the effect of foreclosures and concentrations of foreclosures on the value of the foreclosed properties and the value of surrounding properties. (Dkt. 35 at 20–21.) The Court agrees with Plaintiffs. Plaintiffs' ability to adjust millage rates in response to declines in the overall value of their tax base because of foreclosures is subject to limits. Plaintiffs have alleged they suffer an injury to their tax base regardless of whether their overall property tax remains stable over time. The Court thus finds Plaintiffs have plausibly alleged that Defendants' conduct proximately caused their property tax injuries.

## 2.  Increased Government Services

Plaintiffs also claim injury arising from increased costs of providing county-government services at foreclosed properties. Plaintiffs claim that when Defendants' victims lost their homes to foreclosure or abandonment, Defendants failed to secure the homes, causing them to fall into disrepair and become "location[s] for illegal activities." (Dkt. 1 ¶ 440.) These actions, according to Plaintiffs, have "required Plaintiffs to expend substantial personnel time and out-of-pocket costs to send building code enforcement officers, police officers, and fire departments

to inspect, investigate, repair, clean up, monitor, and/or respond to events that threaten public health and safety." (*Id.*)

Other courts have found equivalent claims rely on conclusory allegations and a foreseeability-only theory without establishing proximate cause.[5]   The Court agrees with that conclusion given the pleadings here.  Plaintiffs' allegations purport to identify actions they were required to take in the light of foreclosures without establishing "any direct connections . . . between the foreclosure and any of these expenditures" and without providing any "explanation of how [Plaintiffs] will identify that amount of increase attributable to the foreclosures or to [Defendants'] conduct." *Miami II*, 923 F.3d at 1286.  Plaintiffs' claim that "[f]oreclosures automatically result in costs of cleaning and safeguarding vacant homes and securing foreclosure blighted-neighborhoods" is too conclusory.  (Dkt. 35 at 24.)  But Plaintiffs do not even explain what exactly goes into such expenses.

Plaintiffs' claim fails under both the first and second *Holmes* factors.  Demand of county services depends on many intervening factors.

---

[5] The Court notes there is one outlier, *Prince George's Cnty., Md. v. Wells Fargo & Co.*, 520 F. Supp. 3d 747, 756–57 (D. Md. 2021).

Plaintiffs vaguely argue they will use Defendants' mortgage loan and servicing data to isolate service costs directly attributable to Defendants' FHA violations which will then be matched to Plaintiffs' databases relating to the services they provided. But Plaintiffs fail to account for "[i]ntervening causes and independent variables [that] will inevitably run up . . . [services] damages because [Plaintiffs'] expenditures occur at some obvious level removed from the foreclosures." *Miami II*, 923 F.3d at 1285. Plaintiffs also fail to explain how these injuries "are anything more than merely foreseeable consequences" of Defendants' discriminatory acts. *Id.* at 1264. Plaintiffs' allegations are thus too conclusory and have not been "plausibly presented as directly and automatically resulting from [Defendants'] alleged misconduct." *Id.* at 1294. *See City of Oakland*, 14 F.4th at 1041 ("[T]he theory relies not only on the fact that a home will be foreclosed upon and the other variables, but also that individual actors will commit civil and criminal violations, thus necessitating more city resources to avoid and remedy those harms. This claim, which lacks even a scintilla of directness between the FHA violation and the purported harm, is founded on speculation based on conjecture."); *City of Sacramento v. Wells Fargo & Co.*, No. 2:18-cv-00416,

2019 WL 3975590, at *9 ("[T]hese allegations also expressly rely on third parties' conduct following foreclosure, extending the causal chain and making proper attribution of damages more difficult.").

These injuries are "precisely the ripples that [*Miami I*] cautions flow far beyond the defendant's misconduct, . . . risking massive and complex damages litigation." *County of Cook (Wells Fargo)*, 314 F. Supp. 3d at 988 (quotations omitted). The Court finds Plaintiffs have not adequately pled proximate cause as to their alleged increased government services injury.

### 3.   Foreclosure-Processing Costs

Plaintiffs allege they "were damaged as a result of the foreclosure process itself" in that "Plaintiffs' efforts to provide foreclosure-related services on the discriminatory foreclosures Defendants have filed impedes Plaintiffs' ability to provide similar services to others" and "Plaintiffs' judicial systems and clerk's offices have been overloaded with foreclosures filings and proceedings." (Dkt. 1 ¶¶ 439–40.) Defendants argue foreclosure processing claims are implausible in Georgia because Georgia permits nonjudicial foreclosure which "permits private parties to sell at auction, without any court oversight." (Dkt. 24-1 at 24–25 (quoting

*You v. JP Morgan Chase Bank*, 743 S.E.2d 428, 430 (Ga. 2013).)  They contend nonjudicial foreclosure is the most common method used, so the allegation that Plaintiffs' judicial systems and clerk's offices have been overloaded with foreclosure filings is not plausible in Georgia.  (Dkt. 24-1 at 25.)   Plaintiffs respond arguing even assuming nonjudicial foreclosures are the most common type, Defendants cannot establish there are no judicial foreclosures in Georgia or that there are no processing costs connected to nonjudicial foreclosures.  (Dkt. 35 at 26.)  Plaintiffs also contend Defendants have cited nothing that would show the number of judicial foreclosures is *de minimis*.  (*Id.*)  Defendants reply, arguing Plaintiffs' claim is premised on the assertion that foreclosures have *overloaded* the judicial system so the plausibility inquiry dictates Plaintiffs would only incur additional costs given a *meaningful* increase in filings which is not plausible in a nonjudicial foreclosure state.  (Dkt. 36 at 16–17.)  This is a factual dispute, not a legal one.  At this stage of proceedings, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."   *Bryant*, 187 F.3d at 1273 n.1.   Plaintiffs allege discriminatory foreclosures have impeded their offices.  At this stage,

Plaintiffs have the burden of meeting a plausibility standard, not a reasonable probability or more-likely-than-not standard. The Court finds Plaintiffs have adequately pled proximate cause as to their claim for foreclosure-processing costs.

### 4.   Municipal Services

Plaintiffs claim injury from the loss of municipal service income described as lost "municipal revenue" for water, utility, and sanitation services, and "lost franchise tax revenue," which is "paid to local government entities" for "things like local telephone service and cable television" because foreclosures have resulted in empty homes so "no one is using those services." (Dkt. 1 ¶¶ 435–37.) Plaintiffs allege their monetary damages can be established from Plaintiffs' records and databases, and the records and databases of their affiliated utility providers, once property addresses and periods of vacancy are determined. (*Id.* ¶ 438.)[6] Plaintiffs claim this can be accomplished by searching their databases and records for a property address, using the time frame the property was vacant. (*Id.*) Plaintiffs state their use of

---

[6] Plaintiffs' complaint contains two 438 paragraphs. The Court is citing the first 438 paragraph.

borrower property addresses and the timing of the foreclosure-related events from Defendants' records will ensure that Plaintiffs' damages are a direct result of Defendants' conduct.  (*Id.* ¶ 438.)[7]

Defendants argue these injuries are too attenuated and purely derivative.  (Dkt. 24-1 at 25–26.)  The Court agrees they fail both the first and second *Holmes* factors.  Plaintiffs assume a one-to-one relationship between a home vacancy or foreclosure and their loss of municipal service income.  It is not evident that the entire decrease in income could "possibly be fairly attributed to [Defendants'] conduct."  *Miami II*, 923 F.3d at 1285.  Municipal service income could decrease because of a borrower's choice to use streaming services instead of cable or cell phones instead of landlines.  Intervening variables impact causation between Plaintiffs' municipal service income injuries and Defendants' discriminatory policies.  "While these intervening variables do not necessarily vitiate Plaintiffs' claims, . . . Plaintiffs do not account for them when describing their methodology to attribute these damages to Defendants' conduct."  *Cobb Cnty. v. Bank of Am. Corp.* (*Cobb Cnty. II*), No. 1:15-CV-04081-LMM (N.D. Ga. Sept. 18, 2020), Dkt. 100 at 38.

---

[7] The Court cites the second 438 paragraph.

Plaintiffs offer no methodology that would consider outside variables. "These allegations thus stand in stark contrast with Plaintiffs' property tax injuries, as Plaintiffs have not provided any analysis—statistical or otherwise—showing that they 'will be able to sort out the extent to which these damages are attributable to [Defendants'] misconduct." *Id.* at 39 (quoting *Miami II*, 923 F.3d at 1285). Because Plaintiffs have not accounted for intervening variables when pleading proximate cause, the Court finds Plaintiffs have not adequately pled it.

### 5.   Non-Economic Harms

Finally, Plaintiffs allege they "have been harmed non-monetarily" and "seek injunctive relief for these damages." (Dkt. 1 ¶ 445.) Plaintiffs allege they have been injured because of the "frustration of the purposes and missions of their various departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for their residents at large." (*Id.* ¶ 446.) Plaintiffs claim they suffer from the segregative effects of the increased foreclosures and vacant properties for which Defendants are responsible. (*Id.* ¶ 447.) Plaintiffs also allege they suffer from the

combined racial and gender segregative effect from an increased number of defaults and foreclosures on mortgage loans that Defendants targeted to female borrowers, particularly African American female borrowers. (*Id.* ¶ 449.)

Defendants argue (1) Plaintiffs' alleged segregative effect is a harm too far removed as the racial character of a county depends on many variables and (2) Plaintiffs fail to identify specific conduct to enjoin. (Dkt. 24-1 at 26–27.) The Court agrees this alleged harm is too far removed from Defendants' equity-stripping practice to satisfy the proximate cause analysis. The racial character of Plaintiffs' neighborhoods depends on many variables including individual preferences for diversity in housing, the history of governmental and private efforts to dismantle residential segregation, and continuing racial disparities in income and wealth. Plaintiffs have failed to allege any manner for distinguishing between the impact of Defendants' alleged conduct and these other variables. Plaintiffs also fail to allege the race of Defendants' borrowers who lived in the foreclosed homes, the race of the new homeowners post-foreclosure, or how the racial composition of Plaintiffs' neighborhoods changed. The

Court thus finds Plaintiffs have not adequately pled proximate cause as to their non-economic injuries.[8]

### C.   Disparate Impact

Defendants next argue Plaintiffs fail to state disparate impact claims under the FHA.  (*Id.* at 27–31.)  The Supreme Court has held that disparate impact claims are cognizable under the FHA.  *Inclusive Communities*, 576 U.S. at 543–44.  To state such a claim, "a plaintiff must allege, not only a statistical disparity, but also that the defendant maintained a specific policy that caused the disparity."  *County of Cook (Wells Fargo)*, 314 F. Supp. 3d at 990 (citing *Inclusive Communities*, 576 U.S. at 542).  Additionally, "the challenged policy must be 'artificial, arbitrary, and unnecessary."  *Id.* at 991 (quoting *Inclusive Communities*).  And the plaintiff must allege "a robust causal connection between the defendant's challenged policy and the disparate impact."  *See Prince George's Cnty., Md. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 765–67 (D. Md. 2019).  Defendants contend Plaintiffs' claims fail each requirement.

---

[8] Because the Court finds Plaintiffs fail to show proximate cause as to their alleged non-economic injuries, the Court need not address Defendants' argument that Plaintiffs fail to identify specific conduct to enjoin.

44

### 1.    Facially Neutral Policy

Defendants contend Plaintiffs' claims fail because they do not identify a specific and facially neutral, evenly-applied, policy or practice by Defendants. (Dkt. 24-1 at 29.)  They say the term equity stripping is just a conclusory label, not a specific business policy.  They also say equity stripping is not alleged to be neutral or evenly applied since it involves targeting FHA protected minority mortgage borrowers.  (*Id.*)  Several courts have addressed and rejected similar arguments.   The Court similarly finds faults with Defendants' contentions.

First, *Inclusive Communities*, does not require a plaintiff to assert one, single policy.  *See* 576 U.S. at 526–47; *see also Cobb Cnty. II*, No. 1:15-CV-04081-LMM, Dkt. 100 at 10 ("Nowhere in *Inclusive Communities* did the Supreme Court require a plaintiff to assert one, single policy."); *County of Cook (Bank of Am.)*, 2018 WL 1561725, at *9 (N.D. Ill. Mar. 30, 2018) ("Defendants offer[ed] no authority to suggest that the 'specific' practice challenged in a disparate-impact claim must be limited to a single component.").

Second,  Defendants  overgeneralize  Plaintiffs'  allegations, contending the complaint improperly lists multiple broad aspects of

Defendants' lending and servicing business and purports to challenge all operations, with formulaic allegations that span the gambit. (Dkt. 24-1 at 29.) Plaintiffs have set forth a multitude of specific policies including granting employees, brokers, and managers discretion to steer minority borrowers into more costly loans and set loan pricing above published rate sheets; compensating employees and brokers for doing so; and systematically lowering or waiving published underwriting standards and guidelines. (Dkt. 1 ¶¶ 6, 154, 157, 462–63.) The specific policies also include mortgage servicing practices and foreclosure-related practices. (*Id.* ¶¶ 11, 269–70, 273, 276–78, 465, 475.) Plaintiffs' allegations are thus not formulaic and identify specific policies. *See County of Cook (HSBC)*, 314 F. Supp. 3d at 967 (explaining that the complaint was "replete with examples of HSBC policies that . . . resulted in a disparate impact . . . [including] mortgage lending and services policies; pricing and marketing policies; various underwriting policies; loan servicing and loss mitigation policies; and foreclosure-related policies"); *Montgomery Cnty., Md. v. Bank of Am. Corp.*, 421 F. Supp. 3d 170, 183–84 (D. Md. 2019) (finding plaintiff properly alleged a policy by describing the "pattern and practice of predatory and discriminatory mortgage origination (pricing,

underwriting and compensation) and servicing (payment acceptance, loan modification, and foreclosure)").   *Inclusive Communities* also does not bar Plaintiffs from relying on a collective set of practices when asserting a sufficiently specific policy.   *See* 576 U.S. at 526–47; *Montgomery Cnty.*, 421 F. Supp. 3d at 184 ("[T]he Counties can challenge these policies individually or collectively as an equity-stripping practice."); *County of Cook (Wells Fargo)*, 314 F. Supp. 3d at 992 (recognizing equity stripping as a sufficient policy, as it consists of "interrelated predatory and discriminatory loan making, loan servicing and foreclosure activities that occur over the entire life of each mortgage loan").

Third, Defendants contend equity stripping is not alleged to be neutral or evenly applied since it involves intentional conduct of targeting minority mortgage borrowers.   (Dkt. 24-1 at 29.)   Several district courts, including this one, have addressed whether intentional conduct can be the basis for a disparate impact claim.   *See, e.g.*, *Cobb Cnty. II*, No. 1:15-CV-04081-LMM, Dkt. 100 at 15 ("[I]ntentional conduct does not preclude Plaintiffs from asserting their disparate impact claims."); *Montgomery Cnty.*, 421 F. Supp. 3d at 182 ("[A]lthough a

47

plaintiff is not required to explicitly allege, or, ultimately, to prove intent as part of a disparate-impact theory, a plaintiff is not precluded from doing so." (quotation marks omitted)); *County of Cook (HSBC)*, 314 F. Supp. 3d at 968 ("In fact, one of the factors that a court considers to determine whether a plaintiff has made a *prima facie* disparate impact case is 'the presence of some evidence of discriminatory intent, even if circumstantial and less than sufficient to satisfy' the standards required for disparate treatment."). The Court agrees with these courts. While disparate treatment claims require a defendant to have discriminatory intent or motive, Federal Rule of Civil Procedure 8(d) allows a plaintiff to proceed under both disparate impact and disparate treatment claims as alternative theories of recovery. *See County of Cook (Wells Fargo)*, 314 F. Supp. 3d at 994 ("It is true [the plaintiff] also alleges that [the defendant] intentionally targeted minority borrowers. But Civil Rule 8(e) allows plaintiffs to plead alternative theories, provided that they use a formulation from which it can be reasonably inferred that this is what they were doing." (quotation marks omitted)). Plaintiffs clearly advance two alternative theories of liability under the FHA—disparate treatment

and disparate impact.  (Dkt. 1 ¶¶ 460–82 (alleging disparate impact),
¶¶ 483–91 (alleging disparate treatment).)

## 2.   Arbitrary, Artificial, and Unnecessary

Defendants next contend the complaint lacks "factually supported
allegations" that any policy "complained of [is] arbitrary and unnecessary
under the FHA."  (Dkt. 24-1 at 29 (quoting *Inclusive Communities
Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 904 (5th Cir. 2019).)  Not
true.  Plaintiffs allege Defendants' predatory mortgage servicing and
foreclosure policies and practices were artificial, arbitrary, and
unnecessary and served no business purpose.  (Dkt. 1 ¶ 476.)  Plaintiffs
claim Defendants (1) engage in discriminatory equity stripping schemes
for the singular purpose of financial gain, (2) increased the cost of
mortgage loans without regard to objective factors and the risk of the
loan, and (3) incentivized employees to exercise discretionary pricing in
a subjective manner merely for their gain or Defendants' profit.  (*Id.*
¶¶ 89, 154, 196, 412, 485.)  These claims are supported by Plaintiffs'
factual allegations describing Defendants' equity stripping scheme.  The
Court finds Plaintiffs have properly alleged artificial, arbitrary, and
unnecessary policies as required. *See Montgomery Cnty.*, 421 F. Supp. 3d

at 184 (holding that the plaintiff alleged artificial, arbitrary, and unnecessary policies when the plaintiff pointed to the defendants' predatory loan origination, servicing, and foreclosure practices).

### 3.   Statistical Disparity and Robust Causality

Defendants argue Plaintiffs do not plausibly allege robust causality. (Dkt. 24-1 at 30–31.) Defendants contend Plaintiffs' maps and related allegations purport to show that Defendants initiated a disproportionate number of foreclosure proceedings in Plaintiffs' neighborhoods in those census tracts with higher populations of minorities. (*Id.* at 30.) Defendants argue Plaintiffs do not even allege a bare statistical disparately vis-à-vis Defendants' foreclosure activity. (*Id.*) Defendants claim the complaint calculates its rates using the total number of "Owner Occupied Housing (OOH) with a Minority Householder" serviced by all financial institutions as the denominator and says nothing about loans *Defendants* services and could foreclose. (*Id.*)

The OOH represents all owner-occupied housing units in Fulton, Dekalb, and Cobb Counties. Plaintiffs contend that whether some or all of the OOH units have mortgages serviced by Defendants is not relevant,

but what is relevant is that Defendants foreclosed on at least 10,671 borrowers in Fulton County between February 2006 and May 2019. (Dkt. 1 ¶ 324.) Defendants also foreclosed on almost twice as many homes in neighborhoods consisting of 70.1–100% minority owners (5,772) as neighborhoods with 30% or less minority owners (2,989). (*Id.* ¶¶ 324–26.) And the foreclosure rate increased as a neighborhood's minority homeownership increased. (*Id.* ¶ 325.) Plaintiffs contend these claims sufficiently allege a statistical disparity. (Dkt. 35 at 29.)

The Court agrees at this stage of the litigation. First, Plaintiffs provide detailed statistical data showing Defendants issued a disproportionate number of high-cost, subprime, or other nonprime loans to minority borrowers in Plaintiffs' neighborhoods. (Dkt. 1 ¶¶ 302–319.) For example, in Fulton County, Defendants Wells Fargo Bank, N.A. and Wells Fargo Financial Georgia, Inc. were 4.7 times more likely to originate a high-cost loan to a minority borrower compared to a non-minority borrower and in Dekalb County, minorities were almost 5.5 times more likely to receive a high-cost loan compared to non-minorities. (*Id.* ¶¶ 304, 316.)

Second, Plaintiffs have plausibly alleged Defendants were disproportionately likely to foreclose on loans issued to minority borrowers in Plaintiffs' neighborhoods. (*Id.* ¶¶ 326–49.) Plaintiffs' heat maps show that in Fulton County between February 2006 and May 2019, Defendants were 4 times more likely to foreclose on a home in a neighborhood with 90.1–100% minority homeowners; in Cobb County, 3.3 times more likely; and in Dekalb County almost 6 times more likely. (*Id.* ¶¶ 326, 336, 345.) In Fulton County from January 2015 to May 2019, Defendants were 5.3 times more likely to foreclose on a home in a neighborhood with 90.1–100% minority homeowners compared to a neighborhood with 0–30% minority homeowners. (*Id.* ¶ 329.) The Court thus finds Plaintiffs have alleged genuine statistical disparities in mortgage origination and foreclosures to minority borrowers. *See County of Cook (HSBC)*, 314 F. Supp. 3d at 968 ("In addition to offering statistics from multiple mortgage lenders, the County also provides data particularized to HSBC loans and foreclosures. Coupled with the extensive allegations in the Complaint that describe how HSBC's policies resulted in the statistical disparities, the County has asserted sufficiently the existence of a causal connection between the policies and

the statistical data to survive a motion to dismiss." (internal citation omitted)).

For a disparate impact claim to survive, the causal link between the policy and disparity must also be "robust." *Inclusive Communities*, 576 U.S. at 541–42.  Plaintiffs allege because of the "predatory loan terms, higher loan costs, and reduced home equity resulting from Defendants' discretionary policies and practices, Plaintiffs' communities, and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults and foreclosures on the loans Defendants were responsible for." (Dkt. 1 ¶ 405.)  This then contributed to a downward spiral of more delinquencies, defaults, and foreclosures in Plaintiffs' communities and neighborhoods with higher percentages of minority borrowers and surrounding areas.  (*Id.*)  Plaintiffs have shown Defendants' policies were causally connected in a robust way to the racial disparity.

For all of these reasons, the Court concludes Plaintiffs' disparate impact claims meet the plausibility standard and denies Defendants' motion to dismiss.[9]

### D.   Wells Fargo & Co.

Finally, Defendants, citing *City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1321 (S.D. Fla. 2016) and *City of Miami v. JPMorgan Chase & Co.*, 171 F. Supp. 3d 1309, 1314 (S.D. Fla. 2016), contend Plaintiffs' claims against Wells Fargo & Co., the parent corporation, should be dismissed as the complaint says nothing about its conduct. (Dkt. 24-1 at 31.)  Both Southern District of Florida cases dismissed parent holding companies because the complaint did not allege the parent company made any mortgage loans during the limitations period and the complaint impermissibly lumped together four separate corporate defendants.  Plaintiffs, however, specifically allege Defendant Wells Fargo & Co., as the corporate parent, "had the practical ability to direct and control the actions and operations of each of its subsidiaries

---

[9] Defendants contend Plaintiffs fail to allege timely violations, as their statistics do not explain which, if any, loans post-date April 2019.  (Dkt. 24-1 at 31.)  The issues with statute of limitations are addressed above and call for an amended complaint.

and, in fact, did so through a variety of interrelated, interdependent, centralized, [or] coordinated functions, practices, and policies involved in their entire mortgage banking operations, particularly . . . [in] non-conforming loan origination, funding, purchase, securitization, and servicing activities. (Dkt. 1 ¶ 32.) Plaintiffs have stated a widespread scheme of discriminatory lending involving all Defendants. *See Cobb Cnty. II*, No. 1:15-CV-04081-LMM, Dkt. 100 at 44–46. The Court thus finds Defendants' argument unavailing. Maybe at summary judgment, but not now.

## IV.  Conclusion

The Court **GRANTS** Defendants' Motions for Leave to File Supplemental Authority.[10] (Dkt. 37; 49.)

The Court **GRANTS** Defendants' Motion to Dismiss. (Dkt. 24.) But Plaintiffs may file an amended complaint within the next thirty (30) days to address the statute of limitations issue as discussed in this Order if they so choose. Plaintiffs cannot amend their complaint in any other way.

---

[10] The Court found the *City of Oakland* and *Prince George's Cnty. v. Wells Fargo & Co.*, --- F. Supp. 3d ---- , 2021 WL 5921599 (D. Md. Dec. 15, 2021) opinions helpful in ruling on Defendants' motion to dismiss since both opinions address proximate cause under the FHA—a heavily contested issue.

**SO ORDERED** this 22nd day of March, 2022.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE