## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Fulton County, Georgia; Cobb
County, Georgia; and DeKalb
County, Georgia,

               Plaintiffs,

                          Case No. 1:21-cv-1800-MLB

v.

Wells Fargo & Co., et al.,

               Defendants.

_____/

## OPINION & ORDER

Plaintiffs Fulton, DeKalb, and Cobb Counties allege Defendants Wells Fargo & Company and some of its related entities engaged in a broad, predatory lending scheme to target minority citizens living in their counties. They sued Defendants under the Fair Housing Act, seeking injunctive relief and monetary damages. The Court previously dismissed Plaintiffs' claims as barred by the statute of limitations but permitted Plaintiffs to amend their complaint. (Dkt. 51.) Now that they have, Defendants again move to dismiss, saying Plaintiffs' amendments do not save their claim. (Dkt. 59.) Defendants also move for partial summary

judgment on the statute of limitations.  (Dkt. 61.)  The Court denies both.

## I.    Background

Like in their original complaint, Plaintiffs allege Defendants engaged in an "equity stripping" scheme that involved a combination of predatory and discriminatory lending, servicing, and foreclosure practices over the life of a mortgage. (Dkt. 53 ¶ 5.)  They say this scheme began at loan origination when Defendants forced borrowers to pay higher costs and improper fees (while also receiving loans with higher interest rates), continued throughout the life of the loans as borrowers paid inflated interest rates, manifested through the imposition of pre-payment penalties when borrowers refinanced or paid off loans, progressed into default when Defendants subjected borrowers to fees and costs, and culminated in foreclosure when Defendants took away the borrowers' home and stripped them of any remaining equity.  (Dkt. 53 ¶ 5.)  Plaintiffs contend Defendants targeted minority borrowers in their counties because they were easy targets for Defendants to maximize mortgage originations from people most likely to accept less favorable terms and pushed minority applicants into higher cost, non-prime loans even when those applicants qualified for prime loans.  (Dkt. 53 ¶¶ 7, 90,

165.)  Plaintiffs point to publicly available origination and foreclosure data showing Defendants originated high-cost loans to minorities 2.3 times more than they did to non-minorities.  (Dkt. 53 ¶ 311.)  Plaintiffs suffered damages as a result of Defendants' practices, including through lost taxes and foreclosure-processing fees.  (Dkt. 53 ¶¶ 390, 420–426.)

In their original complaint, Plaintiffs identified seven loans they said were subject to Defendants' discriminatory scheme.  (Dkt. 1 ¶ 372.) For each, Plaintiffs alleged origination and foreclosure dates, interest rates, and the cities in which the homes secured by the loans were located.  (*Id.*)  But they failed to allege "specific addresses of the properties, names of borrowers, or why [their] foreclosures allege[d] unlawful discrimination."  (Dkt. 51 at 22.)  On that basis, the Court concluded Plaintiffs failed to allege plausibly Defendants violated the FHA within the statute's two-year statute of limitations—which in this case would be after April 30, 2019.  (Dkt. 51 at 17, 22–23.)  And absent a discrete act of discrimination by Defendants within the limitations period, Plaintiffs' claims regarding various purported discriminatory acts over the lives of those loans were time-barred.  (*Id.*)  The Court dismissed Plaintiffs' claims but allowed them an opportunity to amend their

complaint.  (Dkt. 51 at 22.)  The Court specifically noted Plaintiffs "must allege a violation within the limitations period with the requisite specificity to allege plausibly that the unlawful practice continued past April 30, 2019."  (Dkt. 51 at 23.)  That act or event, the Court said, could be "origination, servicing, modification, or foreclosure."  (*Id.*)

Plaintiffs filed an amended complaint.  (Dkt. 53.)  They now allege detailed information about thirty different loans they claim Defendants originated, serviced, and/or foreclosed.  (Dkt. 53 ¶¶ 371(a)–(f).)  For each, they allege the physical address of the property secured by the foreclosed loan; the adjustable-rate nature of the loan terms and/or the materially increased interest rates on loans compared to national average loan rates; and the name of each of the borrowers (which they say "reflect[s] a highly likely African American, Latino/Hispanic or other minority borrower given the high minority neighborhood locations at issue").  (Dkt. 53 ¶¶ 370, 371(a)–(f).)  Plaintiffs also include three "heat maps," which they say show a difference in foreclosure rates between neighborhoods with mostly minority residents compared to neighborhoods with mostly white residents.  (*Id.*)  The heat maps show the foreclosure rate was 3.5 times higher in high minority neighborhoods compared to mostly white

neighborhoods for Fulton County; 5 times higher in DeKalb County; and 18 percent higher in Cobb County. (*Id.*)

Defendants again move to dismiss and (alternatively) for summary judgment. (Dkts. 59, 61.) Plaintiffs oppose both. (Dkts. 62, 66.)

## II.    Motion to Dismiss

Defendants say Plaintiffs' claims should be dismissed as barred by the statute of limitations. This is largely the same issue the Court previously addressed.

### A.    Standard

A court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

This so-called "plausibility standard" is not a probability requirement. *Id.* Even if a plaintiff will probably not recover, a complaint may still survive a motion to dismiss for failure to state a claim, and a court reviewing such a motion should bear in mind that it is testing the sufficiency of the complaint, not the merits of the case. *Twombly*, 550 U.S. at 556.

### B.   Discussion

"A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred' because '[a] statute of limitations bar is an affirmative defense, and . . . plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815 (11th Cir. 2013) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)).   "At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute."   *Tello v. Dean Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (quotations omitted).   The question for this Court is thus whether Plaintiffs essentially pleaded

themselves out of court.

The FHA provides that an aggrieved person may file a civil enforcement action "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."   42 U.S.C. § 3613(a)(1)(A).  Since Plaintiffs filed their complaint on April 30, 2021, they must show Defendants' alleged discriminatory housing practice continued until at least April 30, 2019.  Defendants argue that, even with the amended complaint, Plaintiffs still fail to do so.[1]  Plaintiffs argue they have adequately alleged Defendants' discriminatory conduct in the origination, servicing, and foreclosure of the loans continued into the limitations period—or, at the very least, that Defendants cannot

---

[1] Defendants filed their motion for partial summary judgment a little over a month after they filed their motion to dismiss. (Dkt. 61.)  Plaintiffs then filed their opposition to the summary judgment motion.  (Dkt. 66.)  Based on Plaintiffs' response, Defendants sought leave to file a supplemental brief in support of their motion to dismiss, which dealt only with arguments Plaintiffs made in their summary judgment opposition brief. (Dkt. 70.)  Plaintiffs filed a response to that motion. (Dkt. 73.)  In deciding a motion to dismiss, a court looks only at the complaint and, in certain circumstances, outside documents that are central to the plaintiff's claims.  *See McClure v. Oasis Outsourcing II, Inc.*, 674 F. App'x 873, 875 (11th Cir. 2016).  The Court thus denies Defendants' motion for leave to file their proposed supplemental brief and declines to consider it in ruling on their motion to dismiss.  Likewise, the Court will not consider Plaintiffs' response.

establish from the face of the complaint that Plaintiffs' claims are time-barred.  (Dkt. 62 at 7–8.)

Some of this argument is just Plaintiffs rearguing legal theories the Court previously rejected.  But, in the amended complaint, Plaintiffs identify thirty loans that allegedly evidence Defendants' ongoing misconduct.  (Dkt. 62 at 11–12.)  Plaintiffs fail to allege Defendants originated or serviced any of the thirty loans after April 2019.  And Plaintiffs admit Defendants foreclosed on 20 of those loans before that date.  (Dkt. 54-1 ¶¶ (371(c), 371(f), 371(i).)  Those twenty loans thus fail to identify any discriminatory conduct that occurred during the limitations period.  Nor do the three heat maps say anything about loan origination or servicing.  So they do not present allegations as to those acts.

Plaintiffs, however, identify ten loans on which Defendants foreclosed after April 30, 2019.   (Dkt. 54-1 ¶¶ (371(a), 371(d), 371(g).)  With those loans, Plaintiffs sufficiently cured the problems previously identified by the Court.  When the Court dismissed Plaintiffs' foreclosure claims the first time, it noted Plaintiffs failed "to allege specific addresses of the properties, names of borrowers, or why these foreclosures allege

unlawful discrimination." (Dkt. 51 at 22.) Now, for each of these ten loans, Plaintiffs allege the specific address of the property, the name of the borrower, and census tract demographics showing high populations of minorities in the neighborhood in which the property is located. (Dkt. 53 ¶¶ 371(a), (d), (g).) Plaintiffs claim each borrower's name reflects the borrower is likely "African American, Latino/Hispanic, or [another] minority," and that census data shows each property was located within a mostly minority neighborhood. (Dkt. 53 ¶ 370.) And Plaintiffs allege that these foreclosures were discriminatory and that they "illustrate the ongoing nature of Defendants' predatory and discriminatory mortgage lending, servicing, and foreclosure practices alleged herein." (Dkt. 53 ¶ 371.) These allegations are enough—at least at the pleading stage—to establish the ten loans were part of Defendants' purported discriminatory scheme and that Defendants undertook a discrete action in furtherance of that scheme within the limitations period. *See Cobb Cty. v. Bank of Am. Corp.* (*Cobb Cty. I*), 2020 WL 13200158, at *17 (N.D. Ga. Sept. 18, 2020) (holding complaint alleged timely FHA violation based on discriminatory foreclosures where plaintiffs "designated each loan's address, type of interest payment, interest rate, and acquiring

entity" and alleged that based on borrowers' names, each individual borrower was "likely African American or Latino/Hispanic").

Defendants recognize Plaintiffs can survive their motion by "plausibly alleg[ing] a discriminatory foreclosure to proceed with FHA claims based on foreclosure conduct." (Dkt. 65 at 7 (emphasis omitted).) But, they argue, Plaintiffs—rather than alleging each foreclosure was itself a discriminatory action—claim the foreclosures "are the result of improper interest rate terms set" at origination, and so are really just "repackage[d] . . . origination allegations." (Dkt. 59-1 at 14.)  This is simply not true, at least not based on the pleadings.  As the Court previously recognized, Plaintiffs allege discriminatory practices by Defendants that "involved a combination of predatory and discriminatory lending, servicing, and foreclosure practices over the life of a mortgage," and that Plaintiffs "have not merely alleged one incident of unlawful discrimination (or even multiple acts of discrimination) but rather challenge an unlawful practice that they say began long ago and continued into the limitations period." (Dkt. 51 at 2, 14.)  The Court also held that Plaintiffs properly alleged Defendants "were disproportionately likely to foreclose on loans issued to minority borrowers in Plaintiffs'

neighborhoods." (Dkt. 51 at 52.) Plaintiffs allege Defendants took a discrete action (foreclosing) on each of the ten loans after April 30, 2019, and that they did so disproportionately to minority borrowers in high minority neighborhoods. Taken together, these facts are enough to sustain Plaintiffs' allegations that Defendants engaged in discriminatory foreclosures within the limitations period. To move past summary judgment on the merits, Plaintiffs will have to present evidence of this overarching scheme, and alleged discrimination in origination may not be enough to establish conduct within the statutory period. But for now, Plaintiffs' allegations plausibly state a claim.

Defendants also argue that, even with the additional information Plaintiffs provided in the amended complaint, they still fail to allege "*why* the foreclosures are discriminatory or support a 'reasonable inference that the defendant is liable' for foreclosing because of race." (Dkt. 65 at 10 (emphasis in original).) They rightfully assert that "'foreclosures in and of themselves without more facts, do not evince discrimination.'" (*Id.* (quoting *Dekalb Cty. v. HSBC N. Am. Holdings Inc.*, 2015 WL 8699229, at *6 (N.D. Ga. Nov. 16, 2015).) But Plaintiffs *do* allege more. They point to "the adjustable-rate nature . . . and/or the materially increased interest

rates on" the allegedly discriminatory loans "compared to national average loan rates." (Dkt. 53 ¶ 370.) Another Court has held the interest rate charged on a loan can be considered when deciding whether a foreclosure was discriminatory. *See Cobb Cty. I*, 2020 WL 13200158, at *17 (plaintiff stated claim of discriminatory foreclosure in part because it "highlight[ed] that the 'interest rates on [these loans] at the time of foreclosure [were] substantially higher than most other foreclosed loans'"). And it is these predatory rates, Plaintiffs allege, that ultimately culminate in foreclosure, "when Defendants take away the borrower's home, thereby removing any remaining equity and eliminating the borrower's ability to generate future equity." (Dkt. 53 ¶ 5.) Finally, the heat maps allegedly show "minority borrowers and neighborhoods have suffered a disproportionate number of foreclosures compared to white borrowers." (Dkt. 53 ¶¶ 371(a), (d), (g).) These allegations are enough *at the pleading stage* to plausibly raise an inference of foreclosure discrimination in violation of the FHA. Again, whether it will be enough to get past summary judgment on liability remains to be seen. The Court offers no opinion, for example, as to whether any disparity between the loans at issue here and loans Defendants originated elsewhere would—

12

by itself—provide evidence from which a jury could infer discriminatory intent. The Court is also confident discovery on this issue can be appropriately limited. But for now, Defendants' motion to dismiss is denied.[2]

## III.  Motion for Partial Summary Judgment

Defendants also moved for partial summary judgment on the statute of limitations issue. (Dkt. 61.) They say that, even if Plaintiffs have shown Defendants' alleged conduct continued into the limitations period, the undisputed evidence shows Plaintiffs knew about their claims as early as February 2015 and thus cannot pursue any claims for conduct that occurred before April 30, 2019.

### A.    Standard

Summary judgment is appropriate when "the movant shows that

---

[2] The Court allowed Plaintiffs to amend their complaint only "to address the statute of limitations issue" and not "in any other way." (Dkt. 51 at 55.) So, the Court does not consider any arguments by either party regarding the other issues already resolved in the Court's prior dismissal order. And Plaintiffs' claims move past the pleading stage only to the extent previously explained in that order. Specifically, only their disparate impact claims, their claims for foreclosure-processing costs, and their claims for property tax injuries survive dismissal. (Dkt. 51 at 26–35, 39–42, 44–54.)

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## B.   Discussion

As already mentioned, claims under the FHA are subject to a two year statute of limitations—"[a]n aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice[.]" 42 U.S.C. §

3613(a)(1)(A).   Defendants argue Congress included the words "or the termination" in the statute to codify the continuing violations doctrine recognized by the Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982).   *See* H.R.Rep. No. 100-711, at 33 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2194 ("A complaint must be filed within [two years] from the time the alleged discrimination occurred or terminated. The latter term is intended to reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the last asserted occurrence of the unlawful practice."). The continuing violations doctrine provides that the statute of limitations for a defendant's continuing conduct does not run (or is tolled) until the defendant ends the practice.   *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001).   But, as Defendants point out, that doctrine is limited.   The Eleventh Circuit has recognized the general principle that claims typically accrue and a limitations period begins to run when "facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated."   *Id.*   This means the continuing violations doctrine does not apply when a plaintiff knows (or should know) that he or she has a claim.   *Id.*

Defendant argue the undisputed evidence shows Plaintiffs have known about their potential FHA claims since at least February 2015— more than six years before they filed suit and well before the April 30, 2019 limitations period commenced.  (Dkt. 61 at 19.)  So, they say the continuing violations doctrine does not apply and Plaintiffs' claims for Defendants' conduct before April 30, 2019 are barred by the statute of limitations.  (Dkt. 61 at 13–16.)

The Court agrees Defendants presented undisputed evidence Plaintiffs knew about their claims at least six years before they filed suit. Plaintiffs considered filing predatory lending litigation against Defendants as early as June 2014, when their counsel sent Defendants a letter "to provide a framework for a possible early resolution of [their] clients' FHA claims against Wells Fargo and Wachovia."  (Dkt. 66-1 ¶ 3.)[3] By early February 2015, each of Plaintiffs' respective boards of

---

[3] In connection with Defendants' summary judgment motion, the parties ask the Court to allow them to file their counterstatements of material fact and supporting evidence under seal.  (Dkts. 68, 80.)  Neither objects to the other's request.  The Court grants those motions.  Because it does not reference or identify any of the confidential information contained within the counterstatements, however, the Court need not redact any portion of this Order.

commissioners authorized the filing of an FHA lawsuit against Defendants for virtually the exact same allegations Plaintiffs have raised in this case. (Dkt. 66-1 ¶¶ 6–9.) They then issued a press release saying they "filed litigation against Wells Fargo/Wachovia . . . [b]ased on the Fair Housing Act" alleging "predatory and discriminatory mortgage lending and servicing practices focused on communities with a high percentage of minority residents." (Dkt. 66-1 ¶ 10.) In July 2015, Plaintiffs' counsel sent Defendants a draft agreement offering to release all claims that "could have been brought under fair housing laws . . . includ[ing] but [] not limited to, any claims related to Wells Fargo's loan origination, loan securitization, loan servicing, loan payment provisions, sales practices, and post-foreclosure services." (Dkt. 66-1 ¶ 15.)[4] Resolution stalled, and Plaintiffs waited six more years to file this

---

[4] Throughout their pre-litigation communications, Plaintiffs explained to Defendants that the contemplated—and authorized—lawsuit against them was akin to the FHA claims they raised against a non-party bank in 2012. (Dkt. 66-1 ¶¶ 4, 10.) They also pointed to litigation filed by their same counsel against a non-party bank on behalf of Cook County, Illinois in March 2014. (*Id.*) The claims in those cases are nearly identical to the ones in this litigation. (Dkt. 61-3 at 6–150, 164–271, 428–746.)

litigation.  (Dkt. 66-1 ¶¶ 16, 25.)  The undisputed facts show Plaintiffs had direct knowledge of their claims long before April 30, 2019.

Plaintiffs counter that the FHA does not have a "notice provision," so it does not matter whether they had notice of their claims "prior to the two-year look back-period." (Dkt. 66 at 9.)  They point to the language of the statute, "precedent[,] and legislative history" to say the statute does not require plaintiffs to file claims within two years of when they know or should know about their claims.  (Dkt. 66 at 10.)  And they say courts imposing a notice requirement applied the "*equitable* continuing violation doctrine."  (*Id.* (emphasis in original).)  This case is different, they say, because they do not rely on the continuing violations doctrine to bring their claims within the limitations period but instead argue Defendants' violative conduct has not "terminated" or did not terminate before April 30, 2019.  (Dkt. 66 at 10–11.)

The Court previously rejected Plaintiff's argument.  (Dkt. 51 at 12–14.)  As Defendants accurately note, the Court held in its prior order that "Congress added the words 'or the termination' to the statute in 1988 to codify the continuing violations doctrine recognized by the Supreme Court in *Havens*."  (Dkt. 61-1 at 12 (citing Dkt. 51 at 12).)  At that time,

however, the Court had no evidence before it regarding the timing of Plaintiffs' alleged knowledge and thus was not in a position to decide finally whether the prior knowledge limitation of the continuing violations doctrine applies to the FHA's statute of limitations.   Now considering that issue, the Court concludes it does not.

The Court starts with nothing but the statutory language.  *See CSX Corp. v. United States*, 18 F.4th 672, 680 (11th Cir. 2021) ("'[Courts] do not consider legislative history when the text is clear. . . . When the words of a statute are unambiguous, . . . judicial inquiry is complete.'") (citation omitted).  The relevant portion of the statute says the limitations period does not begin to run until "termination" of the defendant's "alleged[ly] discriminatory housing practice."  42 U.S.C. § 3613(a)(1)(A).  It does *not* say the statute of limitations starts to run when the discriminatory practice terminates "unless the plaintiff was aware of the practice at an earlier time."  Nothing in the text of the statute supports the application of the prior knowledge limitation of the continuing violations doctrine.

Even assuming the statutory language was somehow ambiguous—so that the Court should look to legislative history and incorporate *Havens* in interpreting the statute—the result is the same.  In finding

continuing violations timely under the FHA, the Supreme Court in *Havens* said nothing about a prior notice limitation.  Indeed, the Supreme Court did not say it was applying the "continuing violations doctrine" such that one could infer it was also applying the prior knowledge limitation of that doctrine.  All the Supreme Court said was that "where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." *Havens*, 455 U.S. at 380–81.  In other words, the Court held that ongoing violations toll the limitations period up to the point those violations end— a concept Congress later allegedly built into the statute.  So, even if Congress did wholly incorporate *Havens* by adding the "termination" language to the FHA, there is nothing to suggest it also incorporated a more restrictive view that requires a plaintiff to act upon notice of a violation—even if that violation has not ended.  Defendants essentially ask the Court to read the statute to say a plaintiff can file a claim within two years of the occurrence or termination of an alleged discriminatory housing practice, unless the plaintiff learns of the practice—in which case

the plaintiff must file any claim within two years of that knowledge. Nothing in *Havens* or the text of the statute supports this interpretation.

In arguing otherwise, Defendants identify two Eleventh Circuit decisions holding the continuing violations doctrine does not toll the statute of limitations over FHA claims when a plaintiff knows of facts supporting a claim prior to the limitations period. (Dkt. 61-1 at 18 (citing *Telesca v. Vill. of Kings Creek Condo. Ass'n*, 390 F. App'x 877, 882 (11th Cir. 2010), and *Wood v. Briarwinds Condo. Ass'n Bd. of Directors*, 369 F. App'x 1, 4 (11th Cir. 2010)). Both cases are unpublished and not binding. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive."). Even if they were, the Court finds them inapposite. Both cases involved complaints about a static condition rather than continuous, repetitive conduct by the defendant. In *Telesca*, for example, the plaintiffs complained the defendant condo association violated the FHA by refusing to assign them handicapped parking spaces. *Telesca*, 390 F. App'x at 879. The Eleventh Circuit recognized the plaintiffs' injury occurred when the defendant first refused their request, more than 3 years before the plaintiffs filed suit.

21

*Id.* So, the court found the claim was time-barred. Similarly, in *Wood*, the plaintiff claimed his condo association violated the FHA by failing to change the "physical attributes" of a pathway and atrium on the condo property. *Wood*, 369 F. App'x at 5. The Eleventh Circuit noted the plaintiff had been "aware of all of the physical attributes" of the property for years and certainly well outside the statute of limitations. *Id.* The claims in *Telesca* and *Wood* were fundamentally different from those raised by Plaintiffs here. Again, those plaintiffs complained about fixed actions by the defendants (*i.e.*, refusing to provide a parking space or to repair (perceived) construction violations). The plaintiffs in neither case alleged the defendant engaged in ongoing, repetitive conduct other than standing by a previous decision to deny an accommodation. In contrast, Plaintiffs claim Defendants engaged in an ongoing discriminatory scheme that involved repeated performance of the same allegedly discriminatory actions over years and only terminated (if at all) after April 2019.

Admittedly, the Eleventh Circuit has limited application of the continuing violations doctrine to other federal statutory claims when a plaintiff knew or should have known of the defendant's purported

violation.  *See Hipp*, 252 F.3d at 1222 (continuing violations doctrine does not apply to toll ADEA claims when plaintiff knew of claims prior to statutory period); *Center for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006) (continuing violations doctrine does not toll statute of limitations for claims under Endangered Species Act when plaintiff knew of claim outside statutory period).  Those cases, however, are different because the statutes of limitations in them expressly began to run upon the occurrence of an unlawful practice.  *See Hipp,* 252 F.3d at 1214 n.2 (statute of limitations required plaintiff to file ADEA discriminatory treatment claim within 180 or 300 days "after the alleged unlawful practice occurred"); *Hamilton*, 453 F.3d at 1331 (statute of limitations for claims under Endangered Species Act begins to run on date Secretary fails to perform nondiscretionary act).  Neither case involved a statute of limitations—like the one here—that expressly allows a plaintiff to file within two years from whenever a defendant terminates its discriminatory practice.  That makes a difference.  The plaintiffs in *Hipp* and *Hamilton* had to rely on the continuing violations doctrine to avoid the statute of limitations.  Since they had to do so, they were also subject to the doctrine's concomitant limitation based on a

plaintiff's prior knowledge of a claim. The FHA's statute of limitations—on the other hand—commands the Court to examine whether Defendants' wrongful conduct was ongoing in nature and, if so, when that conduct terminated. Because Plaintiffs are not relying on the continuing violations doctrine to reach conduct that occurred in the past but also continued, the Court has no basis for imposing the prior knowledge limitation.

At bottom, Defendants ask the Court to read into the FHA a more restrictive statute of limitations than either the plain language of the statute or the import of *Havens* allows. The FHA identifies two—and only two—points at which the limitations period begins: the "occurrence" of a discrete violation or the "termination" of an ongoing one. There is no middle zone in which the time starts ticking when a plaintiff knows or should know about an ongoing (but not yet terminated) violation. To hold otherwise would be antithetical to the language of the statute.

The Court recognizes two orders in this district reaching the opposite conclusion. *See Cobb Cty. v. Bank of Am. Corp.* (*Cobb Cty. II*), 591 F. Supp. 3d 1312, 1319 (N.D. Ga. 2022) (refusing to apply continuing violations doctrine to nearly identical FHA claims when undisputed

evidence showed defendant county was aware of claims prior to two-year limitations period); *Dekalb Cty.*, 2015 WL 8699229, at *5 (noting for continuing violations doctrine to save plaintiffs' claims, plaintiffs "must have acted diligently in asserting their rights under the FHA"). The Court simply disagrees with their decision to read the prior knowledge limitation (from the continuing violations doctrine) into the plain text of the FHA's statute of limitations.[5]

Because the Court previously concluded Plaintiffs have plausibly alleged Defendants' discriminatory housing scheme continued past April 30, 2019 and because it now concludes Plaintiffs' prior knowledge of the misconduct is irrelevant under the plain language of the statute, the

---

[5] The Court has found only one other case applying any sort of notice requirement in the FHA context. *See Krieman v. Crystal Lake Apartments Ltd. P'ship*, 2006 WL 1519320, at *5 (N.D. Ill. May 31, 2006). *Krieman* imposed that requirement based on the general common-law principle that "[t]o establish a continuing course of conduct under any tort claim, . . . the plaintiff must show that the character of the earlier actions 'was not apparent when they were committed but became so when viewed in light of the later acts.'" *Id.* (quoting *Wallace v. Chicago Hous. Auth.*, 321 F. Supp. 2d 968, 973 (N.D. Ill. 2004)). The Court is equally unpersuaded by *Krieman* for the same reasons. Specifically, it ignores the FHA's plain language in favor of a common-law principle that Congress did not build into the statute and that the Supreme Court did not discuss in *Havens*.

Court denies Defendants' motion for partial summary judgment.

## IV.   A Word About Discovery

The Court notes the application of the statute of limitations discussed above assumes the accuracy of Plaintiffs' allegations, including particularly as to the existence of an ongoing scheme by Defendants to discriminate and take advantage of minority borrowers. Plaintiffs avoid the statute of limitations primarily because of their allegations (1) that recent foreclosures constitute part of Defendants' long-running discriminatory practice to target minorities rather than the effects of long-ago actions, and (2) that a comparison of loan rates raises an inference of discrimination (and that the inference carries forward until foreclosure). The Court also recognizes the breadth of discovery Plaintiffs could seek to impose on Defendants based upon Plaintiffs' limited factual allegations and this Court's order. The Court **SETS** a hearing for **April 18, 2023, at 10:00 a.m.**, in Courtroom 1906, Richard B. Russell Federal Building, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303, to discuss how discovery should proceed. As part of this, the Court is considering whether discovery should begin with the ten loans discussed above or some other subset of loans so as to focus initially on whether Defendants'

alleged discriminatory scheme continued beyond April 30, 2019. The parties should be prepared to discuss the appropriate scope of discovery, whether discovery should be segmented into phases, and how the Court can ensure discovery occurs most efficiently. The parties should discuss any competing views beforehand. Discovery is stayed until this hearing.

## V.   Conclusion

The Court **DENIES** Defendants' Motion to Dismiss the Amended Complaint (Dkt. 59), Defendants' Motion for Partial Summary Judgment on Statute of Limitations Issues (Dkt. 61), Defendants' Motion for Leave to File Supplemental Brief (Dkt. 70), and Plaintiffs' Response to Defendants' Supplemental Brief in Support of Their Motion to Dismiss the Amended Complaint (Dkt. 73). The Court **DENIES AS MOOT** Plaintiffs' Motion for Oral Argument (Dkt. 72). The Court **GRANTS** Plaintiffs' Motion for Leave to File Plaintiffs' Counterstatement of Material Facts and Declaration of Hannah Drosky in Support of Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment on Statute of Limitations Issues Under Seal (Dkt. 68) and Defendants' Motion for Leave to File Response to Plaintiffs' Counterstatement of Material Facts Under Seal (Dkt. 80).

**SO ORDERED** this 23rd day of March, 2023.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE